FILED

2010 Dec-01  PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| J.W., by and through his next friend, Tammy Williams; G.S., by and through her next friend, LaTonya Stearnes; P.S., by and through her next friend, LaTonya Stearnes; T.L.P., by and through her next friend, Tarra Pritchett, on behalf of themselves and all similarly situated individuals; T.A.P., by and through her next friend, Barbara Pettaway, individually; and B.J., by and through his next friend, Renee Howard, <br><br>     Plaintiffs, <br><br> v. <br><br> BIRMINGHAM BOARD OF EDUCATION; CRAIG WITHERSPOON, in his individual and official capacity as Superintendent of the Birmingham City School District; A.C. ROPER, in his individual and official capacity as Chief of the Birmingham Police Department; OFFICER J. NEVITT, in his individual and official capacity; OFFICER A. CLARK, in his individual and official capacity; ASSISTANT PRINCIPAL ANTHONY MOSS, in his individual and official capacity; OFFICER R. TARRANT, in his individual and official capacity; OFFICER M. BENSON, in her individual and official capacity, <br><br>     Defendants. | CLASS ACTION <br><br><br> CASE NO. CV- |

## COMPLAINT

1.      This is a civil rights action filed pursuant to 42 U.S.C. § 1983 to protect the

Fourth and Fourteenth Amendment rights of children in the Birmingham City Schools ("BCS").

Plaintiffs are BCS students who have been brutalized with chemical weapons and other

excessive force while attempting to obtain an education.  Defendants – the Birmingham Board of

Education, Superintendent Craig Witherspoon, and the Birmingham Police Department – have

created a police state within the City's public high schools, stationing police officers known as

School Resource Officers ("SRO") in each school, arming them with chemical weapons, and

authorizing them to use those weapons to enforce basic school discipline. Teachers,
administrators, and law enforcement operate in close concert with one another, with school
personnel frequently calling upon SROs to get involved in minor incidents of childish
misbehavior that schools would typically handle as internal matters – without resorting to law
enforcement. Instead of de-escalating these situations, SRO involvement often has the opposite
effect. Officers are quick to resort to pepper spray (a/k/a mace or Freeze +P).[1] School personnel
not only watch but sometimes even celebrate when schoolchildren are maced.

     2.     As a result of the Defendants' conduct, all of which is authorized by BPD policy,
practice, and custom, the Plaintiffs have suffered severe physical and psychological harm. The
physical effects of pepper spray are serious and can be life-threatening. Among the many
physical effects is immediate inflammation and swelling of the throat, a reflexive reaction that
restricts the size of the airway and limits the amount of oxygen entering the lungs – creating an
especially dangerous situation for children with asthma. Physical injuries are not the only
negative consequences that result from the use of pepper spray in Birmingham high schools. As
a result of the Defendants' unconstitutional policy and conduct, the plaintiffs and countless other
BCS students have been conditioned to fear and distrust school and law enforcement officials.
Plaintiffs' attachment to school has been undermined, one has dropped out, and all have been
robbed of the sense of security and safety that children should experience while attending
schools. Mace is used so frequently and so indiscriminately in Birmingham's public high
schools that each Class Representative – and all BCS students – faces a real and substantial risk
of future and repeated injury.

---

[1] Mace is the trademarked name for a line of defense products that include pepper spray. Although the original
Mace product differs in chemical composition from pepper spray, the two terms are frequently used interchangeably
to refer to chemical weapons that contain pepper spray. Following popular practice, this complaint will also use
both terms to refer to Freeze +P chemical spray.

3.     Accordingly, Plaintiffs J.W., G.S., P.S., and T.L.P. bring this action on behalf of a

class composed of all current and future students who are or will be enrolled in any high school

in the Birmingham City School system – all of whom face, and will continue to face, a real and

immediate risk of repeated injury due to Defendants' unconstitutional policies and practices.  On

behalf of the class, Plaintiffs seek declaratory and injunctive relief to vindicate their rights, to

protect members of the class, and to compel Defendants to immediately abandon the use of

chemical and other weapons against schoolchildren and revise their unconstitutional policies.  In

addition to the class claims, Plaintiffs J.W., B.J., G.S., P.S., T.L.P., T.A.P., and B.J. also bring

individual claims for damages arising from violations of their rights under the Fourth and

Fourteenth Amendments to the United States Constitution, from the Defendants' conspiracy to

deprive Plaintiffs of their civil rights under the Civil Rights Act of 1871 (42 U.S.C. § 1983), and

for the torts of assault and battery, and outrage.

## PARTIES

### *Named Plaintiffs/Class Representatives*

4.     Plaintiff J.W. is a 16-year-old boy residing in Birmingham, Alabama.  He is currently

enrolled at Woodlawn High School, a school operated by the Birmingham City Schools

("BCS").  He brings this action by and through his mother and legal guardian, Tammy Williams.

At the time of the incidents described below in paragraphs 63 through 68, he was enrolled as a

9th grader at Woodlawn High School and was subject to the Alabama compulsory school

attendance law.  Ala. Code § 16-28-3.

5.     Plaintiff G.S. is an 18-year-old girl residing in Birmingham, Alabama.  She is currently

enrolled at Huffman High School, a school operated by BCS.  At the time of the incidents

described below in paragraphs 70 through 87, she was enrolled as an 11th grader at Huffman High School.

6.     Plaintiff P.S. is a 16-year-old girl residing in Birmingham, Alabama. She is currently enrolled at Huffman High School, a school operated by BCS. She brings this action by and through her mother and legal guardian, LaTonya Stearnes. At the time of the incidents described below in paragraphs 70 through 87, she was enrolled as a 9th grader at Huffman High School and was subject to the Alabama compulsory school attendance law. Ala. Code § 16-28-3.

7.     Plaintiff T.L.P. is a 16-year-old girl residing in Birmingham, Alabama. She is currently enrolled at Woodlawn High School, a school operated by BCS. She brings this action by and through her mother and legal guardian, Tarra Pritchett. At the time of the incidents described below in paragraphs 88 through 97, she was enrolled as a 10th grader at Woodlawn High School and was subject to the Alabama compulsory school attendance law. Ala. Code § 16-28-3.

### *Individual Plaintiffs*

8.     Plaintiff T.A.P. is a 19-year-old girl residing in Birmingham, Alabama. At the time of the incidents described below in paragraphs 98 through 112, she was enrolled at George Washington Carver High School, a school operated by BCS. Plaintiff T.A.P. seeks damages only.

9.     Plaintiff B.J. is a 16-year-old boy who was enrolled as a 10th grader at P.D. Jackson-Olin High School, a school operated by BCS, at the time of the incidents described below in paragraphs 113 through 126. At all relevant times, Plaintiff B.J was subject to the Alabama compulsory school attendance law. Ala. Code § 16-28-3. He brings this action by and through his mother and legal guardian, Renee Howard. Plaintiff B.J. seeks damages only.

### *Defendants*

10.     Defendant Birmingham Board of Education ("BOE") is a nine-member, elected legal body "vested with all the powers necessary or proper for the administration and management of [the Birmingham City Schools]." Ala. Code § 16-11-9.  BOE is responsible for supervising the schools in the district by establishing and enacting guiding policies.  Birmingham Board of Education, Policy Manual 2009.  Individual BOE members are required to "be familiar with . . . [the] regulations of [BCS] . . . , to visit schools in the school district for the purpose of assessing the learning climate and accomplishment of educational goals . . . [, and] to refer complaints to the superintendent." Birmingham Board of Education, Policy Manual 2009.

11.     Defendant Craig Witherspoon is the Superintendent and Chief Executive Officer of BCS. He serves at the pleasure of the BOE.  As Superintendent, Defendant Witherspoon is responsible for "see[ing] that the laws relating to the schools and the rules and regulations of the city board of education are carried into effect." Ala. Code § 16-12-3.  In addition, Defendant Witherspoon "[s]upervises all schools and all personnel of [BCS]" and "[i]s responsible for the management of the schools under [BOE] policies." Birmingham Board of Education, Policy Manual 2009. He may delegate his responsibilities and duties as Superintendent to other school personnel, but such delegation "shall not relieve [Witherspoon] of responsibility for any action taken under such delegation." *Id.* Defendant Witherspoon is named as a defendant to this action in his individual and official capacities.

12.     Defendant A.C. Roper is the Chief of the Birmingham Police Department ("BPD"), a law enforcement agency created by the Birmingham City Council. BPD is "charged with the preservation of the peace and order of the city, the protection of all persons and property within the city, and the enforcement of all criminal ordinances and criminal laws of the city and the

state." General Code of the City of Birmingham, Public Safety and Protection, Title 9, Ch. 1:
Police Department. Under law, Defendant Roper is required to "direct, control and discipline all
officers and members of the department." *Id.* He is named as a defendant to this action in his
official and individual capacities.

13.     Defendant Officer J. Nevitt was a BPD employee assigned to the Special Victims
Division, Youth Services Unit, as an SRO during the 2009-2010 school year. He is named as a
defendant to this action in his official and individual capacities.

14.     Defendant Officer A. Clark was a BPD employee assigned to the Special Victims
Division, Youth Services Unit, as an SRO during the 2009-2010 school year. He is named as a
defendant to this action in his official and individual capacities.

15.     Defendant Officer R. Tarrant was a BPD employee assigned to the Special Victims
Division, Youth Services Unit, as an SRO during the 2009-2010 school year. He is named as a
defendant to this action in his official and individual capacities.

16.     Defendant Anthony Moss is a BCS employee working at Carver High School. He is
named as a defendant to this action in his individual and official capacities.

17.     Defendant Officer M. Benson is a BPD employee assigned to the Special Victims
Division, Youth Services Unit, as a School Resource Officer (SRO). She is named as a
defendant to this action in her official and individual capacities.

## JURISDICTION AND VENUE

18.     The federal claims in this action arise under the Fourth and Fourteenth Amendments to
the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is invoked pursuant to 28
U.S.C. § 1331 and § 1343(a).

19.     This Court has jurisdiction under 28 U.S.C. § 1367 over the Plaintiffs' state law claims,

as they are so related to the federal claims in this action that they form a part of the same case or

controversy under the Constitution and the laws of the United States.

20.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or

omissions giving rise to the claim[s] occurred" in this district.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs J.W., G.S., P.S., and T.L.P. (collectively "Class Representatives") bring this

suit on their own behalf and on behalf of a class consisting of all students who attend high school

in the Birmingham City School system.

22.     The class is so numerous that joinder of all members is impractical.  Fed. R. Civ. P.

23(a)(1).  Approximately 8,000 students are currently enrolled in Birmingham City high schools.

The class also includes future members whose names and overall number cannot be determined

at this time.  Fed. R. Civ. P. 23(a)(1).

23.     There are questions of law and fact common to all class members, including but not

limited to the Plaintiffs' facial challenge to the constitutionality of BPD's policy concerning the

use of chemical weapons.  Other common legal issues include the presence of a conspiracy

between BPD and BOE and their collective employees to violate the Plaintiffs' rights, the

reasonableness of using mace against children who pose no public safety risk, and the scope of

the BOE's duty to protect students from harm.  Common factual issues include the severe health

risks posed by the deployment of mace against schoolchildren, particularly in a closed

environment and with respect to a population with a higher than average incidence of asthma.

Fed. R. Civ. P. 23(a)(2).

24.     Because the policies, practices, and customs challenged in this action apply with equal

force to the Class Representatives and the other members of the class, the claims of the Class

Representatives are typical of the class in general.  Fed. R. Civ. P. 23(a)(3).

25.     The Class Representatives will fairly and adequately protect the interests of the class.

Each possesses a strong personal interest in the subject matter of the lawsuit and the claims

raised therein.  They are represented by experienced counsel with expertise in class action

litigation and litigation involving children.  Counsel has the legal knowledge and resources to

fairly and adequately represent the interests of all class members in this action.  Fed. R. Civ. P.

