# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **J.W. et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:10-cv-03314-AKK** |
| **BIRMINGHAM BOARD OF** | ) | |
| **EDUCATION, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The court has for consideration J.W., G.S., P.S., T.L.P., T.A.P., B.J., B.D., and K.B.'s ("Plaintiffs") Motion for Class Certification, doc. 75, which is fully briefed, docs. 83, 84, and 86.[1]  In its discretion, and, after considering the parties' written submissions and arguments at the December 6, 2011, hearing, doc. 105, the court **GRANTS** Plaintiffs' motion to certify a class of all current and future high school students of Birmingham City Schools. The issues for class resolution

---

[1] Plaintiffs ask the court to disregard Defendant Anthony Moss's ("Moss") Opposition to Motion for Class Certification, doc. 84, because only Plaintiff T.A.P. has a claim remaining against Moss and T.A.P.'s claims are not asserted on behalf of the proposed class. Doc. 86, at 2-3.  Plaintiffs assert that Moss he cannot respond to their motion since Moss is not a party to the class claim.  *Id.*  In its discretion, the court will consider Moss's arguments because they aid the court in resolving the class issues. Also, Defendants' Motion to Strike Exhibit #1 and Exhibit #5 and Legal Arguments Associated Therein to Plaintiffs' Motion for Class Certification, doc. 82, and Motion to Strike Exhibit #4 and Legal Arguments Associated Therein to Plaintiffs' Reply Brief, doc. 90, are **MOOT** because the court did not rely on the exhibits in question.

are whether the Birmingham Police Department Policy for the use of chemical spray in school settings and the training provided to School Resource Officers ("SROs") are constitutionally defective.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, who are current and former students enrolled in Birmingham City high schools (the "schools"), allege a number of claims arising from the use of chemical spray by SROs, who are Birmingham police officers assigned to the high schools.  Doc. 52.  Plaintiffs, on behalf of the proposed class, seek declaratory and injunctive relief against Defendant A.C. Roper ("Chief Roper"), in his capacity as Chief of the Birmingham Police Department ("BPD"), to limit the use of chemical spray against high school students ("students") through training of the SROs and a revision of policy.  Doc. 75-1; doc. 105, at 20-21.  The proposed class includes all current and future students who "are at risk of injury as a result of Defendant Chief Roper's unconstitutional policy and practices that permit [SROs] . . . to use mace against Birmingham high school students . . . ."  Doc. 75-1, at 2.  According to Plaintiffs, Chief Roper's implementation of alleged unconstitutional policies and practices relating to the use of chemical spray in the schools violates all students' Fourth and Fourteenth Amendment rights against excessive force.  Doc. 52, at 1-2 ¶ 1; doc. 75, at 2.

A.      **Introduction of Chemical Spray  in Birmingham City High Schools**

In January 1996, the Birmingham Board of Education approved the

stationing of SROs at the high schools to conduct arrests and to assist in

discipline.  *Id*., at 12 ¶¶ 35-36.  SROs are permitted to carry and use chemical

spray, if necessary, to address any criminal or breach of the peace violations.  Doc.

83-3, at 1; doc. 52, at 16  ¶ 46.  Over a five-year period beginning in 2006, SROs

used chemical spray on approximately 100 students.[2]  Doc. 83-4, at 1-2.

The BPD has no specific policy regarding SROs' use of chemical spray.

Rather, SROs are subject to BPD's general policy on Chemical Spray Subject

Restraint: Non-Deadly Use of Forces, which provides:

C.      The chemical spray may be used in an arrest situation where
the weapon's use offers the possibility of lessening the
likelihood of physical injury to the arresting officer, citizens on
the scene and/or the suspect.

D.      The use of chemical spray is intended solely as a control device
to enable the officer to carry out his or her duties in the safest,
most efficient and most professional manner with the least
chance of injury to either the officer or suspect.

1.      At no time will an officer unnecessarily brandish, or use
chemical spray as an intimidation device unless the

---

[2]Allegedly, over the same period, similar officers stationed at high schools run by the
Jefferson County Board of Education have only used chemical spray once on students.  Doc. 105,
at 31.

officer is attempting to prevent further escalation of force.

2.     Chemical spray is not[,] under any circumstances, to be used as punishment or as a coercive tool once an individual is under control and in custody.

3.     The chemical spray is not to be used by officers unless they have a reasonable belief that a crime has been committed and that the intended target committed the crime.

E.     Any time chemical spray is used for controlling an offender[,] the application of the chemical spray will end when the subject discontinues resistance or aggression.