23(a)(4).

26.     The Defendants have acted and refused to act on grounds generally applicable to the class

in that the Defendants' policies and practices of violating students' constitutional rights affect all

class members.  Accordingly, final injunctive and declaratory relief is appropriate to the class as

a whole.  Fed. R. Civ. P 23(b)(2).

## STATEMENT OF FACTS

27.     The Birmingham City School ("BCS") system includes seven high schools, which

collectively serve approximately 8,000 students.

28.     Under the Alabama compulsory school attendance law, Ala. Code § 16-28-3, children

between the ages of seven and seventeen are required to attend school.

29.     Defendants BOE and Witherspoon enforce the Alabama compulsory school attendance

law through BCS attendance officers.  BCS attendance officers identify students accused of

truancy and refer them to be prosecuted in the Jefferson County Family Court.  Defendant Roper

authorizes officers of the Birmingham Police Department ("BPD") to locate and pick up students

accused of truancy, and return them to their respective schools.

30.     BPD is a municipal law enforcement agency "charged with the preservation of the peace and order of [Birmingham], the protection of all persons and property of the city, and the enforcement of all criminal ordinances and all criminal laws of the city and state." General Code of the City of Birmingham, Title 9: Public Safety and Protection, Ch. 1: Police Department.

31.     BPD stationed officers in the BCS schools at the request or with the consent and approval of the Birmingham Board of Education and the Superintendent. These officers are known as School Resource Officers ("SROs"). The SRO Program is part of BPD's Special Victims Division, Youth Services Unit.

32.     The original goal and purpose of the SRO Program was to protect the safety of students attending BCS. But in practice, SROs frequently become involved – both on their own initiative and at the request of school personnel – in minor incidents in which safety is not an issue. In some instances, it is the SROs themselves who threaten the safety they are charged to protect.

33.     Each BCS high school is assigned at least two SROs who patrol school property during school hours. SROs patrol school grounds with the permission of Defendants BOE and Witherspoon.

34.     A long-standing agreement exists among BPD, BOE, the Superintendent, BCS personnel, and individual SROs that SROs are expected not only to make arrests when they witness students engaged in illegal behavior, but also to respond when school personnel seek their assistance enforcing the BCS Code of Conduct. All Defendants to this action are aware of this agreement. All Defendants are further aware that SROs often use abusive and unnecessary force against schoolchildren in the course of their duties.

35.     BCS teachers and other school personnel frequently request that SROs handle misbehavior traditionally managed by the school, such as children who utter expletives or refuse

to comply with directives.  In effect, BCS personnel often turn their disciplinary authority over to

BPD by requesting that SROs handle in school discipline.  By the same token, SROs have

abandoned their primary mission – to protect student safety – in order to become tools of school

personnel who have abdicated their disciplinary responsibilities.  This phenomenon was

acknowledged publicly by Interim BCS Superintendent Barbara Allen, who noted:

> "We put SROs (school resource officers) in there to manage the school and
> serious crimes. They are there if someone commits a felony or major crime," said
> interim Birmingham school Superintendent Barbara Allen. "But sometimes we
> have principals who call them to break up a fight. They are busy, and I think it's
> just easier for them to place the responsibility elsewhere, and that isn't right."
>
> ***
>
> "Other school systems aren't arresting kids for small things; they handle it from
> within," Allen said. "We call the police."
>
> She said SROs too often are called upon to handle small fights, disruptive
> behavior and dress-code violations, such as sagging pants.

Marie Leech & Carol Ronbinson, "Birmingham city schools rely on arrests to keep

order," Birmingham News, March 22, 2009.

36.     Most BCS school arrests are for petty misdemeanors like disorderly conduct or

harassment, which are broadly defined offenses that can be used to criminalize a wide range of

ordinary teenage behavior.  During the 2009-10 school year, 86% of arrests in BCS schools were

for minor violations and misdemeanors, while less than 2% involved felonies against persons.

37.     As a result of the presence of SROs in BCS schools, Birmingham students are

significantly more likely to be arrested than students in neighboring districts who engage in the

same conduct.  Although BCS educates only 25% of public school children in Jefferson County,

BCS was responsible for more than 65% of all school-based complaints filed against students in

the Jefferson County Family Court in the 2009-10 school year.

*Policy on Use of Force and Chemical Restraints*

38.     BPD's Use of Force policy, Procedure No. 113-3, was last updated on February 18, 2008.

Under that policy, officers may carry and use Freeze +P chemical spray – a pepper spray product

– during the course of their duties.

39.     BPD's policy on Chemical Spray Subject Restraint:  Non-Deadly Use of Force,

Procedure No. 113-5, was last updated on February 10, 2006.

40.     BPD's policy on Chemical Spray Subject Restraint provides, in pertinent part:

      C.    The chemical spray may be used in an arrest situation where the weapon's use offers the possibility of lessening the likelihood of physical injury to the arresting officer, citizens on the scene and/or the suspect.

      D.    The use of chemical spray is intended solely as a control device to enable the officer to carry out his or her duties in the safest, most efficient and most professional manner with the least chance of injury to either the officer or suspect.

          1.    At no time will an officer unnecessarily brandish, or use chemical spray as an intimidation device unless the officer is attempting to prevent further escalation of force.

          2.    Chemical spray is not[,] under any circumstances, to be used as punishment or as a coercive tool once an individual is under control and in custody.

          3.    The chemical spray is not to be used by officers unless they have a reasonable belief that a crime has been committed and that the intended target committed the crime.

      E.    Any time chemical spray is used for controlling an offender[,] the application of the chemical spray will end when the subject discontinues resistance or aggression.

      F.    The chemical spray is best employed in one to two second bursts.  The spray must be directed to the facial area of the assailant, with the bridge of the nose being the best target area.   This weapon is primarily an inflammatory agent, producing the following results:

          1.    Involuntary closing of the eyes.

    2.     Swelling of the mucous membranes, which results in shallow breathing ability.

    3.     Intense burning on sensitive parts of the body.

********

H.     It should be kept in mind by all concerned that any actual contact with chemical spray to the face or sensitive skin areas will result in the officer being adversely affected by its properties. Caution must be taken while handcuffing prisoners, placing them in automobiles, etc. If contact is made with the actual substance, the officer shall refrain from touching his face with the contacted area until he can wash that area with warm soapy water.

********

III.    <u>AFTER USE PROCEDURE</u>

A.     Following the use of chemical spray the officer will ensure that the subject receives adequate decontamination as soon as practical. The officer should supply immediate medical attention if requested by the subject.

B.     Birmingham Fire and Rescue will be called and will determine whether or not the subject needs further medical attention or hospital treatment.

D.     Any time an officer uses chemical spray for subject control, the officer will notify the on-duty supervisor and complete a **Use of Force Information and Statement Report**.

41.    The BPD's Use of Force policy defines control as "[t]he force an officer uses to influence or neutralize the unlawful, physical actions of a subject under arrest."

42.    The BPD "Use of Force" and "Chemical Spray Subject Restraint: Non-Deadly Use of Force" policies do not provide BPD personnel with adequate guidance for the appropriate use of Freeze +P on adolescents and in school environments. Neither policy addresses any of the following issues:

a.    The appropriate distance to stand from a subject when administering the spray;

b.    Appropriate use of Freeze +P, and other chemical weapons, on adolescents;

12

    c.   Use of chemical-based weapons in closed environments, such as schools or school vehicles;

    d.   Appropriate use of Freeze +P when in close proximity to third parties who are not suspected of committing any crime;

    e.   Procedures for effective decontamination and treatment;

    f.   Guidelines and cautions for use of chemical spray on individuals that are at a higher risk of injury from exposure to pepper spray, such as asthmatics;

    g.   Use of pepper spray as a means to disperse a group of observers; and

    h.   Protocol for deploying chemical weapons, including a mandated warning prior to using the chemical.

43.    All Defendants are aware that SROs routinely use Freeze +P against students in the course of school discipline and arrests, even when the targeted child poses no risk of injury to other children, to the officer, to school personnel, or to herself.  School leadership at every BCS high school – including but not limited to Jackson-Olin, Woodlawn, Huffman, and Carver High Schools – have witnessed SROs use Freeze +P on students.  Under BPD policy, any officer who uses a chemical weapon must notify the on-duty supervisor and complete a Use of Force Information and Statement Report.  Any use of force must also be noted in the officer's report of the incident.  The use of chemical weapons against students in the Birmingham schools has also been the subject of multiple media accounts, including a March 2009 article in the Birmingham News and an August 2008 report by Alabama NBC Channel 13.

44.    Many SROs use Freeze +P against BCS students as a first resort, and without issuing a warning to students.

45.    Many SROs use Freeze +P against BCS students who pose no risk of injury to other students, to school staff, to SROs, or to themselves.

46.    Many SROs use Freeze +P against BCS students when they are restrained.

47.    Many SROs use Freeze +P against BCS students as a form of punishment.

48.     Without regard to others in close proximity to the intended target, SROs often deploy

Freeze +P in closed school spaces without appropriate avenues of ventilation.  As a result,

students who are not accused of any wrongdoing are often injured by the pepper spray.

49.     SROs use Freeze +P as a way to intimidate and control peaceable groups of students

when the groups do not immediately disperse upon order.  In some cases, SROs begin spraying

students immediately without giving them time to disperse.

50.     The abusive practices described in paragraphs 44 through 49 are reflected in the officers'

Use of Force Information and Statement Reports, which are subject to regular review by high-

level BPD officials to ensure conformity to departmental policy, practice, and custom.  BPD

policy also requires that each use of force be reported to the on-duty supervisor.

51.     The use of chemical weapons against students in the Birmingham schools has also been

the subject of multiple media accounts, including an August 2008 report by Alabama NBC

Channel 13 and a front-page article in the Birmingham News on March 22, 2009.  The 2009

article in the Birmingham News was entitled "City Schools Rely on Arrests to Keep Order" and

highlighted several incidents involving the use of mace on BCS high school students by SROs.

Specifically, the article reported that a 16-year-old BCS high school student was sprayed with

mace and handcuffed for yelling a curse word, and that a 17-year-old BCS high school student

was sprayed with mace and arrested for being "loud and boisterous."  Chief Roper was quoted

extensively in the article, and there is no question that he read it.

52.     In his capacity as Chief of Police, Defendant Roper has a legal duty to "direct, control

and discipline all officers and members of the department."  General Code of the City of

Birmingham, Public Safety and Protection, Title 9, Ch. 1:  Police Department.  In order to fulfill

this duty, Chief Roper must: maintain familiarity with the activities, practices, and customs of

officers in all BPD units; ensure their compliance with BPD policy and with state and federal

law; and take disciplinary and other remedial action when officers run afoul of these mandates.

**Properties and Dangers of the Chemical Weapons used against BCS Students**

53.     Freeze +P consists of two chemical agents, Orthochlorobenzalmalonitrile (CS) and

Oleoresin Capsicum (OC).  The product manufacturer claims that "[t]he strong respiratory

effects of OC combined with the severe pain induced by CS magnify each other."  *See*

http://www.aerko.com/Freeze+P.htm.  Freeze +P is marketed as "the most intense, incapacitating

agent available today."  *Id.*

54.     Exposure to pepper spray products like Freeze +P can temporarily eliminate the

protective reflexes in the eyes and throat by poisoning the nerve endings that stimulate these

reflexes.  The absence of the gag and blink reflex make the eyes and lungs susceptible to injury.

The chemical ingredients in Freeze +P are known to cause severe and painful effects, including:

(a) temporary and permanent damage to the cornea, (b) conjunctiva of the eye, (c) temporary loss

of vision,  (d) persistent and debilitating pain and swelling around the eyes, (e) blisters under the

eye, (f) chemical injury to the eye, (g) blurred vision and redness in the eye, (h) blistering of the

eyelids, (i) blistering and scarring of the eyeball, and (j) corneal abrasion of the eye.