F.     The chemical spray is best employed in one to two second bursts.  The spray must be directed to the facial area of the assailant, with the bridge of the nose being the best target area. This weapon is primarily an inflammatory agent, producing the following results:

1.     Involuntary closing of the eyes.

2.     Swelling of the mucous membranes, which results in shallow breathing ability.

3.     Intense burning on sensitive parts of the body.

. . .

H.     It should be kept in mind by all concerned that any actual contact with chemical spray to the face or sensitive skin areas will result in the officer being adversely affected by its properties.  Caution must be taken while handcuffing prisoners, placing them in automobiles, etc.  If contact is made with the actual substance, the officer shall refrain from touching his face

with the contacted area until he can wash that area with warm
soapy water.

III.   AFTER USE PROCEDURE

A.   Following the use of chemical spray the officer will ensure that
the subject receives adequate decontamination as soon as
practical.  The officer should supply immediate medical
attention if requested by the subject.

B.   Birmingham Fire and Rescue will be called and will determine
whether or not the subject needs further medical attention or
hospital treatment.

D.   [sic] Any time an officer uses chemical spray for subject
control, the officer will notify the on-duty supervisor and
complete a Use of Force Information and Statement Report.

Doc. 83-2, at 2-4.  Plaintiffs contend this policy is constitutionally defective as it

relates to the utilization of chemical spray in the school setting and filed this

lawsuit, in part, to force Chief Roper to implement a policy specifically for SROs.

The parties disagree about whether the current policy allows SROs to subject

students to abusive and excessive use of chemical spray and whether the policy

gives SROs unfettered discretion to use chemical spray.  Doc. 75-1, at 1; doc. 83,

at 3.

B.   **Named Class Representatives**

The representatives of the proposed class are six of the eight named

Plaintiffs[3] and are in two distinct groups.  The first group is comprised of students intentionally chemically sprayed (T.L.P., G.S., K.B., and B.D.), and the second is comprised of the innocent bystanders accidently exposed to the effects of chemical spray (P.S. and J.W.).  Doc. 75-1, at 14-15; doc. 75-1, at 3-28.  The court outlines the specific incidents involving both groups below.

     i.    **Group One – Class Representatives Intentionally Sprayed with Chemical Spray**

     1.    **T.L.P.**

On November 29, 2009, while walking past the lunch room at Woodlawn High School, T.L.P., then an 11th grader, heard another student call her a "bitch." Doc. 75-5, at 18 ¶ 4. As is generally the case amongst this age group, T.L.P. engaged the student in a verbal argument, which unfortunately escalated to a fight. *Id.*  Although athletic coaches intervened and successfully separated and restrained both girls, a SRO responding to the incident allegedly sprayed T.L.P. nonetheless with chemical spray.[4] *Id.,* at  ¶ 6-7.  The SRO then handcuffed T.L.P. and transported her to Family Court.  *Id.*, at ¶ 8.  Interestingly, this was the second incident involving a SRO spraying T.L.P. with chemical spray while a teacher

---

[3]The class representatives are T.L.P., G.S., K.B., B.D., P.S., and J.W.

[4]The SRO also accidently sprayed the coach restraining T.L.P.  Doc. 75-5, at 18  ¶ 7.

restrained her. *Id.*, at ¶ 6. On both occasions, the chemical spray burned T.L.P.'s throat and caused her to cough. *Id.,* at 19 ¶ 9.

### 2.    G.S.

On December 8, 2009, as seventeen-year-old G.S. jogged across the lawn at Huffman High School, a SRO grabbed her from behind. Doc. 75-5, at 12 ¶ 4. Naturally, before she recognized the individual as a SRO, G.S. tried to free herself from her attacker. *Id.,* at ¶ 5. Allegedly, the SRO immediately sprayed chemical spray directly in G.S.'s eyes and face. *Id.* G.S. contends the SRO sprayed her a second time even after she fell to the ground due to the pain caused by the first spray. *Id.*, at ¶ 6.

Although the school called the paramedics, G.S. recalls only that the paramedics asked her questions related to her age and allegedly does not remember much else because of the pain. *Id.*, at ¶ 7. At some point, the SRO transported G.S. to Cooper Green Hospital where a nurse told G.S. the pain would eventually subside. *Id*., at ¶ 8. Allegedly, the nurse also made G.S. sign a medical treatment waiver without disclosing the contents of the document. *Id.* As a result of the chemical spray, G.S. allegedly sustained multiple injuries, including swollen eyes, burned facial skin, and difficulty breathing. *Id.,* at ¶ 9.