55.     Exposure to pepper spray product such as Freeze +P also has severe respiratory effects.

Among the many physical reactions to Freeze +P is an immediate inflammation and swelling in

the throat, a reflexive reaction that restricts the size of the airway and limits the amount of

oxygen entering the lungs.  Pepper spray also causes the affected individual to cough violently,

gasp for air, and experience a gagging sensation.  Pepper spray exposure also presents the risk of

apnea, cyanosis, and respiratory arrest.  Inhaling pepper spray may cause acute hypertension,

which may increase the risk of stroke or heart attack.

56.     Asthmatics exposed to pepper spray are at higher risk for severe and possibly life-threatening asthma attacks.  Asthmatics may be hypersensitive to pepper spray because the chemical combination can induce bronchoconstriction – a constriction of the airways causing coughing, wheezing, and shortness of breath.

57.     Asthma is fairly common among children, affecting about nine percent of all children in the general population.

58.     The United States Department of Health and Human Services ("HHS") has reported an especially high prevalence of asthma among African Americans, particularly among African-American children.  According to the Office of Minority Health at HHS:

a.  In 2006, African Americans were three times more likely to die from asthma-related causes than whites.  From 2003 to 2005, the death rate for African-American children was seven times the rate of white children.

b.  Generally, African-American children require more treatment for asthma-related incidents when compared to white children:  260% more for emergency room visits and 250% more for hospitalization.

c.  African-American children also have a 500% higher death rate due to asthma-related complications compared to white children.

59.     African American children comprise approximately 96% of the Birmingham City School System.

60.     The standard of care for individuals affected by pepper spray is to immediately ensure access to a flowing air source (removing them from the chemical-filled environment), and to immediately flush the affected areas of the skin with water, especially the eyes if affected by the chemical.  In addition, the injured person's clothing should be immediately removed to prevent continued exposure and contamination.  Individuals wearing contact lenses should immediately remove them.

61.     The Freeze +P Material Safety Data Sheet is the official document that sets forth the

usage guidelines for the product.  The Emergency and First Aid Procedure contained in this

document sets forth appropriate decontamination and first aid procedures for individuals exposed

to Freeze +P.  Individuals exposed to Freeze +P should "flush [their] eyes with large quantities

of water to speed recovery" and face "wind or forced air source such as fans or air conditioning

outlet."  Aerko International, Freeze +P, Material Safety Data Sheet, Prepared June 17, 1991.

Individuals sprayed with Freeze +P should "remove contaminated clothing" and "wash affected

area[s] with soap and water to avoid transfer to more sensitive areas."  The Material Safety Data

Sheet further provides that "persons with preexisting skin disorders may be more susceptible to

the affects of [Freeze +P]."

62.     BPD policy on the use of chemical weapons provides some limited guidance on

decontamination procedures:

    A.     Following the use of chemical spray the officer will ensure that the subject
           receives adequate decontamination as soon as practical.   The officer
           should supply immediate medical attention if requested by the subject.

    B.     Birmingham Fire and Rescue will be called and will determine whether or
           not the subject needs further medical attention or hospital treatment.

BPD Rules and Regulations, Chemical Spray Subject Restraint:  Non-Deadly Use of Force, No.

113-5, February 10, 2006.

### *Use of Chemical Weapons against Plaintiffs*

### *Plaintiff J.W.*

63.     In April 2010, J.W. left his third-block class at Woodlawn High School and was walking

down the hallway when he saw a physical altercation begin.  A group of students began to gather

near the scene.  J.W. was towards the back of the group.  He was approximately ten feet away

from the altercation.

64.     Defendant Nevitt and an unknown SRO responded to the incident.  The unknown SRO approached the students involved in the altercation and sprayed them in the faces with Freeze +P.

65.     Defendant Nevitt walked up to the group of observers and yelled at them to disperse. Without further warning, and without giving the students any opportunity to move away, Defendant Nevitt immediately started spraying the observers with Freeze +P.  Defendant Nevitt sprayed them for approximately ten seconds, waving the canister back and forth across the group at eye level.

66.     While Defendant Nevitt sprayed the group, the students began screaming and coughing as they ran in different directions to get away from the chemical spray that was filling the hallway.

67.     Although J.W. was about ten feet away when Defendant Nevitt started blasting Freeze +P, some of the chemical spray landed on J.W.'s face.  Upon contact, J.W.'s eyes and nose started stinging and burning immediately.  The burning feeling spread throughout his entire face. J.W. also started coughing uncontrollably as some of the chemical entered his throat.

68.     Although Defendant Nevitt had directly sprayed the group of observers standing in the hallway, he did not ask if they were alright or take any other actions to determine whether any of the children were injured or required help.  Neither J.W. nor any of the students in the group received medical attention for their injuries.  Neither Defendant Nevitt nor any school official took any steps to commence decontamination procedures for J.W. or the other students affected by the Freeze +P.

69.     As a direct and proximate result of Defendant Nevitt's actions, which were authorized by Defendants BOE, Witherspoon, and Roper, Plaintiff J.W. suffered emotional, psychological, and physical injury.  Plaintiff J.W. is afraid that he will be maced again in the future, and that he will

again be powerless to protect himself from the Defendants' unconstitutional policies, practices, and customs.

### *Plaintiff G.S. & Plaintiff P.S.*

70.     At all relevant times, Plaintiff G.S. was five feet, five inches tall.

71.     At all relevant times, Plaintiff P.S. was five feet, four inches tall.

72.     G.S. and P.S. are sisters.  At all relevant times, both girls attended Huffman High School.

73.     Defendant Clark is a male School Resource Officer.  He is approximately five feet, ten inches tall, has a stocky build, and weighs approximately 220 pounds.

74.     On December 8, 2009, G.S. was jogging across the lawn outside Huffman High School when Defendant Clark grabbed her from behind by the waist.  He did not identify himself as a law enforcement officer or say anything before grabbing her.  Unaware of Defendant Clark's identity and alarmed at being attacked by an unknown assailant, G.S. struggled to free herself. When she broke from his grasp, she turned around and pushed him in the chest to distance herself from him.  G.S. did not realize who Defendant Clark was until after she had pushed him.

75.     Without saying a word, Defendant Clark immediately pulled out his Freeze +P, raised it to G.S.'s face, and sprayed her directly in the face and eyes.  The pepper spray entered her eyes, nose, and mouth, causing her to ingest the product.

76.     G.S.'s face and eyes began to burn and she felt like she could not breathe.  She began to cry uncontrollably from the pain.

77.     G.S.'s sister, Plaintiff P.S., had been approaching G.S. when Defendant Clark sprayed G.S. for the first time.  When P.S. was about five feet away from G.S., an unknown SRO grabbed P.S. from behind to stop her from reaching G.S.  As the SRO grabbed P.S. and held her,

Defendant Clark sprayed a second blast of Freeze +P directly into G.S.'s face without warning, causing G.S. to crumble to the ground.

78.     Defendant Clark did not consider whether other students were close enough to be affected by the chemical before he administered the second blast.  As a result of Defendant Clark's recklessness, the second blast of Freeze +P also hit Plaintiff P.S. in the face.  P.S. immediately felt a burning sensation in her eyes and face, and had trouble breathing.

79.     Defendant Clark left G.S. and P.S. in the school yard.  He did not assess their physical well-being or attempt to determine their need for medical attention.

80.     G.S. eventually made her way to the school's main office.  Once in the office, an unknown school official contacted 911 at G.S.'s request.  Emergency Medical Service (EMS) personnel arrived at the school and questioned G.S. for 45 minutes, but did not provide her with any medical treatment.  G.S. had a hard time focusing on the questions EMS personnel asked because she was crying hysterically and asking repeatedly for her mother.

81.     LaTonya Stearnes is the mother of G.S. and P.S.  Ms. Stearnes arrived at the school shortly after G.S. went to the office.  P.S. informed her mother that Defendant Clark had used pepper spray on both girls.

82.     As Ms. Stearnes began to enter the school, she encountered Defendant Clark and asked to see G.S.  Defendant Clark would not permit Ms. Stearnes to enter the school and refused to allow her to see G.S.  Defendant Clark refused to give Ms. Stearnes any information about G.S.'s physical state and threatened to arrest her if she continued to ask about her daughter's well-being.

83.     Eventually, a Huffman faculty member escorted Ms. Stearnes into the school's office, where she sat for 45 minutes before finally being allowed to see G.S.  While she was forced to wait, Ms. Stearnes heard G.S. screaming "I can't breathe!" from the next room.

84.     Neither school personnel nor Defendant Clark advised or allowed G.S. or P.S. to rinse their eyes, wash their faces, or change out of their contaminated clothing.

85.     Nearly an hour after the incident on the school lawn, Defendant Clark took G.S. to Cooper Green Hospital, but it was too late to provide any effective treatment or pain relief. Hospital personnel informed G.S. that they could not provide her with any medical treatment and requested that she sign a form.  Upon information and belief, the form was a medical release waiver.

86.     G.S. was then taken to the Jefferson County Family Court.  She was released to her mother's custody later that day.  No formal charges were filed against her.  At her release, she still wore the same contaminated clothing from earlier in the day because no one had provided her with a change of clothes.

87.     As a direct and proximate result of Defendant Clark's actions, G.S. suffered emotional, psychological, and physical injury.  Due to the pepper spray, the skin on G.S.'s face is still discolored.  She also experienced painful burning in her face and eyes for over 24 hours, had difficulty breathing for an hour, and suffered throat irritation.  G.S.'s hair and skin also smelled like pepper spray for more than 24 hours, causing her further discomfort and pain.  G.S. did not want to return to school for several days following the assault for fear that she would be pepper-sprayed again.  Both G.S. and P.S. are reasonably afraid that an SRO will spray them again.

*Plaintiff T.L.P.*

88.     At all relevant times, T.L.P. was five feet, two inches tall, 120 pounds, and petite in stature.

89.     Defendant Nevitt is an approximately six-foot-tall male, weighs approximately 200 pounds, and has a muscular build.

90.     BCS employee Johnson is an adult male standing approximately five feet, ten inches tall, and weighs about 200 pounds with a muscular build.

91.     BCS employee Howard is an adult male standing approximately six feet tall and weighing more than 200 pounds with a muscular build.

92.     On or around November 29, 2009, a female student initiated a verbal altercation with T.L.P. The situation eventually escalated into a physical altercation. Upon seeing the two girls, BCS employees Johnson and Howard intervened and separated them. Johnson picked T.L.P. up from behind, holding her arms securely against her body, and hoisted her in the air. Johnson held T.L.P. in such a way that posed no threat to herself or others.

93.     After the girls had been separated and T.L.P. had been restrained, Defendant Nevitt arrived at the scene. Without any warning or provocation, Defendant Nevitt directed a blast of Freeze +P in T.L.P.'s direction, even though she was still being restrained by Johnson. The pepper spray entered T.L.P.'s mouth, and she began to cough severely.

94.     While attempting to spray T.L.P., Defendant Nevitt also sprayed Johnson in the face with pepper spray. Johnson released T.L.P. while excitedly yelling, "It got me in the eyes!"

95.     Although T.L.P. was injured by the pepper spray, as evidenced by her violent coughing fit, Defendant Nevitt did not commence any decontamination procedure to rinse T.L.P.'s eyes or face or rid her of her contaminated clothing. Instead, he arrested her and took her to the

22

Jefferson County Family Court, where she was placed in a holding cell at the G. Ross Bell Youth Detention Center (YDC) to wait for her mother. Because no one provided her with a change of clothes, T.L.P. continued to wear the contaminated clothing while she waited at YDC. The allegations in the police report were never pursued as formal charges.