### 3.   K.B.

On or around February 21, 2011, a male student allegedly approached K.B., then a tenth grader at Woodlawn and four months pregnant, and started making inappropriate sexual comments.  Doc. 75-5, at 25-26 ¶ 4.  Although K.B. cried and walked away, the male student followed K.B. and continued the barrage of opprobrious epithets.  *Id.*, at 26 ¶ 5.  As K.B. walked to her next class in tears, a SRO allegedly grabbed K.B. and told her to calm down.  *Id.* at ¶ 6.  When K.B. continued crying, the SRO allegedly turned K.B. around and told her in a stern voice, "you really need to calm down."  *Id.,* at ¶ 7.  Immediately thereafter, the SRO allegedly sprayed K.B. with chemical spray and handcuffed her.  *Id.* at ¶ 8-9. The SRO then transported K.B. to Cooper Green Hospital, where K.B. signed a medical release form even though K.B. alleges she was partially blind due to the effects of the chemical spray.  *Id.*, at 27 ¶ 11.  K.B. contends the chemical spray made her nauseous, burned her eyes and face, and impacted her breathing. *Id.*, at ¶¶ 13-15.

### 4.    B.D.

On February 22, 2011, B.D., then a senior at Woodlawn, had a disagreement with a teacher that caused the teacher to ask the principal to escort B.D. to the office.  Doc. 75-5, at 21 ¶ 5.  While in route to the office, B.D.

informed the principal that she wanted to talk to an assistant principal B.D. knew well. *Id.*, at ¶ 6. Allegedly, this request prompted the principal to page a SRO to assist her with an "outrageous student on the second floor." *Id.* Shortly thereafter, a SRO responding to the page grabbed B.D. by the arm and pulled her down the hallway.  Because of the pain, B.D. tried three times to escape from the SRO's grip.  On the third attempt, the SRO pushed B.D. against the wall and applied chemical spray directly in B.D.'s eyes, *id.*, at ¶ 8, causing them to burn and aggravating a preexisting health condition that causes B.D.'s heart to beat abnormally fast, *id.*, at 20 ¶ 3.  Allegedly, the chemical spray also caused the SRO to start coughing and struggling to catch his breath.  *Id.*, at 22 ¶ 9.  Sometime thereafter, the SRO escorted B.D. to Family Court and then to Cooper Green Hospital, where a nurse "told" B.D. to sign a form declining medical treatment. *Id.*, at ¶ 11.   B.D. alleges that she signed the form because the chemical spray affected her ability to see fully. *Id.*  Finally, B.D. contends her face and eyes burned and that bumps formed on her neck and chin.  *Id.*, at 23 ¶¶ 13-15.

### ii.   Group Two – Class Representatives Accidently Exposed to Chemical Spray

#### 1.   P.S.

P.S. is the sister of Group One class representative G.S. and was exposed

accidently in the incident involving G.S.  Specifically, on December 8, 2009, P.S.,

then fifteen years old, saw G.S. walking across the Huffman High School grounds.

Doc. 75-5, at 15 ¶ 4.   As P.S. ran towards her sister, P.S. saw a SRO spray

chemical spray directly in G.S.'s eyes.  *Id.*, at ¶ 5.   Another SRO grabbed P.S.

from behind to prevent P.S. from reaching G.S.  Unfortunately, despite this second

SRO's efforts, when the other SRO sprayed G.S. a second time, P.S. felt the

effects of the chemical spray.  *Id.*, at ¶ 8.  Specifically, the chemical spray burned

P.S.'s eyes and impacted her breathing.  *Id.*

### 2.   J.W.

In April 2010, J.W., then a tenth grader at Woodlawn, saw two students

fighting.  Doc. 75-5, at 8 ¶¶ 1, 3. As is generally the case amongst this age group,

J.W. and other students gathered nearby to watch.  Around that same time, two

SROs responded and one allegedly directed his chemical spray into the crowd

before the spectators could walk away.  *Id.*, at ¶¶ 5-6.  J.W. alleges that the student

onlookers started coughing and screaming from the pain, that his eyes and nose

started stinging and burning, and that he had difficulty breathing.  *Id.*, at ¶ 6.

### C.   Class Claims

Plaintiffs moved the court for class certification under FED. R. CIV. P. 23(a)

and 23(b)(2) on October 19, 2011.  Doc. 75.  On December 6, 2011, the court

heard arguments only since neither side requested an evidentiary hearing.  Doc.

105.  During the arguments, in response to the court's questions, counsel for

Plaintiffs clarified that Plaintiffs are not asking this court to issue an outright ban

on the use of chemical spray:

> THE COURT: The plaintiff is not asking the Court in this case
> to bar the SROs from ever using mace in school settings.