96.     As a direct and proximate result of Defendant Nevitt's actions, T.L.P. suffered emotional, psychological, and physical injuries. From breathing in the pepper spray, T.L.P. was wracked by violent coughing fits.

97.     T.L.P. is reasonably afraid that she will be subjected to Defendants' illegal policy and practice in the future. She is particularly concerned because the incident described above is not the first time that T.L.P. has been blasted with pepper spray at school while restrained. T.L.P. was previously sprayed with Freeze +P on or around November 17, 2008. During that incident, she was grabbed by a faculty member from behind and completely restrained when an unknown SRO sprayed her in the face and eyes with Freeze +P. Following that assault, T.L.P. suffered from burning sensations on her face, peeling skin, difficulties breathing, swollen and burning eyes, and prolonged head pains.

## INDIVIDUAL PLAINTIFFS

### *Plaintiff T.A.P.*

98.     At all relevant times, T.A.P. was 5 feet, 4 inches tall and weighed approximately 145 pounds. T.A.P. attended Carver High School from 2007 to 2009.

99.     Defendant Tarrant is a male SRO. He has a muscular build, stands approximately five feet, six inches in height, and weighs approximately 200 pounds.

100.    Defendant Moss is an assistant principal at Carver High School. He has a stocky build, stands approximately six feet, two inches in height, and weighs approximately 280 pounds.

Pursuant to BCS policy, Defendant BOE "does not allow the use of corporal punishment as an appropriate means of discipline." As superintendent, Defendant Witherspoon has a duty to enforce this policy and ensure that BCS personnel refrain from engaging in corporal punishment as a means of discipline.

101.    On or around August 31, 2009, T.A.P. entered a classroom to begin her third-block class. As T.A.P. walked in, a substitute teacher approached her, accused her of smoking cigarettes, and sent her to the school's main office to see Assistant Principal Moss.

102.    Outside of the main office, Assistant Principal Moss accused T.A.P. of smelling like cigarette smoke. T.A.P. explained that she had smoked a cigarette before school started and off of school grounds. Moss disregarded T.A.P.'s explanation and ordered her to call her mother to arrange to leave school. In an attempt to comply, T.A.P. took out her cell phone and began to dial her mother. Even though he had told T.A.P. to call her mother, Moss attempted to take the cell phone away from her. When T.A.P. refused to give him the cell phone, he became visibly angry and told her that she could leave.

103.    Assuming that he meant she could go home, T.A.P. followed Moss down the school hallway and outside of the school. As they reached the door, Moss opened the door and motioned for T.A.P. to exit ahead of him. As T.A.P. walked out of the door, Moss grabbed her from behind and tripped her. T.A.P. fell onto the concrete, stomach-first. Moss then dug his foot into her back as she lay on the ground.

104.    T.A.P. heard a student call out "Damn, you didn't have to do it like that." After hearing the student, Moss removed his foot from T.A.P.'s back.

105.    When T.A.P. stood up, she noticed Officer Tarrant standing close by. T.A.P. bent to pick up her backpack from the ground and slung it over her shoulder. As she slung the backpack, the

backpack accidentally bumped Tarrant in the chest.  T.A.P. then saw Tarrant reach for his belt.

Because she did not know what he was reaching for, T.A.P. panicked and ran.

106.     Tarrant caught T.A.P. after she ran approximately seven feet.  He grabbed her from

behind and threw her down into some bushes on the lawn.

107.     When T.A.P. looked up she saw Moss and Tarrant standing above her.  Moss grabbed her

right arm, while Tarrant grabbed her left arm.  Several seconds later, three other men – all

unknown to T.A.P. – approached and held her legs down.  T.A.P. was frightened being restrained

by five men, and began to squirm under their grasp.  However, she did not break free from their

hold nor did she utter any threats to any of the men.

108.     As T.A.P. was pinned to the ground, restrained by five grown men, Tarrant said: "You

wanna act hard?  Let's see how you act when you get this."  Tarrant then removed his canister of

Freeze +P from his belt and sprayed a blast into T.A.P.'s face and eyes without warning.  T.A.P.

felt intense pain on her face and in her eyes, had difficulty breathing, and was blinded.  Tarrant

then flipped T.A.P. onto her stomach, handcuffed her, and took her to one of the school's

administrative offices.

109.     T.A.P. sat handcuffed in the office for more than 40 minutes without any medical

assistance.  T.A.P. was crying profusely, and Tarrant told her: "Stop slobbering on my table."

When she asked Officer Tarrant for a wet paper towel to wipe her eyes, he yelled, "You don't

need a mother-fucking thing!"  Tarrant did not provide T.A.P. with a change of clothing or take

any other decontamination measures even though T.A.P. was obviously in severe pain.

110.     Tarrant eventually escorted T.A.P. to Cooper Green Hospital, but it was too late to

provide any effective treatment or pain relief, and T.A.P. was asked to sign a medical release

waiver.  Tarrant then escorted T.A.P. to the Jefferson County Family Court.  T.A.P. continued to

wear the contaminated clothing until she was released to her mother, Barbara Pettaway, at 5:00

p.m. that evening.

111.    Barbara Pettaway contacted Defendant BOE the next day to complain about Tarrant's

reckless and dangerous use of Freeze +P against T.A.P.  A BOE representative told Ms.

Pettaway that they could not take any action against the school or Tarrant because Ms. Pettaway

had washed the shirt that T.A.P. wore on the day of the incident.

112.    As a direct and proximate result of the actions of Defendants Tarrant and Moss, T.A.P.

suffered emotional, psychological, and physical injuries.  T.A.P. experienced swelling in the face

and eyes for 24 hours, blindness for more than five hours, severe burning of the eyes and face,

and difficulty breathing.  The skin around her eyes was damaged and peeling for a week after she

was sprayed.  The actions of Defendants Tarrant and Moss were major factors in T.A.P.'s

decision not to return to school.  T.A.P. continues to experience a deep distrust of the school and

law enforcement staff at Carver High School.

### Plaintiff B.J.

113.    At all relevant times, B.J. was five feet, six inches tall and weighed 140 pounds, with a

lean build.

114.    On or around September 27, 2010, a substitute teacher, known to B.J. as Mr. Cook,

ordered B.J. to leave his fourth-block classroom at Jackson-Olin High School to tuck his shirt

into his pants.  B.J. complied with the order.  As B.J. re-entered the classroom, another student

mumbled "Fuck you, Mr. Cook" in the direction of the substitute teacher.  Mistaking B.J. for the

speaker, the teacher contacted Assistant Principal Gaston, a BCS employee at Jackson-Olin High

School.

115.   Gaston ordered B.J. out of the classroom.  Although the substitute teacher's only complaints were that B.J.'s shirt had been untucked and that he might have used profanity, Gaston immediately began to pat him down and go through his pockets.  As the illegal search continued, B.J. repeatedly proclaimed his innocence and struggled to free himself from Gaston's hold.  At one point, B.J. tripped and fell to the ground, landing on his stomach.  While B.J. lay on the ground, Gaston continued to search his back pockets.  After a few minutes, Gaston called Assistant Principal Gates to the scene.  Gates is a six-foot-tall male with an average build.

116.   When Gates arrived, the two assistant principals restrained B.J. against a set of lockers with his arms spread, with Gates and Gaston each holding an arm.

117.   At some point, Gates called Defendant Officer Benson to the scene.  Upon arrival, Officer Benson did not take any action or even speak – she just stood there and watched Gates and Gaston restrain B.J.  Officer Benson then blasted Freeze +P directly into B.J.'s face and eyes, holding the cannister within inches from B.J.'s face.

118.   The blast entered B.J.'s eyes, nose, and mouth, causing him to ingest the pepper spray. He immediately experienced a severe burning sensation across his face and in his eyes, and felt as if he could not breathe.  B.J. was also immediately blinded.

119.   B.J. began to fall to the ground holding his face and gasping for air.  The pain was so intense that he began to cry.  As he sank to the ground, Officer Benson used her foot to forcibly shove him fully onto the ground, where she held him in place with her knee planted in his back. Officer Benson threatened to administer a second blast of pepper spray into B.J.'s face if he attempted to stand.

120.   Officer Benson handcuffed B.J. and took him to the school's main office.  As B.J. sat in the office, Gates said: "Woo! That's the first macing of the year!"

27

121.    Officer Benson did not immediately seek medical attention for B.J., nor did she contact Birmingham Fire and Rescue.  B.J. sat handcuffed in the school office for more than 20 minutes before Officer Benson escorted him to the hospital.  Officer Benson did not permit B.J. to wash out his eyes, nor did she take any steps to get him a change of clothes or advise him to get out of his contaminated clothing.

122.    When Officer Benson eventually transported B.J. to Cooper Green Hospital in Birmingham, it was too late to provide any effective treatment or pain relief.  Hospital staff informed B.J. that they could not provide him with any medical treatment and directed him to sign a form.  B.J. signed the form even though he still could not see due to the pepper spray.  No one explained the contents of the form to B.J.  Upon information and belief, the form was a medical release waiver.

123.    Officer Benson then transported B.J. to the G. Ross Bell Youth Detention Facility, where he was placed in a holding cell at 5:00 pm to wait for his grandmother to pick him up.  No formal charges were filed against B.J. as a result of this incident.

124.    While in the holding cell, B.J. continued to experience negative effects from being sprayed directly in the face with pepper spray.  His face felt like it was burning, and it began to swell.  B.J.'s eyes were also swollen, and he could not see for several hours.  B.J. experienced severe stomach pains and violent nausea.  He vomited twice while in the holding cell, and could taste the pepper spray in his vomit.  Because he was never offered a change of clothes at any time, B.J. continued to wear the same contaminated clothing while in the cell.

125.    B.J.'s grandmother was not informed that B.J. had been injured by pepper spray, arrested, transported to Cooper Green Hospital, and taken to a detention facility until later that evening. B.J. was released to her custody at 7:00 p.m.

126.    As a direct and proximate result of Officer Benson's actions, B.J. suffered emotional, psychological, and physical injury.  B.J. endured nausea, violent vomiting, blindness for more than five hours, numbness and burning in his face for more than 24 hours, severe head pains for more than a day, swelling of the face for more than two days, an aggravation of allergies, and pain in the back from SRO Benson's assault with her knee.

### Allegations relating to Municipal Liability for Unconstitutional Policy and Practice, Failure to Train, and Failure to Supervise

127.    In each of the incidents described above, the Defendant Officer's conduct was consistent either with BPD policy or with BPD custom and practice.  In his capacity as Chief of Police, Defendant Roper is aware of BPD policy, custom, and practice concerning the use of Freeze +P on BCS students.

128.    On several occasions, Defendant Roper has publicly expressed concern with the criminalization of teenage behavior in the Birmingham City School system.  For example, Defendant Roper gave the following comments to the Birmingham News in March 2009:

> Roper acknowledges that most of the arrests are for minor violations that should not have involved police.

> "They have over-relied on our officers, and our officers have responded," Roper said.  "I think the school system should handle minor violations and the SROs should be present and respond when it rises to a criminal level."

> "Too many of these kids have been criminalized, and that's not the goal," he said.  "The current system is dysfunctional, and that's putting it mildly."

Marie Leech & Carol Robinson, "Birmingham city schools rely on arrests to keep order," Birmingham News, March 22, 2009.  Despite these comments, and despite his awareness that SROs routinely use Freeze +P against schoolchildren who pose no threat to officers, to BCS staff, to other children, or to themselves, Defendant Roper has failed to take action to prohibit – or even limit – the use of Freeze +P on schoolchildren.

129.    Defendant Roper has not made any effort to amend BPD policy to provide specific

guidance to officers in the use of force on children.

130.    Defendant Roper has not made any effort to provide specialized training to officers to

educate them about the specific risks of using Freeze +P (and other pepper spray products) on

children, in closed environments, and/or within populations with a higher than average incidence

of asthma.