> MS. HOWARD: Right. Your Honor, we're just asking that the
> Court bar the unlawful use of mace in school settings.

*See id.*, at 21-22.  In fact, it is clear Plaintiffs recognize and embrace the school

system's legitimate interests in preserving order and protecting students and

teachers from harm while on school property.  Plaintiffs challenge instead the

specific uses of chemical spray here which Plaintiffs claim constitute excessive

force.  As it relates to the class question currently before this court, Plaintiffs claim

that the use of chemical spray is constitutionally flawed because Chief Roper

allegedly failed to adequately train SROs and to implement a policy specifically

for the utilization of chemical spray by SROs.  Essentially, Plaintiffs contend that

the school setting is unique and requires police procedures tailored specifically to

such an environment.  In other words, Chief Roper's general policy on the use of

chemical spray and the training he provides to officers is purportedly geared

towards the adult population and, consequently, applying it in the school setting

11

without any modifications is tantamount to excessive force.  Plaintiffs seek to challenge these alleged constitutional deficiencies on behalf of themselves and a class of similarly situated students, and ask this court to certify a class and appoint them as representatives of the class.

## II.    CLASS CERTIFICATION ANALYSIS

## A.    Class Certification Standard

Rule 23 of the Federal Rules of Civil Procedure outlines the requirements for class certification.  Initially, Plaintiffs must satisfy the four Rule 23(a) prerequisites:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Courts often refer to these prerequisites as the numerosity, commonality, typicality, and adequacy requirements.  They are "designed to limit class claims to those fairly encompassed by the named plaintiffs' individual

12

claims." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir.

2003) (citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)).

"These four requirements serve as guideposts for determining whether under the

particular circumstances maintenance of a class action is economical and whether

the named plaintiff's claim and the class claims are so interrelated that the

interests of the class members will be fairly and adequately protected in their

absence." *Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001)

(quotations and citations omitted).

 If Plaintiffs succeed in establishing the Rule 23(a) prerequisites, the analysis

then shifts to Rule 23(b), which states in pertinent part that:

> A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (2) the party opposing the class has acted or refused to act on grounds
> that apply generally to the class, so that final injunctive relief or
> corresponding declaratory relief is appropriate respecting the class as
> a whole . . .

FED. R. CIV. P. 23(b)(2).  In reviewing the motion, "[a] district court must conduct

a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Sher v.

Raytheon Co.*, 419 F. App'x 887, 889 (11th Cir. 2011) (citing *Falcon*, 457 U.S. at

161).  While class certification naturally focuses on the requirements of Rule 23,

"the trial court can and should consider the merits of the case to the degree

13

necessary to determine whether the requirements of Rule 23 will be satisfied."

*Valley Drug Co.*, 350 F.3d at 1188 n.15.  Signficantly, "[i]t is inescapable that in

some cases there will be overlap between the demands of Rule 23(a) and (b) and

the question of whether plaintiff can succeed on the merits."  *Rutstein v. Avis Rent-*

*A-Car Sys.*, 211 F.3d 1228, 1234 (11th Cir. 2000).  Finally, the movant bears the

burden of proving that she satisfies one of the Rule 23(b) requirements.  *Valley*

*Drug Co.*, 350 F.3d at 1187.

**B.      Rule 23(a) Analysis**

Consistent with the established procedures for analyzing motions for class

certification, the court will begin its analysis with an assessment of whether this

matter is appropriate for class certification by examining the "numerosity,

commonality, typicality, and adequacy of representation" requirements contained

in Rule 23(a). Because the court answers the question in the affirmative, the court

will then address the requirements of 23(b) fully in section C.

i.      **Numerosity**

Under Rule 23(a)(1), a class action may be maintained only if the class is so

numerous that joinder of all class members is impracticable. *Dujanovic v.*

*MortgageAmerica, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999); *Terazosin*

*Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 553 (S.D. Fla. 2001).  Whether

joinder is practicable depends on many factors, including "the size of the class,

ease of identifying its numbers and determining their addresses, facility of making

service on them if joined and their geographic dispersion." *Kilgo v. Bowman*

*Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (finding that class of at least 31

individual class members from a wide geographic area met the numerosity

requirement).  "While there is no fixed numerosity rule, generally less than

twenty-one is inadequate, more than forty adequate, with numbers between

varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d

1546, 1553 (11th Cir. 1986) (quotations omitted).  If the court can draw

reasonable inferences from the facts before it as to the approximate size of the

class and the infeasibility of joinder, the numerosity requirement is satisfied.

*Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) ("Although

mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff

need not show the precise number of members in the class"); *Dujanovic*, 185

F.R.D. at 666 ("This court may 'make common sense assumptions' to support a

finding of numerosity.").

Here, Plaintiffs maintain that all students are at risk of either direct or

indirect exposure to chemical spray and, accordingly, seek declaratory and

injunctive relief on behalf of all current and future high school students.  Doc. 75-

1, at 4.  Moreover, because approximately 8,000 students attended Birmingham city high schools during the 2009-2010 school year, doc. 77-1, at 7-8, doc. 83, at 11, Plaintiffs allege the 8,000 current students, plus the future students, make the class "so numerous that joinder of all the class members is impracticable." FED. R. CIV. P. 23(a); doc. 75-1, at 7.  Furthermore, Plaintiffs contend the class is clearly defined and identifiable because all potential class members are currently attending or will attend one of the eight high schools in the Birmingham system. Doc. 75-1, at 8.

Defendants disagree and assert that the proposed class is too broad and should only include the 100 students SROs sprayed with chemical spray from 2006-2011.  Doc. 83, at 11-12.  Furthermore, Defendants contend that 100 students over a five-year period, when compared to the approximate 35,000 students attending the eight high schools during this period, is too small a number to meet the numerosity requirement.

Defendants' focus on the 100 students directly targeted by the SROs overlooks the bystander students impacted indirectly by the use of chemical spray. Although SROs are trained professionals who make an effort to restrict the chemical spray to the specific student in question, chemical spray is nonetheless an aerosol that knows no boundaries and makes no distinction between

misbehaving and compliant students. As such, any student in the vicinity can suffer from the effects of the chemical spray.  Indeed, this is the subset of students the second group of class representatives seeks to represent.  While the precise number for this group is speculative, it is safe to assume nonetheless that the innocent bystander group is fairly significant given that SROs directly sprayed 100 students, including while in close proximity to other students. *See Dujanovic*, 185 F.R.D. at 666 ("This court may 'make common sense assumptions' to support a finding of numerosity.").  Therefore, the court rejects Defendants' contention that the chemical spray only impacted 100 students.

Moreover, even if the court ignores the innocent bystander subset and focuses only on the group of 100, Plaintiffs still satisfy the numerosity requirement because generally more than forty is sufficient.  *Cox*, 784 F.2d at 1553.  Thus, under Rule 23(a)(1), it is insignificant whether the class is comprised of 8,000 as Plaintiffs contend or 100 students as Defendants contend because either amount is so "numerous that joinder of all class members is impracticable." *Dujanovic*, 185 F.R.D. at 666.

ii.   **Commonality and Typicality**[5]

"Traditionally, commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado-Steiman,* 221 F.3d at 1266.  Commonality under Rule 23(a)(2) requires that the named plaintiff and the class members' grievances share common questions of law or fact, while typicality under Rule 23(a)(3) requires that "the claims or defenses of the representative parties [are] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(2), (a)(3). Commonality is satisfied whenever "[t]he claims actually litigated in the suit [are] fairly represented by the named plaintiffs." *Cox,* 784 F.2d at 1567.  Indeed, commonality requires "'that there be at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)). Likewise, typicality exists when the named plaintiffs' claim arises "from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*,

---

[5]The court addresses these two prerequisites together because they involve similar considerations and "tend to merge." *See e.g.*, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

741 F.2d 1332, 1337 (11th Cir. 1984). "Typicality also encompasses the question of the named plaintiff's standing, for '[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class.'" *Piazza,* 273 F.3d at 1346. Significantly, commonality and typicality do not require that the named plaintiffs' claims are identical to each class member's claims, but they must share "the same essential characteristics." *Prado-Steiman*, 221 F.3d at 1279 n.14 (citations and quotation marks omitted).

### a. *Commonality*

Plaintiffs allege they satisfy the commonality requirement because "this action raises questions of law and fact that are common to the class and arise from a Police policy that is generally applicable to Birmingham City high school students." Doc. 75-1, at 9. Plaintiffs frame the common questions of law and fact as follows:

- Whether Defendant Roper's policy governing the use of mace on children attending Birmingham high schools permits and encourages SROs to use . . . mace against students in inappropriate situations and in an unconstitutional manner in violation of the Fourth and Fourteenth Amendment.

- Whether the practices and customs related to use of mace employed by SROs . . . are impermissible under the Fourth and Fourteenth Amendments.

19

- Whether Defendant Roper's uniform training and supervision SROs in the use of mace provides insufficient guidance on application of the chemical in school settings and against children . . . .