131.    Instead, Defendant Roper has continued to condone and approve the abusive and brutal

practices and/or customs that SROs employ when using pepper spray against BCS students in the

course of administering school discipline and conducting school arrests, even where custom and

practice is inconsistent with written policy.  Specifically, Defendant Roper authorizes the use of

pepper spray on students who are completely restrained, who pose no threat to themselves or

others, and who are merely in the wrong place at the wrong time.

### *Allegations Relating to Defendant Board of Education's and Defendant Witherspoon's Liability for Failure to Protect and Conspiracy to Violate Plaintiffs' Civil Rights*

132.    Based on numerous complaints from parents, reports from BCS staff, media coverage,

direct observation, and a variety of other sources, Defendant BOE and Defendant Witherspoon

are well aware of the policies, practices, and customs described above.

133.    On July 27, 2010, the Southern Poverty Law Center ("SPLC") submitted a Request for

Access to Information to the Family Court of Jefferson County, Alabama.  The Request sought

copies of all police reports submitted to the Jefferson County Family Court that reflected the use

of chemical spray against BCS students.  The Request included a significant amount of medical

evidence, documenting the dangers of chemical spray.

134.    Upon information and belief, an electronic copy of SPLC's Request, including the

supporting documentation, was provided to Defendants BOE, Witherspoon, Roper, and the

Birmingham City Attorney's Office within a week.

135.    On or about September 16, 2010, BOE and Superintendent Witherspoon were served

with a copy of an Order by the Honorable Scott Vowell, Presiding Judge of the Jefferson County

Circuit Court.  That Order provided, in pertinent part:

> 1.    A copy of this Order shall be served by the Clerk of the Family Court [by]
> mailing a copy to the Birmingham Board of Education and the Birmingham
> Superintendent of Education.  Any objection to this Order must be filed with this
> Court (at the Chambers of the undersigned) within fourteen (14) days from the
> date of this Order or any such objection will be waived.
>
> 2.    If no objection is received within 14 days from the date of this Order, the
> Family Court of Jefferson County will produce for inspection and copying all
> police reports that:
>
>> a.    were submitted to the Family Court in connection with complaints
>> filed against students in the Birmingham City School System
>> arising from incidents or behavior that occurred in or at school
>> during the 2008-2009 and 2009-2010 school years; and which
>>
>> b.    document the use of chemical restraints, including Freeze +P or
>> other mace- [or] pepper-spray products.

136.    Neither BOE nor Superintendent Witherspoon raised any objections to the September 16

order.  Accordingly, the Circuit Court entered a second order on October 7, 2010, directing the

Family Court to produce the documents described in the Order dated September 16.

137.    Despite the Circuit Court's orders and the obvious concerns raised by SPLC's Request

for Access to Information, neither BOE nor Superintendent Witherspoon took any action to

prohibit – or even investigate – the use of chemical weapons against Birmingham schoolchildren.

*Necessity of Injunctive Relief*

138.    Because mace is used so frequently and so indiscriminately in Birmingham's public high

schools, each plaintiff – and each member of the class – faces a real and substantial risk of future

and repeated injury as a result of the Defendants' unlawful policies, customs, and practices.

There are only three ways for the class members to avoid that real and substantial risk: (a) by

attending school in another school system, something prohibited by zoning requirements; (b) by

foregoing their right to a free public education and enrolling in private school, which Plaintiffs

cannot afford; or (c) by dropping out of school entirely, which would violate the compulsory

school attendance law and deprive the students of their rights to an "equal and adequate"

education under Alabama law.

139.    As described above, the Defendants have acted and continue to act in violation of the

law.  The Class Representatives and the class they seek to represent do not have an adequate

remedy at law.  As a result of the policies, practices, acts, and omissions of the Defendants, the

Class Representatives and the class of children they seek to represent have suffered and continue

to suffer imminent, serious and irreparable injuries.

## CAUSES OF ACTION

140.    The named Plaintiffs and the proposed class incorporate by reference all of the above

factual allegations to support the following claims:

32

## *CLASS CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF*

### COUNT I

**Declaratory and Injunctive Relief to Protect Plaintiffs' Fourth and Fourteenth
Amendment Rights to be Free from Excessive Force**
*Defendant Roper, in his official capacity*

141.    Defendant Roper is responsible for supervising BPD and ensuring that the agency

operates in compliance with federal and state law.  In his official capacity, he is responsible for

the "Chemical Spray Subject to Restraint: Non-Deadly Use of Force" policy, which is

unconstitutional both on its face and as applied to the Plaintiffs and the class they represent.

142.    On its face, the Chemical Spray policy allows the use of a chemical weapons against

children under circumstances that are patently unreasonable under *New Jersey v. T.L.O.*, 469

U.S. 325 (1985).  The deployment of chemical weapons against schoolchildren in a closed

environment is exceptionally dangerous, yet BPD policy and practice allows and encourages this

extreme application of force in situations where such force is not remotely justified by the

targets' conduct, by the risk they pose, or by any other factors.  As such, the Defendant's policy

cannot pass muster under the second prong of the *T.L.O.* reasonableness inquiry, which asks

whether the level of force used was "reasonably related in scope to the circumstances justifying

interference in the first place." *T.L.O.*, 469 U.S. at 341.

143.    Indeed, because the Defendant's custom and practice allows the use of chemical weapons

against children who are not accused of any wrong-doing and children who are being physically

restrained, Defendant Roper cannot even satisfy the first prong of the *T.L.O.* reasonableness

inquiry, which asks whether any force was justified. *Id.* at 341.

144.    By promulgating an unconstitutional policy and by condoning unconstitutional customs

and practices with respect to the use of chemical weapons in the Birmingham schools, Defendant

Roper has violated and continues to violate the Fourth and Fourteenth Amendment rights of the Plaintiff class.

145.    By failing to train, supervise, and monitor the use of Freeze +P by SROs in the Birmingham schools, Defendant Roper has been deliberately indifferent to repeated and ongoing violations of the Fourth and Fourteenth Amendment rights of the Class Representatives and the class they seek to represent.

146.    Accordingly, the Class Representatives and the proposed class are entitled to a permanent injunction to remedy the constitutional violations described above and to ensure that the constitutional rights of Class Representatives and the plaintiff class are protected.

## COUNT II

### Declaratory and Injunctive Relief to Protect Plaintiffs' Substantive Due Process Rights to Personal Security under the Fourteenth Amendment
*Defendant Birmingham Board of Education and Defendant Witherspoon,
in his official capacity*

147.    Defendants BOE and Witherspoon have created a custodial environment within the BCS high schools for all students subject to the compulsory school attendance law.  Factors evidencing the presence of a custodial environment include, but are not limited to the following:

a.   Defendants BOE and Witherspoon have requested and/or agreed to the placement of BPD law enforcement officers in each BCS high school.

b.   Defendants BOE and Witherspoon have delegated authority to BPD officers to handle school discipline matters that are traditionally handled by school officials.

c.   Alabama's compulsory school attendance law requires that all students between the ages of seven and seventeen attend school.

d.   Defendants Roper, BOE, Witherspoon, and their employees play a significant role in enforcing the compulsory school attendance statute: school officials routinely

34

file complaints against students for truancy; while BPD officers not only file complaints, but also physically transport truant students back to school.

148.    As a result of that custodial environment, Defendants BOE and Witherspoon have a constitutional duty under the Fourteenth Amendment to protect BSC high school students from being injured by third parties while the students are on school property for the purpose of obtaining an education. Defendants BOE and Witherspoon have breached this constitutional duty by authorizing, approving, and failing to take any action to prevent the reckless and malicious use of Freeze +P on schoolchildren, including children who are not suspected of any delinquent activity, children who are physically restrained, and children who do not pose a serious threat of injury to anyone.

149.    Defendants BOE and Witherspoon are liable pursuant to 42 U.S.C. § 1983 for violating the constitutional due process rights of the Class Representatives and other members of the class under the Fourteenth Amendment to the U.S. Constitution.

150.    The Class Representatives and the proposed class are entitled to a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described above.

## COUNT III

**Declaratory and Injunctive Relief for Conspiracy to Violate Plaintiffs' Fourth Amendment Rights to be Free from Unlawful Seizures**
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon, in their official capacities*

151.    As set forth above, Defendant Roper has violated and continues to violate the Fourth and Fourteenth Amendment rights of the Class Representatives and the other members of the class by promulgating and enforcing policies, practices, and customs that have deprived the plaintiffs of their constitutional rights to be free from excessive force and unlawful seizures.

152.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among themselves to deprive the Class Representatives and the other members of the class of their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  As provided above, Defendant BOE and Defendant Witherspoon, in his official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to administer school discipline and conduct school arrests pursuant to unconstitutional policies, customs, and practices.  Pursuant to this agreement, Defendants BOE and Witherspoon have effectively authorized and continue to authorize the illegal deployment of chemical spray against schoolchildren.

153.    Accordingly, Defendants Roper, Witherspoon, and BOE are liable pursuant to 42 U.S.C. § 1983 for conspiring to violate the Fourth and Fourteenth Amendment rights of the Class Representatives and the proposed class.

154.    The Class Representatives and the proposed class are entitled to a permanent injunction prohibiting the Defendants from engaging in the unlawful conduct described above.

### *Individual Claims for Damages under Federal Law*

### COUNT IV

**Damages for Fourth and Fourteenth Amendment Violations
arising from the use of Excessive Force against Plaintiff J.W.**
*Defendant Roper and Defendant Nevitt, in their official and individual capacities*

155.    By deploying a chemical weapon against Plaintiff J.W. as a means of pure intimidation, Defendant Nevitt violated J.W.'s clearly established constitutional rights under the Fourth and Fourteenth Amendments.  Defendant Nevitt's conduct fails even the threshold inquiry for Fourth Amendment violations: whether the defendant's action was justified at its inception.  In the incident giving rise to this claim, Plaintiff J.W. had committed no crime and posed no threat whatsoever to anyone's safety.  Even if the deployment of Freeze +P against Plaintiff J.W. was

36

deemed justified at its inception, which it was not, the use of a chemical weapon against Plaintiff

J.W. was unconstitutional in that it was not reasonably related in scope to the circumstances

justifying the interference.

156.    Defendants Roper and Nevitt are liable pursuant to 42 U.S.C. § 1983 for sanctioning,

enforcing, and implementing a policy, custom, and practice of subjecting BCS students,

including Plaintiff J.W., to excessive force and illegal seizures, in violation of the Fourth and

Fourteenth Amendments of the United States Constitution.  Because Defendants Nevitt and

Roper acted in clear violation of well-established law, of which a reasonable person would have

been aware, they are not entitled to qualified immunity.   Defendants Nevitt and Roper acted

recklessly, maliciously, and with a callous disregard or indifference to the rights of Plaintiff J.W.

157.    Plaintiff J.W. seeks compensatory damages from these Defendants.

<h2 style="text-align:center">COUNT V</h2>

**Damages for Fourth and Fourteenth Amendment Violations
arising from the use of Excessive Force against Plaintiff G.S.**
*Defendant Roper and Defendant Clark, in their official and individual capacities*

158.    By repeatedly attacking Plaintiff G.S. with a chemical weapon without justification or

warning, Defendant Clark violated the Plaintiff's clearly established constitutional rights under

the Fourth and Fourteenth Amendments.  Both deployments of Freeze +P against Plaintiff G.S.

constituted unjustified and excessively intrusive seizures.  Defendant Clark grabbed Plaintiff

G.S. from behind, failed to identify himself as a law enforcement officer, then deployed chemical

spray in her face – without a warning – when she reasonably defended herself against his attack.