- Whether Defendant Roper's decontamination procedures for students who have been exposed to mace are inadequate to reduce the risk of prolonged pain, injury, or other serious harm to exposed students.

- Whether SROs' use of mace on students constitutes an unreasonable seizure in violation of the Fourth Amendment.

- Whether Defendant Roper is liable under 42 U.S.C. § 1983 for failing to adequately train and supervise SROs who are authorized to use mace on children.

Doc. 75-1, at 10-11.

Defendants disagree and contend the "primary issue is whether the use of mace by Defendants against teenagers engaging in criminal activity in the Birmingham High School is excessive on its' face." Doc. 83, at 14. Moreover, Defendants allege that this matter is inappropriate for class certification because excessive force cases involve numerous factual disputes that require an individual fact intensive review on each allegation of alleged excessive force. Doc. 83, at 14. These factual differences, according to Defendants, include:

- Different Police Officers
- Different Officers' perception of the events involving the Plaintiffs
- Reasonableness of the Officer's actions
- Various and different Officers' training, background and experiences
- Different uses of force by the Officers for each incident

20

- •    Whether the Plaintiffs were violating the law
- •    Different criminal charges that resulted from each incident
- •    Different criminal and disciplinary history of the Plaintiffs
- •    Different students as witnesses to each incident
- •    Different actions by the Plaintiffs for each incident
- •    Different locations (schools) and physical makeup of the area of each incident
- •    Numerous other different witnesses, including principles, teachers and faculty to the events

Doc. 83, at 14.

Although Defendants are correct about factual differences in Plaintiffs'

individual claims, they overlook that Rule 23(a)(2) "demands only that there be

questions of law or fact common to the class.  This part of the rule does not require

that all the questions of law and fact raised by the dispute be common." *Vega v. T-*

*Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (citations and quotation

marks omitted).  Indeed, here, all of Plaintiffs' claims, including the Plaintiffs

accidently subjected to chemical spray, stem from whether Chief Roper's

implementation of policies and practices and the alleged failure to train SROs

specifically relating to the use of chemical spray in a school setting violate

students' Fourth and Fourteenth Amendment rights.  *See* doc. 75, at 3-28.

Furthermore, potential class members' claims will also stem from the intentional

or accidental affects of chemical spray as a result of policies and training

procedures implemented by Chief Roper.  Therefore,  Plaintiffs claims "are

21

premised on the same legal theories " of whether the policy and practices

governing the use of chemical spray are inadequate, whether Chief Roper failed to

properly supervise and train the SROs, and whether these alleged inadequate

policies and training violated students' constitutional rights.   Doc. 75-1, at 16.

Resolving this issue will not require witnesses from each school or witnesses of

each incident, nor an inquiry into the alleged criminal charges levied on each class

member.  In fact, the class may be able to present their case on this issue based

solely on policies and training records.  Since the resolution of this constitutional

issue will depend primarily on policies and training related to SROs and will not

require an extensive assessment of each specific chemical spray incident, the court

finds the commonality requirement is satisfied.

### b.   *Typicality*

A class representative must possess the same interest and suffer the same

injury as the class for her claims to be typical of the class under Rule 23(a)(3). *See*

*Prado-Steiman,* 221 F.3d at 1279.  However, typicality can exist despite

substantial factual differences when there is a "strong similarity of legal theories."

*Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001); *see also Appleyard v.*

*Wallace,* 754 F.2d 955, 958 (11th Cir.1985).  To establish typicality, plaintiffs

must show there is "a nexus between the class representative's claims or defenses

and the common questions of fact or law which unite the class." *Kornberg,* 741

F.2d at 1337.  "A sufficient nexus is established if the claims or defenses of the

class and the class representatives arise from the same event or pattern or practice

and are based on the same legal theory." *Id.*; *see also Prado-Steiman*, 221 F.3d at

1279 n.14. ("[A] strong similarity of legal theories will satisfy the typicality

requirement despite substantial factual differences.").

 As previously stated, the proposed class and Plaintiffs' claims arise from the

same allegedly unconstitutional practices. Doc. 75-1, at 16.  Because the class

representatives consist of four students actually sprayed with chemical spray and

two students accidently affected by the effects of chemical spray, their claims are

consistent with the proposed class's injury or risk of injury from the use of

chemical spray by SROs. Thus, the court finds the typicality requirement is

satisfied because the class representatives and members' claims are premised

around the same injury or threat of injury and the same legal theory of the

unconstitutionality of Chief Roper's policies, practices and training.

 iii.  **Adequate Representation**

 Rule 23(a) also requires the named plaintiffs to demonstrate adequacy of

representation, which courts extend to two areas:  (1) the competency of class

counsel to handle the case; and (2) the absence of disabling conflicts of interest

23

between the named plaintiffs and the class members.  *Griffin v. Carlin*, 755 F.2d 1516, 1532-33 (11th Cir. 1985).  Thus, "adequacy of representation means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel." *Piazza*, 273 F.3d at 1346 (quotation marks omitted).  Therefore, "[i]f substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Valley*, 350 F.3d at 1189.