Defendant Clark then unleashed another round of chemical spray against Plaintiff G.S., despite

the fact that she had already been completely incapacitated and was, in fact, struggling to

breathe.  His actions were not reasonably related in scope to the circumstances justifying

37

interference in the first place, and were calculated to injure, punish, humiliate, and intimidate Plaintiff G.S. Accordingly, Defendant Clark's actions constitute an excessively intrusive seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

159.    As described herein, Defendants Roper and Clark are both liable pursuant to 42 U.S.C. § 1983 for sanctioning, enforcing, and implementing a policy, practice, and custom of unreasonably and unconstitutionally subjecting BCS students, including Plaintiff G.S., to excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Because Defendants Nevitt and Roper acted in clear violation of well-established law, of which a reasonable person would have been aware, they are not entitled to qualified immunity. The actions of these Defendants were intentional, malicious, and reckless, and showed a callous disregard for the rights of the Plaintiff.

160.    Plaintiff G.S. seeks compensatory damages against these Defendants.

## COUNT VI

**Damages for Fourth and Fourteenth Amendment Violations
arising from the use of Excessive Force against Plaintiff P.S.**
*Defendant Roper and Defendant Clark, in their official and individual capacities*

161.    By deploying a chemical weapon with reckless disregard for the safety of Plaintiff P.S., and without any reason to believe she had committed a delinquent act, Defendant Clark violated the Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments. Defendant Clark's conduct fails even the threshold inquiry for Fourth Amendment violations: whether the defendant's action was justified at its inception. In the incident giving rise to this claim, Plaintiff P.S. had committed no crime and posed no threat whatsoever to anyone's safety. In fact, Plaintiff P.S. was being physically restrained by an adult when Defendant Clark deployed a second burst of Freeze +P against Plaintiff G.S., also hitting

Plaintiff P.S. in the face. The deployment of Freeze +P against Plaintiff P.S. was also

unconstitutional in that it was not reasonably related in scope to the circumstances justifying the

interference.

162.    Defendants Roper and Clark are liable pursuant to 42 U.S.C. § 1983 for sanctioning,

enforcing, and implementing a policy, custom, and practice of subjecting BCS students,

including Plaintiff P.S., to excessive force and illegal seizures, in violation of the Fourth and

Fourteenth Amendments of the United States Constitution. Because Defendants Clark and

Roper acted in clear violation of well-established law, of which a reasonable person would have

been aware, they are not entitled to qualified immunity. Defendants Clark and Roper acted

recklessly, maliciously, and with a callous disregard or indifference to the rights of Plaintiff P.S.

163.    Plaintiff P.S. seeks compensatory damages from these Defendants.

## COUNT VII

**Damages for Fourth and Fourteenth Amendment Violations
arising from the use of Excessive Force against Plaintiff T.L.P.**
*Defendant Roper and Defendant Nevitt, in their official and individual capacities*

164.    By deploying a chemical weapon against Plaintiff T.L.P. without justification or warning,

Defendant Nevitt violated T.L.P.'s clearly established constitutional rights under the Fourth and

Fourteenth Amendments. The deployment of Freeze +P against Plaintiff T.L.P. was unjustified,

given that T.L.P. was restrained by an adult man at the time and posed no threat to the safety of

others. This seizure was calculated to punish, humiliate, and intimidate T.L.P. Defendant

Nevitt's actions were not reasonably related in scope to the circumstances justifying interference

in the first place, and were calculated to injure, punish, humiliate, and intimidate T.L.P.

Accordingly, Defendant Nevitt's actions constitute an excessively intrusive seizure in violation

of the Fourth and Fourteenth Amendments of the United States Constitution.

165.    By the forgoing actions and inactions, Defendants Roper and Nevitt are liable pursuant to 42 U.S.C. § 1983 for sanctioning, enforcing, and implementing a policy, practice, and custom of unreasonably and unconstitutionally subjecting BCS students, including Plaintiff T.L.P., to excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution.  Because Defendants Nevitt and Roper acted in clear violation of well-established law, of which a reasonable person would have been aware, they are not entitled to qualified immunity.   The actions of these Defendants were intentional, malicious, and reckless, and showed a callous disregard for the rights of Plaintiff T.L.P.

166.    Plaintiff T.L.P. seeks compensatory damages from these Defendants.

## COUNT VIII

### Damages for Fourth and Fourteenth Amendment Violations
### arising from the use of Excessive Force against Plaintiff T.A.P.
*Defendant Roper, Defendant Moss, and Defendant Tarrant,*
*in their official and individual capacities*

167.    By deploying a chemical weapon against Plaintiff T.A.P. without justification, Defendant Nevitt violated T.A.P.'s clearly established constitutional rights under the Fourth and Fourteenth Amendments.  The deployment of Freeze +P against Plaintiff T.A.P. was unjustified at its inception, given that T.A.P. was pinned to the ground by five adult men and posed no threat to the safety of others.  This seizure was calculated to punish, humiliate, and intimidate T.A.P., as evidenced by his taunting words prior to deploying the chemical in her face.  His actions were not reasonably related to the circumstances justifying the interference, and were calculated to injure, punish, humiliate, and intimidate T.A.P.  Accordingly, Defendant Tarrant's actions constitute an excessively intrusive seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

168.    By the forgoing actions and inactions, Defendants Roper and Tarrant are liable pursuant to 42 U.S.C. § 1983 for sanctioning, enforcing, and implementing a policy, practice and custom of unreasonably and unconstitutionally subjecting BCS students, including Plaintiff T.A.P., to excessive force in violation of the Fourth and Fourteenth Amendments of the United States Constitution. Because Defendants Tarrant and Roper acted in clear violation of well-established law, of which a reasonable person would have been aware, they are not entitled to qualified immunity.   The actions of these Defendants were intentional, malicious, reckless, and showed a callous disregard for the rights of Plaintiff T.A.P.

169.    Plaintiff T.A.P. seeks compensatory damages from these Defendants.

## COUNT IX

### Damages for Fourth and Fourteenth Amendment Violations
### arising from the use of Excessive Force against Plaintiff B.J.
*Defendant Roper and Defendant Benson, in their official and individual capacities*

170.    By deploying a chemical weapon against Plaintiff B.J. without justification or warning, Defendant Benson violated B.J.'s clearly established constitutional rights under the Fourth and Fourteenth Amendments. The deployment of Freeze +P against Plaintiff B.J. was both unjustified and unreasonable in that that B.J. was already being physically restrained by two adult men and posed no threat to the safety of others or the school environment. This seizure was calculated to punish, humiliate, and intimidate B.J. Even after he had been blinded and incapacitated by the chemical sprayed into his nose and mouth, Defendant Benson continued to use excessive force by forcing B.J. to the ground and holding him down with her knee as he struggled to breathe. Defendant Benson's actions were not reasonably related in scope to the circumstances justifying interference in the first place, and were calculated to injure, punish, humiliate, and intimidate B.J.

171.    By the forgoing actions and inactions, Defendants Roper and Benson are liable pursuant

to 42 U.S.C. § 1983 for sanctioning, enforcing, and implementing a policy, practice and custom

of unreasonably and unconstitutionally subjecting BCS students, including Plaintiff B.J., to

excessive force in violation of the Fourth and Fourteenth Amendments of the United States

Constitution.  Because Defendants Nevitt and Roper acted in clear violation of well-established

law, of which a reasonable person would have been aware, they are not entitled to qualified

immunity.   The actions of these Defendants were intentional, malicious, reckless, and showed a

callous disregard for the rights of Plaintiff B.J.

172.    Plaintiff B.J. seeks compensatory damages against these Defendants.

## COUNT X

**Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff J.W.**
*Defendant Birmingham Board of Education and Defendant Witherspoon,*
*in his official and individual capacity*

173.    By failing to protect Plaintiff J.W. from the illegal and unreasonable actions of

Defendants Roper and Nevitt, Defendants BOE and Witherspoon have violated Plaintiff J.W.'s

clearly established rights under the Fourteenth Amendment.  Defendants BOE and Witherspoon

have created a custodial environmental within the BCS system for all students subject to the

compulsory school attendance law.  That custodial environment imposes a constitutional duty on

Defendants BOE and Witherspoon to ensure J.W.'s safety and well-being while he attends BCS.

Defendants BOE and Witherspoon breached that duty by authorizing and approving the use of

chemical weapons against BCS students, and by failing to take action to protect Plaintiff J.W.

and other students against the use of chemical weapons.  Accordingly, Defendants BOE and

Witherspoon have violated Plaintiff J.W.'s rights in violation of the Fourteenth Amendment to

the U.S. Constitution.

42

174.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C.

§ 1983 under the Fourteenth Amendment of the United States Constitution for failing to protect

J.W. from Defendant Roper's unlawful and illegal policies, practices, and customs.  Because

Defendants BOE and Witherspoon breached their duty to protect J.W. as required by the

Fourteenth Amendment and acted in clear violation of well-established law, of which a

reasonable person would have been aware, they are not entitled to qualified immunity.

175.    Plaintiff J.W. seeks compensatory and punitive damages from these Defendants.

## COUNT XI

**Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff G.S.**
*Defendant Birmingham Board of Education and Defendant Witherspoon,*
*in his official and individual capacity*

176.    By failing to protect Plaintiff G.S. from the illegal and unreasonable actions of

Defendants Roper and Benson, Defendants BOE and Witherspoon have violated Plaintiff G.S.'s

clearly established rights under the Fourteenth Amendment.  Defendants BOE and Witherspoon

have created a custodial environmental within the BCS system for all students subject to the

compulsory school attendance law.  That custodial environment imposes a constitutional duty on

Defendants BOE and Witherspoon to ensure G.S.'s safety and well-being while she attends BCS.

Defendants BOE and Witherspoon breached that duty by authorizing and approving the use of

chemical weapons against BCS students, and by failing to take action to protect Plaintiff G.S.

and other students against the use of chemical weapons.  Accordingly, Defendants BOE and

Witherspoon have violated Plaintiff G.S.'s rights in violation of the Fourteenth Amendment to

the U.S. Constitution.

177.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C.

§ 1983 under the Fourteenth Amendment of the United States Constitution for failing to protect

G.S. from Defendant Roper's unlawful and illegal policies, practices, and customs. Because Defendants BOE and Witherspoon breached their duty to protect G.S. as required by the Fourteenth Amendment and acted in clear violation of well-established law, of which a reasonable person would have been aware, they are not entitled to qualified immunity.

178.    Plaintiff G.S. seeks compensatory and punitive damages from these Defendants.

## COUNT XII

**Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff P.S.**
*Defendant Birmingham Board of Education and Defendant Witherspoon,*
*in his official and individual capacity*

179.    By failing to protect Plaintiff P.S. from the illegal and unreasonable actions of Defendants Roper and Benson, Defendants BOE and Witherspoon have violated Plaintiff P.S.'s clearly established rights under the Fourteenth Amendment. Defendants BOE and Witherspoon have created a custodial environmental within the BCS system for all students subject to the compulsory school attendance law. That custodial environment imposes a constitutional duty on Defendants BOE and Witherspoon to ensure P.S.'s safety and well-being while she attends BCS. Defendants BOE and Witherspoon breached that duty by authorizing and approving the use of chemical weapons against BCS students, and by failing to take action to protect Plaintiff P.S. and other students against the use of chemical weapons. Accordingly, Defendants BOE and Witherspoon have violated Plaintiff P.S.'s rights in violation of the Fourteenth Amendment to the U.S. Constitution.

180.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C. § 1983 under the Fourteenth Amendment of the United States Constitution for failing to protect P.S. from Defendant Roper's unlawful and illegal policies, practices, and customs. Because Defendants BOE and Witherspoon breached their duty to protect P.S. as required by the

Fourteenth Amendment and acted in clear violation of well-established law, of which a

reasonable person would have been aware, they are not entitled to qualified immunity.