### a.  *Adequacy of Class Counsel*

"Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action." *City of St. Petersburg, et al., v. Total Containment, Inc., et al.*, 265 F.R.D. 630, 651 (S.D. Fla. 2008) (citing *Dahlgren's Nursery, Inc. v. E.I. DuPont De Nemours & Co.*, No. 91-8709-CIV, 1994 WL 1251231, at *6-7 (S.D. Fla. 1994).  Here, Plaintiffs contend class counsel Ebony Howard and Mary Bauer are fully qualified to pursue this action.  Doc. 18, at 22; doc. 75-8.  Although Defendants do not challenge Ms. Bauer's qualifications, they question whether Ms. Howard, who has no class litigation experience, is qualified to handle this matter.  Doc. 19, at 21.

Defendants' concerns about Ms. Howard's experience would carry the day

if Ms. Howard is lead counsel for the class.  However, Ms. Howard is assisting

Ms. Bauer whom Defendants acknowledge is competent to adequately represent

the proposed class.  Indeed, Ms. Bauer has prior experience serving as class

counsel in at least four cases.  Doc. 75-8, at 3.  Moreover, The Southern Poverty

Law Center, where Ms. Bauer and Ms. Howard work, has extensive experience as

class counsel in at least twenty cases and has sufficient funds to finance this

litigation. *Id.* at 3-4. In other words, because Ms. Howard will have the assistance

of Ms. Bauer and The Southern Poverty Law Center, Ms. Howard's participation

will not handicap the class adversely.  Furthermore, Ms. Howard has almost five

years of litigation experience which, although not class action related, will be a

benefit to the class nonetheless.  Finally, the court adds that Ms. Howard can only

gain experience by working on a class case under the guidance and tutelage of an

experienced counselor like Ms. Bauer, and it might as well be this one especially

since Ms. Howard has proved to be an effective advocate thus far in this case.

Therefore, the court finds that counsel are adequate to represent the proposed

class.

### b.   *Adequacy of Class Representatives*

The Eleventh Circuit has held that "[t]he existence of minor conflicts alone

will not defeat a party's claim to class certification: the conflict must be a

'fundamental' one going to the specific issues in controversy." *Valley,* 350 F.3d at 1189.  "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."  *Id.*

Plaintiffs contend no conflict exists between them and the proposed class because they want to make all students safer by ensuring that Chief Roper implements adequate policies and training for the SROs.  Doc. 75-1, at 17; 75-5, at 3-28.  Defendants disagree and contend that Plaintiffs may have "interests antagonist to those of the class" because some Plaintiffs are no longer students, doc. 83, at 18, and some class members may actually want SROs to continue their current practice given that SROs are in the schools to protect students from misbehaving students, doc. 84, at 11.

Defendants' arguments fail for several reasons.  First, as it relates to the graduation or drop-out argument, Defendants seem to limit this contention solely to T.A.P.  Specifically, Defendants state "[T.A.P's] interest are not in a line with the interest of the class" because she is no longer in school.  Doc. 83, at 18.  However, T.A.P.'s interests do not need to align with the class because she raises claims against Defendant Moss only and is not seeking to serve as a class representative.  Doc. 84, at 2. Moreover, even if some of the proposed class representatives have graduated or no longer attend Birmingham schools, to the

extent that their departure causes a conflict, the conflict is not fundamental.  The proposed class representatives were either directly or indirectly harmed by the chemical spray.  Doc. 75-5, at 3-28.  Each representative described the pain he or she suffered and wants to ensure that no other student experiences similar trauma.  That some have since graduated or left Birmingham schools does not diminish the trauma they claim they endured and which current and future students may endure as well.  In short, no fundamental conflict exists between the named Plaintiffs and the proposed class simply because some named Plaintiffs may no longer attend Birmingham City Schools.

Likewise, no conflict exists between the named Plaintiffs and any potential class members who advocate for or favor the presence of SROs in the schools.  Again, the named Plaintiffs are not seeking to remove SROs from city schools, nor do they contend that SROs can never use chemical spray.  Doc. 105, at 21-22.  Rather, as it relates to the class, they challenge only Chief Roper's policies and the training Chief Roper provides for the use of chemical spray by SROs, which the named Plaintiffs contend are inadequate and encourage SROs to violate the constitutional rights of students.  To the extent that Plaintiffs prevail, *all* students will benefit from the implementation of revised policies and more effective training, if, in fact, the current policies and training are ineffective.  Therefore, the

court finds that the named representatives are adequate to represent the class.