181.    Plaintiff P.S. seeks compensatory and punitive damages from these Defendants.

## COUNT XIII

**Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff T.L.P.**
*Defendant Birmingham Board of Education and Defendant Witherspoon,*
*in his official and individual capacity*

182.    By failing to protect Plaintiff T.L.P. from the illegal and unreasonable actions of

Defendants Roper and Benson, Defendants BOE and Witherspoon have violated Plaintiff

T.L.P.'s clearly established rights under the Fourteenth Amendment. Defendants BOE and

Witherspoon have created a custodial environmental within the BCS system for all students

subject to the compulsory school attendance law. That custodial environment imposes a

constitutional duty on Defendants BOE and Witherspoon to ensure T.L.P.'s safety and well-

being while she attends BCS. Defendants BOE and Witherspoon breached that duty by

authorizing and approving the use of chemical weapons against BCS students, and by failing to

take action to protect Plaintiff T.L.P. and other students against the use of chemical weapons.

Accordingly, Defendants BOE and Witherspoon have violated Plaintiff T.L.P.'s rights in

violation of the Fourteenth Amendment to the U.S. Constitution.

183.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C. §

1983 under the Fourteenth Amendment of the United States Constitution for failing to protect

T.L.P. from Defendant Roper's unlawful and illegal policies, practices, and customs. Because

Defendants BOE and Witherspoon breached their duty to protect T.L.P. as required by the

Fourteenth Amendment and acted in clear violation of well-established law, of which a

reasonable person would have been aware, they are not entitled to qualified immunity.

184.    Plaintiff T.L.P. seeks compensatory and punitive damages from these Defendants.

## COUNT XIV

**Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff T.A.P.**
*Defendant Birmingham Board of Education and Defendant Witherspoon,
in his official and individual capacity*

185.    By failing to protect Plaintiff T.A.P. from the illegal and unreasonable actions of

Defendants Roper and Benson, Defendants BOE and Witherspoon have violated Plaintiff

T.A.P.'s clearly established rights under the Fourteenth Amendment.  Defendants BOE and

Witherspoon have created a custodial environmental within the BCS system for all students

subject to the compulsory school attendance law.  That custodial environment imposes a

constitutional duty on Defendants BOE and Witherspoon to ensure T.A.P.'s safety and well-

being while she attends BCS.  Defendants BOE and Witherspoon breached that duty by

authorizing and approving the use of chemical weapons against BCS students, and by failing to

take action to protect Plaintiff T.A.P. and other students against the use of chemical weapons.

Accordingly, Defendants BOE and Witherspoon have violated Plaintiff T.A.P.'s rights in

violation of the Fourteenth Amendment to the U.S. Constitution.

186.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C. §

1983 under the Fourteenth Amendment of the United States Constitution for failing to protect

T.A.P. from Defendant Roper's unlawful and illegal policies, practices, and customs.  Because

Defendants BOE and Witherspoon breached their duty to protect T.A.P. as required by the

Fourteenth Amendment and acted in clear violation of well-established law, of which a

reasonable person would have been aware, they are not entitled to qualified immunity.

187.    Plaintiff T.A.P. seeks compensatory and punitive damages from these Defendants.

## COUNT XV

### Damages for Fourteenth Amendment Violations: Failure to Protect Plaintiff B.J.
*Defendant Birmingham Board of Education and Defendant Witherspoon,*
*in his official and individual capacity*

188.    By failing to protect Plaintiff B.J. from the illegal and unreasonable actions of

Defendants Roper and Benson, Defendants BOE and Witherspoon have violated Plaintiff B.J.'s

clearly established rights under the Fourteenth Amendment.  Defendants BOE and Witherspoon

have created a custodial environmental within the BCS system for all students subject to the

compulsory school attendance law.  That custodial environment imposes a constitutional duty on

Defendants BOE and Witherspoon to ensure B.J.'s safety and well-being while he attends BCS.

Defendants BOE and Witherspoon breached that duty by authorizing and approving the use of

chemical weapons against BCS students, and by failing to take action to protect Plaintiff B.J. and

other students against the use of chemical weapons.  Accordingly, Defendants BOE and

Witherspoon have violated Plaintiff B.J.'s rights in violation of the Fourteenth Amendment to

the U.S. Constitution.

189.    By the forgoing actions and inactions, these Defendants are liable pursuant to 42 U.S.C. §

1983 under the Fourteenth Amendment of the United States Constitution for failing to protect

B.J. from Defendant Roper's unlawful and illegal policies, practices, and customs.  Because

Defendants BOE and Witherspoon breached their duty to protect B.J. as required by the

Fourteenth Amendment and acted in clear violation of well-established law, of which a

reasonable person would have been aware, they are not entitled to qualified immunity.

190.    Plaintiff B.J. seeks compensatory and punitive damages from these Defendants.

47

## COUNT XVI

### Damages for Conspiracy to Violate the Civil Rights of Plaintiff J.W. under the Fourth and Fourteenth Amendments
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon, in their official and individual capacities*

191.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate

Plaintiff J.W.'s civil rights under the Fourth and Fourteenth Amendments of the U.S.

Constitution. As set forth above, Defendants Roper and Nevitt have violated J.W.'s Fourth and

Fourteenth Amendment rights by subjecting him to unreasonable and excessive force, and an

unlawful seizure in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.

192.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive J.W. of his rights under the Fourth and Fourteenth Amendments to the

U.S. Constitution. As provided above, Defendant BOE and Defendant Witherspoon, in his

official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to

administer school discipline and conduct school arrests pursuant to unconstitutional policies,

customs, and practices. Pursuant to this agreement, Defendants BOE and Witherspoon

effectively authorized Defendant Nevitt's illegal deployment of chemical spray against J.W.

193.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff J.W.'s rights under the

Fourth and Fourteenth Amendments of the United States Constitution. Because Defendants

Roper, BOE, and Witherspoon conspired to subject J.W. to unlawful seizures and excessive

force, and acted in clear violation of well-established law, of which a reasonable person would

have been aware, they are not entitled to qualified immunity.

194.    J.W. seeks compensatory damages from these Defendants.

48

## COUNT XVII

**Damages for Conspiracy to Violate the Civil Rights of Plaintiff G.S.
under the Fourth and Fourteenth Amendments**
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon,
in their official and individual capacities*

195.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate

Plaintiff G.S.'s civil rights under the Fourth and Fourteenth Amendments of the U.S.

Constitution.  As set forth above, Defendants Roper and Clark have violated Plaintiff G.S.'s

Fourth and Fourteenth Amendment rights by subjecting her to unreasonable and excessive force,

and an unlawful seizure in violation of the Fourth and Fourteenth Amendments of the U.S.

Constitution.

196.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive Plaintiff G.S. of her rights under the Fourth and Fourteenth Amendments

to the U.S. Constitution.  As provided above, Defendant BOE and Defendant Witherspoon, in his

official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to

administer school discipline and conduct school arrests pursuant to unconstitutional policies,

customs, and practices.  Pursuant to this agreement, Defendants BOE and Witherspoon

effectively authorized Defendant Clark's illegal deployment of chemical spray against Plaintiff

G.S.

197.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff G.S.'s rights under the

Fourth and Fourteenth Amendments of the United States Constitution.  Because Defendants

Roper, BOE, and Witherspoon conspired to subject G.S. to unlawful seizures and excessive

force, and acted in clear violation of well-established law, of which a reasonable person would

have been aware, they are not entitled to qualified immunity.

198.    Plaintiff G.S. seeks compensatory damages from these Defendants.

## COUNT XVIII

### Damages for Conspiracy to Violate the Civil Rights of Plaintiff P.S.
### under the Fourth and Fourteenth Amendments
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon,*
*in their official and individual capacities*

199.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate P.S.'s

civil rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. As set forth

above, Defendants Roper and Clark have violated P.S.'s Fourth and Fourteenth Amendment

rights by subjecting her to unreasonable and excessive force, and an unlawful seizure in violation

of the Fourth and Fourteenth Amendments of the U.S. Constitution.

200.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive P.S. of her rights under the Fourth and Fourteenth Amendments to the

U.S. Constitution. As provided above, Defendant BOE and Defendant Witherspoon, in his

official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to

administer school discipline and conduct school arrests pursuant to unconstitutional policies,

customs, and practices. Pursuant to this agreement, Defendants BOE and Witherspoon

effectively authorized Defendant Clark's illegal deployment of chemical spray against P.S.

201.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff P.S.'s rights under the

Fourth and Fourteenth Amendments of the United States Constitution. Because Defendants

Roper, BOE, and Witherspoon conspired to subject P.S. to unlawful seizures and excessive

force, and acted in clear violation of well-established law, of which a reasonable person would

have been aware, they are not entitled to qualified immunity.

202.    P.S. seeks compensatory damages from these Defendants.

## COUNT XIX

### Damages for Conspiracy to Violate the Civil Rights of Plaintiff T.L.P. under the Fourth and Fourteenth Amendments
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon, in their official and individual capacities*

203.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate

T.L.P.'s civil rights under the Fourth and Fourteenth Amendments of the U.S. Constitution. As

set forth above, Defendants Roper and Nevitt have violated T.L.P.'s Fourth and Fourteenth

Amendment rights by subjecting her to unreasonable and excessive force, and an unlawful

seizure in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.

204.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive T.L.P. of her rights under the Fourth and Fourteenth Amendments to the

U.S. Constitution. As provided above, Defendant BOE and Defendant Witherspoon, in his

official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to

administer school discipline and conduct school arrests pursuant to unconstitutional policies,

customs, and practices. Pursuant to this agreement, Defendants BOE and Witherspoon

effectively authorized Defendant Nevitt's illegal deployment of chemical spray against T.L.P.

205.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff T.L.P.'s rights under the

Fourth and Fourteenth Amendments of the United States Constitution. Because Defendants

Roper, BOE, and Witherspoon conspired to subject T.L.P. to unlawful seizures and excessive

force, and acted in clear violation of well-established law, of which a reasonable person would

have been aware, they are not entitled to qualified immunity.

206.    T.L.P. seeks compensatory damages from these Defendants.

## COUNT XX

**Damages for Conspiracy to Violate the Civil Rights of Plaintiff T.A.P.
under the Fourth and Fourteenth Amendments**
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon,
in their official and individual capacities*

207.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate

Plaintiff T.A.P.'s civil rights under the Fourth and Fourteenth Amendments of the U.S.

Constitution. As set forth above, Defendants Roper and Tarrant have violated Plaintiff T.A.P.'s

Fourth and Fourteenth Amendment rights by subjecting her to unreasonable and excessive force,

and an unlawful seizure in violation of the Fourth and Fourteenth Amendments of the U.S.

Constitution.

208.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive T.A.P. of her rights under the Fourth and Fourteenth Amendments to the

U.S. Constitution. As provided above, Defendant BOE and Defendant Witherspoon, in his

official capacity, invited BPD, represented in this action by Defendant Roper, into BCS to

administer school discipline and conduct school arrests pursuant to unconstitutional policies,

customs, and practices. Pursuant to this agreement, Defendants BOE and Witherspoon

effectively authorized Defendant Tarrant's illegal deployment of chemical spray against T.A.P.

209.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff T.A.P.'s rights under the

Fourth and Fourteenth Amendment of the United States Constitution. Because Defendants

Roper, BOE, and Witherspoon conspired to subject T.A.P. to unlawful seizures and excessive

force, and acted in clear violation of well-established law, of which a reasonable person would

have been aware, they are not entitled to qualified immunity.

210.    T.A.P. seeks compensatory damages from these Defendants.

## COUNT XXI

**Damages for Conspiracy to Violate the Civil Rights of Plaintiff B.J.
under the Fourth and Fourteenth Amendments**
*Defendant Roper, Defendant Birmingham Board of Education, and Defendant Witherspoon,
in their official and individual capacities*

211.    Defendants Roper, BOE, and Witherspoon have engaged in a conspiracy to violate

Plaintiff B.J.'s civil rights under the Fourth and Fourteenth Amendments of the U.S.

Constitution.  As set forth above, Defendants Roper and Benson have violated B.J.'s Fourth and

Fourteenth Amendment rights by subjecting him to unreasonable and excessive force, and an

unlawful seizure in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.

212.    Defendants Roper, BOE, and Witherspoon willfully and maliciously conspired among

themselves to deprive B.J. of his rights under the Fourth and Fourteenth Amendments to the U.S.

Constitution.  As provided above, Defendant BOE and Defendant Witherspoon, in his official

capacity, invited BPD, represented in this action by Defendant Roper, into BCS to administer

school discipline and conduct school arrests pursuant to unconstitutional policies, customs, and

practices.  Pursuant to this agreement, Defendants BOE and Witherspoon effectively authorized

Defendant Benson's illegal deployment of chemical spray against B.J.

213.    By the forgoing actions and inactions, Defendants Roper, BOE, and Witherspoon are

liable pursuant to 42 U.S.C. § 1983 for conspiring to violate Plaintiff B.J.'s rights under the

Fourth and Fourteenth Amendments of the United States Constitution.  Because Defendants

Roper, BOE, and Witherspoon conspired to subject B.J. to unlawful seizures and excessive force,

and acted in clear violation of well-established law, of which a reasonable person would have

been aware, they are not entitled to qualified immunity.

214.    B.J. seeks compensatory damages from these Defendants.

## COUNT XXII

**Damages for Excessive Corporal Punishment inflicted upon Plaintiff T.A.P.,
in Violation of the Fourteenth Amendment**
*Defendant Moss in his individual capacity*

215.   By illegally assaulting Plaintiff T.A.P. in direct violation of BCS policy prohibiting

corporal punishment, Defendant Moss violated Plaintiff T.A.P.'s right to be free from excessive

corporal punishment as provided by the Fourteenth Amendment of the United States

Constitution.  Defendant Moss unreasonably and unjustifiably assaulted Plaintiff T.A.P.,

intentionally caused her to fall to the ground, and planted his foot in her back when she posed no

threat to anyone.  Defendant Moss' actions were obviously excessive and presented a reasonably

foreseeable risk of serious bodily injury to Plaintiff T.A.P.  Accordingly, Defendant Moss' use of

corporal punishment amounts to arbitrary and egregious conduct in violation of the Fourteenth

Amendment to the United States Constitution.

216.   Plaintiff T.A.P. seeks compensatory and punitive damages.

### *Individual Claims for Damages under Alabama Law*

### COUNT XXIII

**Damages for Assault and Battery on Plaintiff G.S., in Violation of Alabama Law**
*Defendant Roper and Defendant Clark, in their official and individual capacities*

217.   By twice deploying chemical spray against Plaintiff G.S. as a means of intimidation,

Defendant Clark committed the tort of assault and battery against G.S., in violation of Alabama

law.  Defendant Clark intentionally and unlawfully twice sprayed G.S. in the face with a

dangerous chemical weapon, without warning, without justification, and without cause.

Defendant Clark's actions were intended to physically harm G.S. and caused her to fear

imminent bodily harm.

54

218.    Defendants Roper and Clark are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including G.S., to bodily harm in violation of Alabama law. Defendants Clark and Roper acted willfully, recklessly, maliciously, and with a callous disregard or indifference to G.S.'s rights. Because Defendants Clark and Roper acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

219.    Plaintiff G.S. seeks compensatory damages from these Defendants.

### COUNT XXIV

**Damages for Assault and Battery on Plaintiff T.L.P., in Violation of Alabama Law**
*Defendant Roper and Defendant Nevitt, in their official and individual capacities*

220.    By deploying chemical spray against T.L.P. as a means of intimidation, Defendant Nevitt committed the tort of assault and battery against T.L.P., in violation of Alabama law. Defendant Nevitt intentionally and unlawfully sprayed B.J. with a dangerous chemical weapon, without warning, while she was restrained by an adult man. Defendant Nevitt's actions were intended to physically harm T.L.P. and caused her to fear imminent bodily harm.

221.    Defendants Roper and Nevitt are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including T.L.P., to bodily harm in violation of Alabama law. Defendants Nevitt and Roper acted willfully, recklessly, maliciously, and with a callous disregard or indifference to T.L.P.'s rights. Because Defendants Nevitt and Roper acted acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

222.    Plaintiff T.L.P. seeks compensatory damages from these Defendants.

## COUNT XXV

### Damages for Assault and Battery on Plaintiff T.A.P., in Violation of Alabama Law
*Defendant Roper, Defendant Moss, and Defendant Tarrant, in their official and individual capacities*

223.    By deploying chemical spray against Plaintiff T.A.P. as a means of intimidation, Defendant Tarrant committed the tort of assault and battery against T.A.P., in violation of Alabama law.  Defendant Tarrant intentionally and unlawfully sprayed T.A.P. with a dangerous chemical weapon, without warning, and while she was restrained by five grown men.  Defendant Tarrant's actions were intended to physically harm Plaintiff T.A.P. and caused her to fear imminent bodily harm.

224.    Defendants Roper and Tarrant are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including T.A.P., to bodily harm in violation of Alabama law.  Defendants Tarrant and Roper acted willfully, recklessly, maliciously, and with a callous disregard or indifference to T.A.P.'s rights.  Because Defendants Tarrant and Roper acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

225.    Plaintiff T.A.P. seeks compensatory damages from these Defendants.

## COUNT XXVI

### Damages for Assault and Battery on Plaintiff B.J., in Violation of Alabama Law
*Defendant Roper and Defendant Benson, in their official and individual capacities*

226.    By deploying chemical spray against B.J. as a means of intimidation and kicking him to the ground grounding her foot in his back, Defendant Benson committed assault and battery against B.J., in violation of Alabama law.  Defendant Benson intentionally and unlawfully sprayed B.J. with a dangerous chemical weapon without warning or cause.  Defendant Benson

also kicked B.J. to the ground after deploying the chemical in B.J.'s face. Her actions were intended to physically harm B.J. and caused him to fear imminent bodily harm.

227.    Defendants Roper and Benson are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including B.J., to bodily harm in violation of Alabama law. Defendants Benson and Roper acted willfully, recklessly, maliciously, and with a callous disregard or indifference to B.J.'s rights. Because Defendants Benson and Roper acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

228.    Plaintiff B.J. seeks compensatory damages from these Defendants.

## COUNT XXVII

**Damages for the Tort of Outrage against Plaintiff G.S., in Violation of Alabama Law**
*Defendant Roper and Defendant Clark, in their official and individual capacities*

229.    By intentionally deploying chemical spray against G.S. as a means of intimidation and fear, Defendant Clark engaged in extreme and outrageous conduct in violation of Alabama law. Without identifying himself as a police officer, Defendant Clark grabbed a young girl from behind, then sprayed a blast of painful chemicals in her face when she tried to defend herself. After Plaintiff G.S. had already been incapacitated from the first blast of chemical spray, Defendant Clark proceeded to intentionally and recklessly spray her for a second time. Defendant Clark's actions caused G.S. physical and emotional distress that no reasonable child could be expected to endure.

230.    Defendants Roper and Clark are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including Plaintiff G.S., to extreme and intentional emotional distress in violation of Alabama law. Defendants Clark and Roper acted willfully, maliciously, and with a callous disregard or

indifference to Plaintiff G.S.'s rights. Because Defendants Clark and Roper acted willfully and

maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

231.    Plaintiff G.S. seeks compensatory damages from these Defendants.

### COUNT XXVIII

**Damages for the Tort of Outrage against Plaintiff T.L.P., in Violation of Alabama Law**
*Defendant Roper and Defendant Nevitt, in their official and individual capacities*

232.    By intentionally deploying chemical spray against T.L.P. as a means of intimidation,

Defendant Nevitt engaged in extreme and outrageous conduct in violation of Alabama law.

Without first delivering a warning or giving Plaintiff T.L.P. an opportunity to avoid his attack,

Defendant Nevitt intentionally and recklessly sprayed a young child in the face with chemical

spray, while she was being restrained by an adult man. Defendant Nevitt's actions caused T.L.P.

physical and emotional distress that no reasonable child could be expected to endure.

233.    Defendants Roper and Nevitt are liable pursuant to Alabama law for sanctioning,

enforcing, and implementing policies, customs, and practices that subject BCS students,

including T.L.P., to extreme and intentional emotional distress in violation of Alabama law.

Defendants Nevitt and Roper acted willfully, maliciously, and with a callous disregard or

indifference to T.L.P.'s rights. Because Defendants Nevitt and Roper acted willfully and

maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

234.    Plaintiff T.L.P. seeks compensatory damages from these Defendants.

### COUNT XXIX

**Damages for the Tort of Outrage against Plaintiff T.A.P., in Violation of Alabama Law**
*Defendant Roper, Defendant Moss, and Defendant Tarrant,*
*in their official and individual capacities*

235.    By intentionally deploying chemical spray against Plaintiff T.A.P. as a means of pure

intimidation and punishment, Defendant Tarrant engaged in extreme and outrageous conduct in

violation of Alabama law. Defendant Tarrant intentionally and recklessly sprayed a young child in the face with a painful chemical, while she was pinned to the ground and completely incapacitated by five adult men. Defendant Tarrant's actions caused T.A.P. physical and emotional distress that no reasonable child could be expected to endure.

236.   Defendants Roper and Tarrant are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including Plaintiff T.A.P., to extreme and intentional emotional distress in violation of Alabama law. Defendants Tarrant and Roper acted willfully, maliciously, and with a callous disregard or indifference to the rights of Plaintiff T.A.P. Because Defendants Tarrant and Roper acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

237.   Plaintiff T.A.P. seeks compensatory damages from these Defendants.

### COUNT XXX

**Damages for the Tort of Outrage against Plaintiff B.J., in Violation of Alabama Law**
*Defendant Roper and Defendant Benson, in their official and individual capacities*

238.   By intentionally deploying chemical spray against B.J. as a means of intimidation and fear, Defendant Benson engaged in extreme and outrageous conduct in violation of Alabama law. Without even delivering a warning, Defendant Benson intentionally and recklessly sprayed a young child in the face with a painful chemical spray, while that child was being restrained by two adult men. Defendant Benson's actions caused B.J. physical and emotional distress that no reasonable child could be expected to endure.

239.   Defendants Roper and Benson are liable pursuant to Alabama law for sanctioning, enforcing, and implementing policies, customs, and practices that subject BCS students, including B.J., to extreme and intentional emotional distress in violation of Alabama law.

Defendants Benson and Roper acted willfully, maliciously, and with a callous disregard or indifference to B.J.'s rights. Because Defendants Benson and Roper acted willfully and maliciously, they are not entitled to discretionary function immunity provided by Alabama law.

240.    Plaintiff B.J. seeks compensatory damages from these Defendants.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2);

3.    Declare that the acts and omissions of all Defendants violate the U.S. Constitution;

4.    Declare that the acts and omissions of Defendants Roper, Clark, Nevitt, Tarrant, Moss, and Benson violate state law;

5.    Enter a permanent injunction requiring the Defendants, their agents, employees and all persons acting in concert with them to cease their unconstitutional and unlawful practices;

6.    Award compensatory and punitive damages to the named Plaintiffs for the injuries they sustained as a result of the actions of Defendants BOE, Witherspoon, Roper, Clark, Nevitt, Tarrant, Moss, and Benson;

7.    Award the Plaintiffs the costs of this lawsuit and reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

8.    Grant any other relief the Court shall deem just and proper.

Respectfully submitted this 1st day of December, 2010.

Ebony Glenn Howard (admission pending)
ASB-7247-O76H
Mary C. Bauer (admission pending)
ASB-1181-R76B
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
334-956-8200
334-956-8481 (fax)

*Attorneys for Plaintiffs*

By                Ebony Glenn Howard