## C.   <u>Rule 23(b)(2) Standard</u>

In light of the court's finding that the named Plaintiffs satisfy Rule 23(a), the court turns now to Rule 23(b)(2), which provides that to maintain a class, Plaintiffs must show that "(1) the party opposing the class must have acted or refused to act or failed to perform a legal duty on grounds generally applicable to all class members; and (2) the class must seek final injunctive or declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2); *see also Murray,* 244 F.3d at 812.

Plaintiffs contend Chief Roper failed to implement a policy for the use of chemical spray by SROs and to train and supervise SROs.  Doc. 75-1, at 19. Therefore, Plaintiffs assert that the alleged deficiencies of Chief Roper's training and policies affect all students who attend and will attend a Birmingham high school.  *Id.*  Defendants disagree and contend Plaintiffs "have failed to prove that Defendant Roper's policy of using mace on teenagers in the Birmingham high Schools is unconstitutional or a danger."  Doc. 83, at 20. Furthermore, Defendants rely on *Kerr v. City of West Palm Beach*, 875 F.2d 1546 (11th Cir. 1989), for the proposition that "district courts tend to deny class certification when the allegations show factual differences among the putative class members in

excessive force cases." Doc. 83, at 15.  Indeed, the Eleventh Circuit stated in

*Kerr*:

> As we have already discussed, when presented with allegations that a police officer used excessive force in the apprehension of a suspect, the federal courts must assess the reasonableness of the office's actions in light of the essentially unique factual circumstances accompanying the arrest.  Such determinations cannot be made *en masse,* and such suits therefore are especially unsuited to class disposition.

*Kerr*, 875 F.2d at 1558 (citations omitted).  However, Defendants overlook that

this court will not decide on a class basis whether each use of chemical spray was

justified under the circumstances.  That determination is one that indeed the court

can only assess "in light of the essentially unique factual circumstances

accompanying" each incident.  Rather, the class determination here is whether

Chief Roper's alleged failure to implement a policy specifically for the use of

chemical spray by SROs and the alleged failure to train SROs on the use of

chemical spray in a school setting violated the constitutional rights of the

Plaintiffs.  Therefore, the *Kerr* holding is not applicable here.  Moreover, *Kerr* is

also distinguishable because it involved Rule 23(b)(3), which requires that "the

questions of law or fact common to the members of the class [must] predominate

over any questions affecting only individual members."  FED. R. CIV. P. 23(b)(3).

Conversely, under Rule 23(b)(2), "there is no requirement . . . that issues subject to

generalized proof predominate over those subject to individualized proofs."
*Murray*, 244 F.3d at 811; *see also Rutstein v. Avis Rent-A Car Sys., Inc.,* 211 F.3d
1228, 1233 (11th Cir.2000); *Barnes v. American Tobacco Co.,* 161 F.3d 127, 143
(3rd Cir.1998) ("While 23(b)(2) class actions have no predominance . . .
requirements, it is well established that the class claims must be cohesive.").

To satisfy the first requirement of 23(b)(2), Plaintiffs allege Chief "Roper
has acted or refused to act on grounds applicable to the proposed class by
subjecting Birmingham high school students to an unconstitutional policy and
deficient police training program on mace." Doc. 19, at 21.  As previously stated,
Plaintiffs only need to show general questions of law or fact are common to the
members of the class, which Plaintiffs have done.  Plaintiffs and the proposed
class's claims are based on the same legal theory that Chief Roper allegedly failed
to perform his constitutional legal duty to implement a policy for the use of
chemical spray by SROs and to train and adequately supervise SROs.  Doc. 75-1,
at 19.  Therefore, although there may be some factual disputes about the
circumstances surrounding each specific incident, Chief Roper's legal duty to
Plaintiffs is generally applicable and cohesive to the class members. Furthermore,
the exclusive relief sought in the Complaint under class action is injunctive and
declaratory relief; thus, the second requirement of Rule 23 (b)(2) is satisfied.  *See*

Doc. 52.

## V.  CONCLUSION

For the reasons stated above, the court finds that Plaintiffs satisfy the Rule 23(a) and (b)(2) requirements. Accordingly, the court **GRANTS** Plaintiffs' motion for class certification.

**DONE** this the 31st day of August, 2012.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE