FILED

2015 Sep-30  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **J.W. et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action Number |
| **v.** | ) | **2:10-cv-03314-AKK** |
| | ) | |
| **BIRMINGHAM BOARD OF EDUCATION., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Since the dawn of time, children have engaged in challenging but normal adolescent behavior in school settings. Indeed, this is perhaps the one point on which the parties in this matter agree. For just as long, presumably wiser, more level-headed adults have responded and have successfully utilized deescalation techniques that are far less violent than those at issue here. As this case has revealed, the adults tasked with ensuring the safety of Birmingham's school children have resorted to using chemical spray to deal with this normal—and, at times, challenging—adolescent behavior. The chemical spray at issue here is Freeze +P, which is described by its manufacturer as "the most intense [] incapacitating agent available today." Pl. Ex. 10 at 1. While some may disagree, there are scenarios in which the use of Freeze +P is

perfectly justifiable, even in the school setting. What no one can disagree on, however, is that once law enforcement officers have secured the affected individual, they have a legal obligation to decontaminate the individual. Unfortunately, despite established case law requiring effective decontamination and clear instructions from Freeze +P's manufacturer, the officers here failed to decontaminate the students, and instead left them to suffer the effects of the chemicals until they dissipated over time. That the officers chose to do so when each of the high schools has science labs with eye wash stations, showers in the lockers, and bathroom sinks with showers and soap is simply confounding to this court when, as here, the officers testified that the students posed no further threat after the officers sprayed them with Freeze +P.

The plaintiffs in this case are eight former Birmingham City School students who Birmingham Police Department School Resource Officers ("S.R.O.s") sprayed with Freeze +P while they attended various Birmingham high schools. The plaintiffs seek damages from the officers who sprayed them. Six of the plaintiffs, J.W., G.S., P.S., T.L.P., B.D., and K.B.,[1] are also the named representatives of a class of all current and future Birmingham City Schools high school students. They seek injunctive relief from Birmingham Police Chief A.C. Roper. The court presided over a twelve-day bench trial on the matter between January 20, 2015 and February 9,

---

[1] The plaintiffs' motion requesting that the court continue to refer to them by their initials, doc. 264, is **GRANTED**.

2015.

At the outset, let the court be clear regarding what is not at issue in this case. This case is not about whether the S.R.O.s assigned to Birmingham City Schools can spray students who are actively engaged in a physical fight or other violent behavior with Freeze +P. They can. The plaintiffs have long since conceded that point and agree that S.R.O.s can use Freeze +P in schools. *See* doc. 105 at 5. Indeed, the law affords law enforcement a great deal of discretion when a person poses a risk of harm to others or to the officers. Instead, this case boils down to four issues. The first is whether the defendant S.R.O.s inflicted excessive force on the plaintiffs when they sprayed the plaintiffs with Freeze +P. The second is whether the defendant S.R.O.s adequately decontaminated the plaintiffs after spraying them with Freeze +P, and if not, whether their failure to do so constituted excessive force. The third is whether, if they inflicted excessive force on the plaintiffs, the defendant S.R.O.s' behavior was pursuant to a Birmingham Police Department ("B.P.D.") policy or custom. The fourth is whether the plaintiffs have demonstrated that they are entitled to injunctive relief.

The court was profoundly disturbed by some of the testimony it heard at trial. The defendant S.R.O.s uniformly displayed a cavalier attitude toward the use of Freeze +P—in a display of both poor taste and judgment, one defendant joked that Freeze +P is a potent nasal decongestant for individuals with sinus problems. Equally disturbing, the trial revealed that the defendant S.R.O.s believe that deploying Freeze

+P is the standard response even for the non-threatening infraction that is universal to all teenagers—i.e. backtalking and challenging authority. Frankly, the defendant S.R.O.s' own testimony left the court with the impression that they simply do not believe spraying a student with Freeze +P is a big deal, in spite of their own expert's testimony that Freeze +P inflicts "severe pain." The court also heard testimony that indicated several of the officers spray students with Freeze +P because it is easier than more hands-on approaches, even though those approaches cause students less pain than Freeze +P. Ultimately, the court believes that it was unnecessary for the defendant S.R.O.s to spray most if not all of the plaintiffs. Unfortunately for some of the plaintiffs, behavior that is unnecessary and disturbing is not automatically unconstitutional.

Because the defendants have raised a number of thorny legal issues, the length of this opinion belies the simplicity of resolving the merits of this case. To summarize the court's findings, two of the plaintiffs—K.B. and B.J.—succeed on the merits of their individual excessive force claims against the defendant S.R.O.s who sprayed them with Freeze +P. Although K.B. and B.J. were creating noisy disturbances when S.R.O.s sprayed them, both were restrained and neither tried to resist arrest or posed a danger to anyone. In contrast the other plaintiffs either resisted, fled, or tried to assault someone, all grounds for the deployment of chemical spray in this circuit.

The six plaintiffs who the defendant S.R.O.s directly sprayed with Freeze +P[2] succeed on the merits of their excessive force claim against the defendant S.R.O.s for failing to adequately decontaminate them. By and large, the defendant S.R.O.s did nothing to decontaminate the plaintiffs, and their efforts certainly do not rise to the level suggested by Freeze +P's manufacturer and, most tellingly, the defendants' own expert.

These two constitutional violations occurred pursuant to B.P.D. policy or custom. Birmingham police officers are instructed that they can respond to resistance with a degree of force one to two levels greater than the resistance itself. As will become clearer when the court explains the B.P.D.'s use of force continuum, the result is that Birmingham police officers may respond to verbal noncompliance by students with Freeze +P. That is precisely what happened to K.B. and B.J. Similarly, B.P.D. policy dictates that time alone may be an adequate decontamination measure for Freeze +P exposure, and Birmingham police officers are taught that time and air are sufficient measures of decontamination. These measures fall far short of those suggested by Freeze +P's manufacturer and the defendants' own experts, and B.P.D.'s policy governing the use of chemical spray indicates that decontamination is not necessary at all. Finally, the plaintiffs have met their burden and are entitled to

---

[2] Two of the plaintiffs, P.S. and J.W., were bystanders when S.R.O.s sprayed other students with Freeze +P—P.S. was nearby when Officer Anthony Clark sprayed her sister, G.S., with Freeze +P, 1/21/15 at 61, and J.W. was standing in a crowd watching a fight when an unnamed S.R.O. sprayed the crowd, *id.* at 91.

injunctive relief.

**Findings of Fact**[3]

I. Findings of Fact Related to the Plaintiffs' Claims against Individual Officers

    A. G.S. and P.S.

    1. On the afternoon of December 8, 2009, at about 4:00 p.m. G.S.,[4] a seventeen-year-old student enrolled in Huffman High School, was standing in front of the school waiting for her mother to pick her up. 1/20/15 at 130–32.[5] While G.S. talked to a friend, a boy known as "Snake" approached the two girls and insulted G.S.'s friend. *Id*. at 133–34. G.S. and Snake exchanged words, and Snake pushed G.S. twice in the chest. *Id*. at 134–35. At this point, other students intervened; G.S.'s friend grabbed her by the arm and Snake's friends moved him away to a different area. *Id.* at 135. G.S. escaped from her friend and started running toward Snake. *Id.* at 135–36. As G.S. reached Snake, someone grabbed her from behind. *Id*. at 136–37. G.S. thought it was another student and tried to break free. *Id*. at 138–39. G.S. kept her eyes closed

---

[3] The parties filed various motions in limine seeking to exclude certain evidence at trial. *See* docs. 256, 265, 266, and 267. To the extent that the court did not address these motions during the trial, they are **DENIED** because "during a bench trial . . . it is presumed that the district judge with rely only upon properly admitted and relevant evidence." *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1216 (11th Cir. 2003) (citing *Cmty. Action Grp. v. City of Columbus*, 473 F.2d 966, 973 (5th Cir. 1973)).

[4] G.S. was approximately 5'5" tall and weighed approximately 145 pounds on December 8, 2009. Pl. Ex. 14 at 1. Officer Clark, the S.R.O. who sprayed her with Freeze +P, was approximately 5'11" tall and weighed approximately 240 pounds. *Id*.

[5] The citation reflects the date of the testimony and the page of that day's transcript.

as she struggled, and did not realize it was Officer Anthony Clark who had grabbed her until she opened her eyes and saw that he was holding a can of Freeze +P directly in front of her face. *Id*. at 137–39. Without telling G.S. to calm down, that she was under arrest, or that he was about to spray her with Freeze +P, Officer Clark sprayed G.S. in the face, and G.S. fell to the ground. *Id*. at 138, 140–41.

2. At trial, Officer Clark presented a different version of the facts. Relevant here, Officer Clark testified that he spoke to G.S. prior to spraying her with Freeze + P, that G.S. told him that Snake had hit her, 2/3/15 at 209, that at the time he sprayed G.S., she was trying to fight with a girl who described herself as Snake's sister, rather than Snake, that G.S. tried to punch the other girl over Officer Clark's shoulder, and that he sprayed G.S. in response to G.S. pushing him in the chest five times, *id*. at 209–11.

3. The court did not find Officer Clark's testimony credible, based in part on his combative and evasive demeanor during cross-examination. Moreover, cross examination pointed to a number of inconsistencies between Officer Clark's testimony at trial and his deposition testimony such as whether he walked or ran through students to reach G.S. and the number of times G.S. allegedly shoved him. *Id*. at 243, 244. Most tellingly, Officer Clark failed to mention G.S.'s supposed fight with Snake's sister and her purported attempt to punch the other girl in either his arrest report or during his deposition. *Id*. at 244. The arrest report described G.S.

trying to get to a male student who previously hit her, presumably Snake, and does not describe her trying to punch anyone, although it does state that she pushed Officer Clark twice. Pl. Ex. 14 at 3. Finally, P.S., G.S.'s younger sister, who was nearby, testified that she did not hear Officer Clark say anything to G.S. prior to spraying her with Freeze +P. 1/21/15 at 63.

4. After Officer Clark sprayed G.S., a teacher helped G.S. off the ground and walked her into the school building to the office, where a school official asked if she needed an ambulance. *Id*. at 142–44. G.S. said yes because her face burned badly and she was having trouble breathing. *Id*. at 144.

5. Birmingham Fire and Rescue Service personnel responded and spoke with G.S. *Id*. at 145. They asked her for basic information, including her name and other identifying information. *Id*. G.S. asked the paramedics if she could wipe or put water on her face, but they told her doing so would make the burning worse. *Id*. at 146.

6. At some point, Officer Clark arrested G.S. and charged her with physical harassment. Pl. Ex. 14 at 1. Eventually, Officer Clark drove G.S. to Cooper Green Hospital, where G.S. told a nurse she was feeling better and signed a release form (albeit purportedly without knowing it was a release form). 1/20/14 at 147–49.

7. Officer Clark then transported G.S. to the Jefferson County Family Court, where court officials strip-searched G.S. *Id.* at 149–52. Eventually, G.S. was released to her mother. *Id.* at 150. She did not face any criminal proceedings in connection

with her arrest. *Id*. at 154.

8. At trial, the court heard no testimony indicating that Officer Clark attempted to decontaminate G.S. in any way. Specifically, the court heard no testimony indicating that Officer Clark placed G.S. in front of a fan or arranged for her to access any airflow. The court heard no testimony indicating he provided her with an opportunity to wash her face or shower. He also failed to provide G.S. with a change of clothes or give her the opportunity to access clothing that was not soaked in Freeze +P. *Id*. at 152.

9. G.S.'s younger sister, P.S., then a ninth grade student at Huffman High School, was standing nearby when Officer Clark sprayed G.S. with Freeze +P. 1/21/15 at 55, 64. Because of the windy conditions, P.S. and other students nearby experienced the effects of Freeze +P, which P.S. described as feeling like "needles stabbing my face. . . . [I]t hurt." *Id*. at 64.

B. T.L.P.

10. On October 29, 2009, a fight erupted between T.L.P.,[6] a fifteen-year-old student enrolled in Woodlawn High School, and another female student, E.H., in the school's cafeteria. 1/21/15 at 137. Two members of the school staff, Coach Johnson and Coach Howard, were the first adults to reach the girls. *Id*. at 139. Coach Johnson

---

[6] T.L.P. was approximately 5'2" tall and weighed approximately 128 pounds on October 29, 2009. Pl. Ex. 14 at 4. Officer Nevitt, the S.R.O. who sprayed her with Freeze +P, was approximately 6'4" tall and weighed approximately 265 pounds. *Id*.

grabbed T.L.P., and Coach Howard grabbed E.H., who had fallen to the ground.[7] *Id*. at 163. Officer Jeremiah Nevitt was already in the cafeteria and reached the girls a few seconds after Coach Johnson and Coach Howard. 2/2/15 at 150. He attempted to join the coaches in separating the girls but was unable to do so because T.L.P. had a tight grip on E.H.'s hair. *Id*. at 151.

11. Officer Nevitt told T.L.P. to let go of E.H.'s hair several times. *Id*. By this time, the many other students in the lunch room were growing rowdy and beginning to throw things. *Id*. at 230–31. When T.L.P. failed to comply with his instructions, Officer Nevitt attempted to spray her with Freeze +P. *Id*. Although some of the spray hit T.L.P. in the mouth, 1/21/15 at 142, Coach Johnson "took the bulk of the spray." 2/2/15 at 151. The spray made the inside of T.L.P.'s mouth burn and itch and caused her to cough. 1/21/15 at 142. T.L.P. released E.H.'s hair, ending the fight, and Coach Johnson dropped T.L.P. 2/2/15 at 151–52.

12. Subsequently, in an assistant principal's office, an administrator prepared papers suspending T.L.P. from school, and Officer Nevitt called Birmingham Fire and Rescue to provide medical assistance to T.L.P. *Id.* at 155. After the paramedics left, Officer Nevitt charged T.LP. with disorderly conduct, *id*. at 235, and transported her to the Family Court, instead of the hospital, where court staff strip searched her. *Id*.

---

[7] Officer Nevitt testified that Coach Johnson was about 6'0" tall and weighed about 300 pounds, and that Coach Howard was about 6'3" tall and weighed about 230 pounds.

at 156, 1/21/15 at 131, 235. T.L.P. was not formally charged with any criminal conduct in connection with this incident.

13. At trial, the court heard no testimony indicating that Officer Nevitt made any effort to decontaminate T.L.P. Specifically, the court heard no testimony indicating Officer Nevitt placed T.L.P. in front of a fan or arranged for her to access any airflow.[8] *Id*. at 234. The court heard no evidence indicating Officer Nevitt provided T.L.P. with a change of clothes or gave her the opportunity to access clothing uncontaminated by Freeze +P. The court also heard no evidence indicating that Officer Nevitt provided T.L.P. with water to wash her face or arranged for her to go to the restroom to wash. *Id*. at 235.The day after the incident, T.L.P. saw her pediatrician because she continued to cough as a result of the exposure to Freeze +P. 1/21/15 at 187.

14. At trial, T.L.P.'s version of these events differed somewhat from Officer Nevitt's. Most critically, she denied holding onto E.H.'s hair, 1/21/15 at 139, and testified that she and E.H. had stopped struggling with the coaches when Officer Nevitt sprayed her and Coach Johnson, *id*. at 141. Unfortunately for T.L.P., she undermined her own credibility by attempting to minimize the seriousness of and her culpability in the fight with E.H. *Compare id*. at 139 (testifying on direct that she

---

[8] Officer Nevitt did note during cross examination that the air conditioning was on in the assistant principal's office and that there "was plenty of air."2/2/15 at 234.

could not remember whether E.H. fell during the fight), *with id*. at 163 (admitting on cross-examination that E.H. was on the ground by the end of the fight). There is nothing in the record that undermines Officer Nevitt's testimony, and based on his demeanor at trial, the court chooses to credit his version of events to the extent they are inconsistent with T.L.P.'s.

C. B.D.

15. On February 22, 2011, B.D.,[9] a seventeen-year-old student enrolled in Woodlawn High School, became argumentative with a teacher. *Id*. at 12. The teacher told B.D. to leave the classroom, and B.D. refused, fearing that she would get in trouble if a teacher or administrator found her in the hallway after the bell rang. *Id*. The teacher used the classroom's telephone to call Woodlawn's principal, Shirley Burrell,[10] and summon her to the classroom. *Id*. When Burrell arrived, she asked B.D. to step into the hallway and, once there, told B.D. to accompany her to her office. *Id*. at 13. The two began arguing, and Burrell used her walkie-talkie to call for assistance. 2/4/15 at 91.

---

[9] At the time of the incident at issue, B.D. was approximately 5'4" tall and weighed approximately 106 pounds. Pl. Ex. 14 at 7. Officer Henderson was approximately 6'4" tall and weighed approximately 210 pounds.

[10] At trial and in the parties evidentiary submissions, Burrell was referred to alternatively as Shirley Burrell and as Shirley Graham, her married name. 1/21/15 at 34.

16. Officer Douglas Henderson and Assistant Principal John Lyons responded to Burrell's request for assistance. 2/4/15 at 88, 95. They found B.D. very agitated and cursing loudly at Burrell. 2/2/15 at 23; 2/4/15 at 92–93. All four began walking to Burrell's office, with Burrell walking ahead of the group. *Id*. at 94–95. B.D. continued to curse loudly, and other students began stepping into the hallway looking for the source of the commotion. *Id*. at 95. Officer Henderson grabbed B.D. by the arm and told her to calm down. 2/2/15 at 64–65. B.D. ignored Officer Henderson and lunged toward Burrell. *Id*. at 65; 2/4/15 at 95. At that point, fearing for Burrell's safety, Officer Henderson sprayed B.D. with Freeze +P. 2/2/15 at 27, 65. Officer Henderson's testimony—which B.D. disputed—was corroborated by Assistant Principal Lyons. Therefore, the court finds Officer Henderson's version of the incident more credible than B.D.'s.

17. After spraying B.D. with Freeze +P, Officer Henderson took her outside so that she could get some air and called Birmingham Fire Rescue. *Id*. at 30–32.  When paramedics arrived, B.D. told them that her face felt like it was on fire and she could not breathe. 1/21/15 at 20. They told her it was normal to feel that way and that she should keep wiping her eyes with gauze. *Id*.

18. After the paramedics left, Officer Henderson handcuffed B.D., 2/2/15 at 85, charged B.D. with disorderly conduct, Pl. Ex. 14 at 7, and drove B.D. to Family

Court, 1/21/15 at 22. During the drive, the windows in Officer Henderson's squad car were up and the air conditioning was off. *Id*. at 23. The Family Court refused to accept B.D. in light of her distress and her lack of medical treatment.[11] *Id*. at 22–23. Officer Henderson transported B.D. to Cooper Green Hospital, where, although she wanted medical attention, B.D. signed a form refusing treatment, purportedly because she did not understand the document. *Id*. at 23. After leaving Cooper Green, Officer Henderson transported B.D. back to Family Court, where court officers strip-searched her. *Id*. at 24. B.D. remained there for a few hours until her mother picked her up. *Id*. at 25.

19. B.D.'s eyes remained swollen for three or four days, and the spray caused welts on her face that lasted for a week and a half. *Id*.

20. At trial, the court heard testimony indicating that Officer Henderson undertook only minimal measures to decontaminate B.D. Although Officer Henderson took B.D. outside to provide her with access to fresh air, 2/2/15 at 30, the court heard no testimony indicating that he provided her with water to wash her face or arranged for her to go to the restroom to wash. The court also heard no testimony indicating that Officer Henderson provided B.D. with a change of clothes or gave her the opportunity to access clothing uncontaminated by Freeze +P.

---

[11] Officer Henderson testified that he could not recall whether he took B.D. to Family Court before taking her to Cooper Green Hospital. 2/2/15 at 69–72.

D. K.B.

21. During a class change on the afternoon of February 21, 2011, K.B.,[12] a fifteen-year-old female student enrolled in Woodlawn High School, and a boy named L.M. became engaged in a verbal altercation. 1/20/15 at 96. The dispute apparently stemmed from K.B.'s family's decision to ask L.M., who had previously lived with them, to move out after K.B. caught him stealing from her family. *Id* at 98. During the incident at Woodlawn, L.M. cursed at K.B., called her derogatory names, and insulted K.B.'s family members. *Id.* at 98. K.B. cursed back and walked away to avoid further confrontation. *Id*. at 99–100. However, L.M. followed her and continued to insult her. *Id*. at 100. L.M.'s friends and other students changing classes began to laugh at K.B. and she became upset and began to cry. *Id*.

22. K.B. continued to walk away, and L.M. followed, continuing to call her names. *Id*. at 102. K.B. continued to cry and cursed loudly at L.M. *Id*. At this point, L.M. went inside the girl's gymnasium. *Id.* Without explanation, Officer Silburn Smith[13] approached K.B., grasped her arm, handcuffed her, and told her to calm

---

[12] K.B. was approximately  5'4" tall and weighed approximately 130 pounds. Pl. Ex. 14 at 10. She was also five months pregnant. 1/20/15 at 107. Officer Smith was approximately 6' tall and weighed approximately 200 pounds. Pl. Ex. 14 at 10.

[13] Ordinarily, Officer Smith was assigned to Jackson-Olin High School, but on this day he filled in at Woodlawn.

down. *Id*. K.B. insisted that she was calm, *id*., even though, by her own account, she was still upset and continued to cry hysterically, *id*. at 103.

23. K.B. did not struggle with Officer Smith, try to pull away from Officer Smith,  or call him any names. *Id*. at 104. When Officer Smith asked K.B. about the dispute with L.M., K.B. started to tell him, and added that she did not understand why she was the only person in handcuffs. *Id*. Officer Smith told her to calm down twice more, and when she failed to do so, with no warning,[14] he sprayed her with Freeze +P. *Id*. The spray made K.B.'s eyes burn and her face felt like someone had cut it and poured hot sauce on it. *Id.* at 105.

24. While K.B. waited for the paramedics to arrive, she vomited. *Id*. at 106. Birmingham Fire and Rescue responded and talked to K.B., but did not provide any treatment. *Id*. Instead, they asked her a few questions and told her to keep her eyes open and not to put water on her face. *Id*. At the time of this incident, K.B. was five months pregnant. *Id*. at 124.

25. After Birmingham Fire and Rescue left, Officer Smith drove K.B. to Cooper Green Hospital. *Id*. at 108. The car windows were up. *Id*. At the hospital, K.B. signed a form declining treatment because Officer Smith told her there was nothing

---

[14] Officer Smith admitted he failed to warn K.B. before spraying her. 2/3/14 at 67.

the medical personnel could do to help her and that they would sit at the hospital all day if K.B. requested treatment. *Id.* at 109–10.

26. After leaving Cooper Green, Officer Smith transported K.B. to the Family Court, where the staff strip searched her. *Id.* at 111. K.B. was not formally charged with any criminal conduct in connection with this incident.

27. At trial, the court heard no testimony indicating that Officer Smith made any effort to decontaminate K.B. Specifically, the court heard no testimony indicating that Officer Smith placed K.B. in front of a fan or arranged for her to access any airflow. Officer Smith did not provide K.B. with a change of clothes or give her the opportunity to access clothing uncontaminated by Freeze +P. *Id.* at 109. The court also heard no testimony indicating that Officer Smith provided K.B. with water to wash her face or arrange for her to go to the restroom to wash.

28. Officer Smith's testimony differed from the preceding account in several ways. Most significantly, Officer Smith testified that K.B. made several attempts to move aggressively toward L.M. and repeatedly and loudly stated, "I'll fight a boy." 2/3/15 at 47. Officer Smith also testified that a large crowd had gathered around L.M. and K.B., and his concern about additional fights developing influenced his decision to spray K.B. with Freeze +P. *Id.* at 56. Finally, Officer Smith testified that he did not handcuff K.B. until after he sprayed her with Freeze +P. *Id.* at 49.

29. Based on K.B. and Officer Smith's demeanor on the stand, the court finds K.B.'s testimony to be more credible. Unlike some of the plaintiffs, K.B. did not try to minimize the disturbance her yelling and crying created. She also testified with great detail about her and L.M.'s movements around the campus prior to her encounter with Officer Smith, an aspect absent from Officer Smith's own testimony. In contrast, Officer Smith was evasive and combative on cross examination. And, importantly, a number of significant contradictions emerged in his testimony. On direct examination, Officer Smith testified that he sprayed K.B., in part, because a crowd of students was nearby, and he was worried that additional fights would begin. *Id*. at 56. But on cross examination, he stated that he could not remember if the crowd was yelling and admitted many of the students in it were trying to dissuade K.B. from fighting with L.M. *Id.* at 63–64. His position regarding the crowd was further undermined by the revelation that he testified at his deposition that the students in it were not, in fact, yelling, and, most significantly, that the crowd had dispersed by the time he sprayed K.B. with Freeze +P. *Id*. at 64–65. Additionally, he testified that he was not afraid of K.B., *id.* at 67, that K.B. did not hit him or anyone else, *id*., and that he could not remember whether L.M. seemed frightened of K.B., although as to this later point, plaintiffs' counsel subsequently revealed that at his deposition, Officer Smith testified that L.M. did not seem frightened by K.B, *id*. at 61, 63. In short,

Officer Smith undermined his own credibility. Consequently, to the extent they are at odds, the court chooses to credit K.B.'s testimony over that of Officer Smith.

E. B.J.[15]

30. On September 27, 2010, B.J.,[16] a 16-year-old student enrolled in Jackson-Olin High School, was in English class when the substitute teacher, Mr. Cook, summoned Assistant Principal Gadson to the classroom for assistance with verbal epithets directed at him. 1/23/15 at 5. When Gadson arrived, Cook identified B.J. as the offending student,[17] and Gadson pulled B.J. into the hallway. *Id.* at 6. Once there, with no warning, he began searching B.J.'s pockets. *Id*. Gadson pulled out a cell phone belonging to a friend of B.J., and B.J., fearful that Gadson would confiscate the cell phone, began to resist the search by pulling away from Gadson, pushing at Gadson's hands, and trying to retrieve the cell phone. *Id.* at 7–8.

31. At some point, Gadson called Assistant Principal Gates over the school radio and requested his assistance. 2/3/15 at 146. Officer Marion Benson was in Gates' office, and she accompanied him to meet Gadson. *Id*. When they arrived, Gates began to help Gadson search B.J.  *Id.* at 148. The precise sequence of events

---

[15] The defendants second motion to depose B.J., doc. 241, is **DENIED AS MOOT**.

[16] B.J. was approximately 5'6" tall and weighed approximately 140 pounds. Pl. Ex. 14 at 16. Officer Benson was approximately 5'6" tall and weighed approximately 200 pounds. *Id*.

[17] B.J. denied cursing at Mr. Cook. 1/23/15 at 6.

that ensued was not clear from either B.J. or Officer Benson's testimony, but they culminated in the two men holding B.J. against a locker. 1/23/15 at 26–27. Although B.J. had stopped resisting at this point, *id*., he heard a woman's voice say "Stay still, don't move." *Id*. at 9. Then, Officer Benson sprayed him in the face with Freeze +P, threw him to the ground, where he hit his head, kneeled on his back, and handcuffed him. *Id.* at 10–11.

32. Officer Benson picked B.J. by the handcuffs and took him to Gates' office. 2/3/15 at 149, 160. The Freeze +P made B.J. feel like his skin was steaming. 1/23/15 at 10. In the office, B.J. vomited, *id.* at 11, and Gates gave him a paper towel so that he could blow his nose, 2/3/15 at 149. Officer Benson charged B.J. with harassment. Pl. Ex 14 at 16. She then drove him to Cooper Green Hospital. 1/23/15 at 12. The windows in Officer Benson's car were rolled up. *Id*. at 13. At Cooper Green, B.J. signed a form declining treatment, although he purportedly did not understand what it meant. *Id*. at 12. Officer Benson then took B.J. to Family Court, *id*. at 13, where B.J. stayed until his father picked him up, *id*. at 16. He continued to cough until he fell asleep that night. *Id*. at 18. B.J. was not formally charged with any criminal conduct in connection with this incident.

33. Officer Benson failed to engage in any efforts to decontaminate B.J. after she sprayed him with Freeze +P. Specifically, she failed to place B.J. in front of a fan

or arrange for his access to any airflow.[18] 2/3/15 at 162. She failed to provide B.J. with a change of clothes or give him the opportunity to access clothing uncontaminated by Freeze +P. *Id*. at 163. She also did not provide him with water to wash his face or arrange for him to wash. *Id*. at 162.

34. B.J. and Officer Benson's versions of these events are largely consistent, although by Officer Benson's account, B.J.'s resistance to Principals Gadson and Gates' search was somewhat more aggressive than the behavior B.J. described in his testimony. More specifically, Officer Benson testified that B.J. was hitting Gadson's hand while resisting the search, rather than pushing it away. *Id*. at 152. To the extent that B.J. and Officer Benson's testimony is inconsistent, the court chooses to credit B.J.'s account of events, because Officer Benson's credibility, both in terms of truthfulness and in terms of the accuracy of her memory, was called into question significantly at trial due to the numerous discrepancies between her trial testimony and her deposition testimony. *See id*. at 156, 163–64, 167–68, 169, 170, 181, and 189.

F. T.A.P.

35. On August 29, 2009, a teacher brought T.A.P.,[19] a seventeen-year-old student enrolled in Carver High School, to Assistant Principal Anthony Moss, who

---

[18] Officer Benson did note that Mr. Gates' Office was air conditioned. 2/3/15 at 162.

[19] T.A.P. was approximately 5'4" tall and weighed approximately 145 pounds. Pl. Ex. 14 at 13. Officer Tarrant was approximately 5'11" tall and weighed approximately 165 pounds. *Id*.

was standing in the atrium near Carver High School's front entrance, and reported T.A.P. for smoking in the bathroom. 2/4/15 at 130. Moss asked T.A.P. to give him her mother's telephone number, and T.A.P. began cursing at Moss. *Id*. at 132.  Officer Ricky Tarrant entered the atrium, and as he told T.A.P. that she needed to calm down, T.A.P. swung her book bag at Officer Tarrant, hitting him with it, and ran out the front door.[20] *Id*.

36. Officer Tarrant chased after T.A.P., tackled her, and the two fell into a shrubbery. *Id*. at 28. Even though she was lying face down on the ground with Officer Tarrant on top of her, *id*. at 46, T.A.P. resisted Officer Tarrant's attempts to handcuff her, *id*. at 28. Consequently, Officer Tarrant sprayed T.A.P. in the face with Freeze +P. *Id*.

37. Officer Tarrant then handcuffed T.A.P. and took her to the school's distance learning center. *Id*. at 33. He called Birmingham Fire Rescue, and when the paramedics arrived, they briefly asked T.A.P. questions and then left. *Id*. One of Carver's special education teachers washed T.A.P.'s face. 1/22/15 at 174. An hour and a half later, Officer Tarrant drove T.A.P. to Cooper Green Hospital. *Id*. at 175. Officer Tarrant rolled his car windows down to expose T.A.P. to a breeze. *Id*. at 189. At Cooper Green, T.A.P. declined treatment because someone told her previously it

---

[20] T.A.P.'s account differed, but the court finds that Officer Tarrant's version, which Moss corroborated, is more credible.

would not help and some of her discomfort had been alleviated when the teacher washed her face. *Id.* at 175, 190. After leaving Cooper Green, Officer Tarrant drove T.A.P. to Family Court, where T.A.P. stayed until her mother picked her up. *Id*. at 175. The Freeze +P caused T.A.P.'s face to hurt for a couple of days. *Id.* at 177. T.A.P. was not formally charged with any criminal conduct in connection with this incident.

38. At trial, the court heard testimony indicating that Officer Tarrant undertook only minimal measures to decontaminate T.A.P. Although Officer Tarrant rolled down his car windows while driving T.A.P. to Cooper Green and Family Court, the court heard no testimony indicating he placed T.A.P. in front of a fan or arranged for her to access any airflow during the hour and a half she sat in the distance learning center after he sprayed her with Freeze +P.[21] Officer Tarrant did not provide T.A.P. with a change of clothes or give her the opportunity to access clothing uncontaminated by Freeze +P. 2/4/15 at 53. He also did not provide her with water to wash her face or arrange for her to go to the restroom to wash.[22] *Id*. at 54.

G. J.W.

---

[21] Officer Tarrant noted that the distance learning center was air conditioned. 2/4/15 at 53.

[22] Officer Tarrant noted that he did not prevent the special education teacher from washing T.A.P.'s face. 2/4/15 at 56.

39. In April 2010,[23] J.W., a tenth-grade student enrolled in Woodlawn High School, was on his way to English class when a fight involving three or four students broke out in the hallway. 1/21/15 at 89–90. J.W. and many other students formed a crowd around the fight to observe the events. *Id*. at 90. Two S.R.O.s responded, and one sprayed the students who were fighting with Freeze +P while the other S.R.O. sprayed the crowd. *Id*. at 91.

40. The mist from the Freeze +P landed on J.W.'s face, and felt like "burning wind." *Id*. at 92. It made his eyes and nose burn and made him cough. *Id*. He went to the bathroom, put water on his hands and rubbed his face, which did not help. *Id*. J.W. then went to class, but coughed for the rest of the day. *Id.* at 93.

II. Findings of Fact Related to the Plaintiffs' Municipal Liability Claims

    A. The B.P.D. S.R.O. Program

1. B.P.D. officers who are stationed in Birmingham City Schools are referred to as School Resource Officers or S.R.O.s.  S.R.O.s are a part of the Youth Services Unit which is a part of the Community Services Division of the B.P.D. 1/23/15 at 77.

2. Birmingham City Schools has eight high schools, which collectively serve approximately seven to eight thousand students. 1/29/15 at 211. There are sixteen

---

[23] The exact date is not clear.

S.R.O.s stationed in the high schools. 2/3/15 at 174. Huffman High School, Wenonah High School, Jackson-Olin High School and Kennedy Alternative School each has one full-time and two part-time S.R.O.s. Woodlawn High School, Carver High School, and Parker High School each has one full-time and one part-time S.R.O. Ramsay High School has one part-time S.R.O.

B. B.P.D. Rules and Regulations on the Use of Force and Chemical Spray

3. B.P.D. has rules and regulations governing officer conduct. Each officer is trained on the rules and regulations at the police academy and receives periodic retraining in various forms. *See e.g.*, 2/2/15 at 35, 161.

4. At the time the incidents giving rise to this matter occurred, B.P.D. Use of Force Policy, Procedure No. 113-3, Revision 9[24] ("Revision 9") governed the use of force.[25] It provides that B.P.D. officers may use physical control methods under four circumstances: "to stop potentially dangerous and unlawful behavior; to protect the officer or another from injury or death; to protect subjects from injuring themselves;

---

[24] In post-trial briefing, the defendants attempt to exclude Procedure No. 113-3 from the court's analysis. Doc. 279 at 3 n. 3. However, the defendants failed to object to the admission of either Procedure 113-3 Revision 9 or 10 at trial. 2/3/15 at 125, 130.

[25] Revision 9 became effective on December 10, 2009. Pl. Ex. 1 at 5647. Consequently, it was not in effect when S.R.O.s sprayed T.A.P., T.L.P., and G.S. with Freeze +P. The parties did not present any evidence regarding the use of force police in effect prior to the implementation of Revision 9. At any rate, this omission is immaterial in light of the court's findings that T.A.P., T.L.P., and G.S.'s excessive force claims fail on the merits.

and in the process of effecting lawful arrest or detention when the subject offers resistance." Pl. Ex. 1 at 1.

   5. Revision 9 provides that an "officer's actions to resistance will be based upon his perception of the level of resistance." *Id*. at 3.  The following table displays the B.P.D.'s classification of resistance and control:

| Level: | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| Levels of Resistance: | Psychological Intimidation | Verbal Non-Compliance | Passive Resistance | Defensive Resistance | Active Aggression | Lethal Force Assaults |
| Examples of Resistance | Blank stares, clenching of fists, tightening of jaws | Any verbal response of unwillingness to obey | Dead weight | Pulling away, pushing away | Challenging, punching, kicking, grabbing | Dangerous instruments, firearms, knives; any force which the officer believes could cause serious bodily injury or death |
| Levels of Control: | Officer presence | Verbal Direction | Soft Empty Hand Control | Hard Empty Hand Control | Intermediate Weapon | Lethal Force |
| Examples of Control | Badge, uniform | Officer's commands, advice persuasion | Handcuffing, pressure points, wrist locks | Kicks, punches, strikes, **CS/OC spray**, TASER | Impact weapons, less than lethal munitions, K-9 | Firearm, baton strikes to the head, neck, and throat areas |

*Id.* at 6.

   6. Revision 9 does not limit officers to responding to a given level of resistance with an equivalent level of control. Specifically, Chief Roper testified that officers

are permitted to respond with a level of control one to two levels higher than the level of resistance displayed by an individual.[26] 1/23/15 at 150. Similarly, several of the defendant S.R.O.s testified that their training included instruction that they were allowed to use control one to two levels higher than a subject's level of resistance.[27] 2/2/15 at 166; 2/3/15 at 54. With regard to the resistance and force at issue in this case, Chief Roper specifically testified that chemical spray can be an appropriate control level in response to verbal noncompliance. 1/23/15 at 128.

7. Revision 9 requires an officer to notify his supervisor after using chemical spray. Pl. Ex. 1 at 14. It also requires the officer to prepare a Use of Force Information and Statement Report. *Id*. The officer's sergeant, lieutenant, captain, the deputy chief and ultimately Chief Roper must review and approve the report. *Id*. at 15; *see also* 1/23/15 at 86 (Chief Roper's testimony that he is ultimately responsible for reviewing and approving every incident report involving the use of chemical spray). Each Use of Force Information and Statement also is reviewed independently by the B.P.D.'s Internal Affairs Division. *Id*.

8. The Use of Force Rules and Regulations, Procedure No. 113-3, Revision 10 ("Revision 10"), an updated version of Revision 9, became effective on March 27,

---

[26] The plaintiff's expert, Dr. Aaron Kupckik, testified that permitting this upward deviation was standard law enforcement practice. 1/22/15 at 141.

[27] By point of contrast, Officer Henderson denied he received training instructing him that he could deviate upward by one to two levels. 2/2/15 at 49.

2012. Pl. Ex. 2 at 1. Unlike Revision 9, Revision 10 requires that officers evaluate a number of specific factors when determining the appropriate level of control required for a situation. *Id*. at 11. For example, Revision 10 requires that an officer evaluate the seriousness of the crime committed by the subject, the subject's size, age and weight, the apparent physical ability of the subject, the number of subjects present, the weapons possessed or available to the subject, whether the subject has a known history of violence, whether innocents or potential victims are present in the area, and whether evidence is likely to be destroyed. *Id*. Revision 10 also requires that officers consider their own size, physical ability and defensive tactics expertise, the number of officers present or available, the weapons or restraint devices available to the officer, legal requirements, agency policy, and the environment. *Id*. However, several of the defendant S.R.O.s testified that they failed to consider some of these factors when determining what level of force to employ in a given situation, even after Revision 10 went into effect. 2/2/15 at 54 (Officer Henderson's testimony that he failed to consider the size and age of an individual when deciding whether to use Freeze +P); 2/3/15 at 186 (Officer Benson's testimony that she failed to consider the size and age of an individual when deciding whether to use Freeze +P). Others were unaware of the difference between Revision 9 and Revision 10. 2/4/15 at 73 (Officer Tarrant's testimony that the two policies were basically the same).

9. B.P.D. Chemical Spray Subject Restraint: Non-Deadly Use of Force Rules and Regulations, Procedure No. 113-5 Revision 5[28] (the "Chemical Policy") specifically governs B.P.D. officers' use of chemical spray. Consistent with Revision 9, the Chemical Policy classifies chemical spray as a Level IV Control "Use of Force." Pl. Ex. 3 at 2. According to the Chemical Policy, "chemical spray may be used in an arrest situation where the weapon's use offers the possibility of lessening the likelihood of physical injury to the arresting officer, citizens on the scene and/or the suspect." *Id.*

10. Like Revision 9, the Chemical Policy, requires an officer to notify the on-duty supervisor when the officer uses a chemical restraint to control a subject. *Id.* at 4. Similarly, the chemical policy, requires an officer to complete a Use of Force Information and Statement Report any time he or she uses a chemical restraint to control a subject. *Id.*

D. B.P.D. Training on Chemical Spray Use[29]

11. All B.P.D. recruits complete the twenty-one week B.P.D. Police Academy. 1/23/15 at 53. Next, new B.P.D. officers complete 16 weeks of field training, which consists of accompanying a senior patrol officer. *Id.* at 81. All B.P.D. officers,

---

[28] Procedure No. 113-5, Revision 5, went into effect on February 10, 2006.

[29] This section relies on "facts" the parties submitted in a joint pretrial submission.

including S.R.O.s, attend required semiannual in-service training. *Id.* at 63. As part of these semi-annual sessions, officers receive update and refresher courses on the use of force, including the use of chemical spray. *Id*. B.P.D. officers also receive additional training at weekly roll call meetings with their units. 2/9/15 at 11–12.

12. Training for cadets at the Police Academy includes describing the chemical components of Freeze +P, reviewing the Chemical Policy, spraying the cadets with Freeze +P in an outdoor environment, and answering cadet questions. 1/23/15 at 51–52. Cadets are instructed to wash their faces with warm, soapy water 30 minutes to an hour after exposure. Doc. 229-5 at 53–54.

13. Although cadets are personally instructed to use warm soapy water for their own exposure, cadets are trained that the appropriate methods for decontaminating an individual sprayed with Freeze + P are time, air, and calling Birmingham Fire Rescue Services. 2/2/15 at 12; *id*. at 262; 2/3/15 at 30; *id*. at 225; 2/4/15 at 70.

F. The Effects of Chemical Spray

14. S.R.O.s, like other uniformed B.P.D. officers, are required to carry duty belts that contain canisters of chemical spray. 1/23/15 at 49. B.P.D. officers carry a chemical spray marketed as Freeze +P, *id*. which is made by Aerko International. Pl.

Ex. 9. Between 2006 and 2014, S.R.O.s sprayed 199[30] Birmingham City School students with Freeze +P in 110 incidents. Pl. Exs. 14, 15. With one exception, none of these incidents involved any students who had weapons in their possession.

15. Incapacitating agents, such as Freeze +P, are designed to temporarily incapacitate an individual by causing pain and intense tissue irritation. 1/28/15 at 177. Freeze +P consists of one percent Oleoresin Capsicum ("OC") and one percent Orthochlorobenzalmalonitrile ("CS") in a nonflammable solvent. *Id.* at 37. The expected effects of Freeze +P are burning of the eyes, skin, mouth, and airway, tearing, reflexive closing of the eyes, coughing, gagging, and difficulty breathing. 1/21/15 at 188. In the words of the defendants' expert Dr. David Tanen, it works by causing "severe pain." 1/28/15 at 25.

16. The plaintiffs' experiences were consistent with this description. G.S. testified that her face burned badly and she had trouble breathing. 1/20/15 at 144. P.S. testified that exposure to Freeze +P felt like "needles stabbing [her] face." 1/21/15 at 52. T.L.P. testified that her mouth burned and itched and that the spray made her cough. *Id.* at 142. B.D. testified that she felt like her face was on fire and that she had trouble breathing. *Id.* at 20. K.B. testified that her eyes burned and that her face felt like someone had cut it and poured hot sauce on it. 1/20/15 at 105. B.J. testified that

---

[30] The plaintiffs derive this number from the 110 arrest reports at issue. The defendants do not challenge the 195.

his skin felt like it was steaming, and that he coughed and vomited. 1/23/15 at 10, 11, and 18. Finally, J.W. testified that his eyes and nose burned and that the spray made him cough. 1/21/15 at 92.

17. Testimony at trial varied somewhat as to the duration of the effects of Freeze +P. The defendants' position, generally, was that they persist for less than an hour. B.P.D.'s Chemical Policy states that "[t]he effects of chemical spray will begin to lessen in 10–15 minutes with all effects disappearing in approximately 45 minutes with no treatment being administered." Pl. Ex. 3 at 3. B.P.D. training materials state that "[e]ffects are temporary," that after treatment with "[c]ool air or water," "eyes can open in 10–20 minutes," that "[r]espiratory effects [] dimishing in 10–30 minutes," and that "[e]ffects on skin [] may take 45–60 minutes" and may last "up to hours" for "some sensitive subjects." Pl. Ex. 12 at 000068. Dr. Tanen, one of the defendants' experts, testified that "severe pain" lasts for less than a minute, 1/28/15 at 25, and that an individual might cough for half an hour and experience eye irritation for about an hour after exposure to Freeze +P, *id*. at 31.

18. The plaintiffs' testimony placed more emphasis on the extreme pain they experienced immediately after exposure, but some of them testified about lingering discomfort. B.J. coughed for the rest of the day after Officer Benson sprayed him, T.L.P. sought medical attention the day after Officer Nevitt sprayed her because she

continued to cough, T.A.P.'s skin hurt for a few days after Officer Tarrant sprayed her, and B.D.'s eyes were swollen for three or four days after Officer Henderson sprayed her.

19. The plaintiffs presented a great deal of evidence in an attempt to establish that exposure to Freeze +P may potentially lead to serious and/or long-term medical ramifications. In particular, the plaintiffs' expert, Dr. Michael Cohen testified that exposure to chemical spray could lead to corneal abrasions and ulcers, changes in skin color related to inflammation that could last for months or years, potentially fatal spasms of the larynx, chemical pneumonia, potentially fatal exacerbation of bronchitis, exacerbations of asthma, and loss of protective reflexes. 1/21/15 at 189–203. However, Dr. Cohen, who testified that he had no experience treating patients for chemical spray exposure, based this testimony on single, isolated incidents. In contrast, Dr. Tanen, the defendants' expert and the only medical expert who testified at trial with experience treating patients sprayed with Freeze +P, *see* 1/28/15 at 9, testified that during his twenty years of experience as a physician in the Navy, he never encountered or heard of any patients who had suffered severe complications from exposure to chemical spray, *id*. at 27. He noted that he encountered one officer who suffered a corneal ulcer after being sprayed in training, whom he successfully treated, *id*. at 27–28, and that corneal ulcers are generally treatable with antibiotic drops, *id*. at 30. He also noted that he encountered a few

patients who suffered from corneal abrasions after being sprayed, that corneal abrasions are "a known side effect of being sprayed," *id.* at 69, but that "ninety-eight to ninety-nine percent of corneal abrasions heal spontaneously," *id.* at 73, and that they can also be caused by rubbing one's eyes, *id.* at 30. The court finds Dr. Tannen's testimony regarding the relatively safety of chemical spray, based on his own experience, more convincing than Dr. Cohen's testimony based on hypotheticals and isolated incidents. More to the point, none of the plaintiffs contend that they suffered from serious or long-term medical ramifications because of exposure to Freeze +P. The plaintiffs seemed to be moving in that direction when B.D. testified that doctors diagnosed her with pulmonary tachycardia as an infant, 1/21/15 at 35, but none of her testimony suggested exposure to Freeze +P exacerbated her underlying condition. In light of Dr. Cohen and Dr. Tanen's testimony, but primarily because the matter is simply not at issue in this lawsuit, the court declines to issue findings regarding the risks of serious or long term medical consequences posed by exposure to Freeze +P.

20. Similarly, the plaintiffs presented evidence and elicited testimony seemingly for the purpose of establishing that teenagers who take prescription psychotropic medication are at risk of increased harm if exposed to Freeze +P. The plaintiffs' expert, Dr. Daphne Glindmeyer, testified that the use of Freeze +P on an individual taking psychotropic medication could cause cardiovascular side effects. 1/26/15 at 12. Specifically, Dr. Glindmeyer testified that exposure to Freeze +P could

cause such an individual to experience "[i]ncreased blood pressure, increased heart rate, [and/or] cardiac arrhythmia, which could lead to death." *Id*. at 36. However, Dr. Glindmeyer admitted that she knew of no such fatal incidents, *id.*, and, indeed, failed to give any examples regarding actual individuals who suffered an adverse reaction as a result of exposure to Freeze +P while taking psychotropic medication. More to the point, while two of the plaintiffs, B.D. and T.A.P.,[31] testified that they were taking medication for psychiatric disorders at the time Officers Henderson and Tarrant sprayed them with Freeze +P, 1/21/15 at 21, 1/22/15 at 188, neither testified that she experienced any cardiac symptoms in association with the events. Consequently, sufficiency of Dr. Glindmeyer's testimony aside, because the matter is not at issue in this case, the court declines to make findings regarding the interaction between Freeze +P and psychotropic medication.

21. Turning to the final issue in this vein, Dr. Glindmeyer testified that all of the plaintiffs experienced some "peritraumatic symptomatology" as a result of their exposure to Freeze +P.[32] 1/26/15 at 11–12. However, even had the plaintiffs testified that they experienced lasting, significant psychological damage, which they did not,

---

[31] B.D. testified that she was taking Adderall and Vyvanse at the time Officer Henderson sprayed her. 1/21/15 at 21. T.A.P. testified that she was taking medication for depression, bipolar disorder, and impulse control disorder when Officer Tarrant sprayed her, but did not specify the particular medication. 1/22/15 at 188.

[32] Dr. Glindmeyer testified that none of the plaintiffs suffered from post-traumatic stress disorder as a result of their exposure to Freeze +P. 1/26/15 at 12.

Dr. Glindmeyer repeatedly testified that trauma is "additive." *Id*. at 20, 23, 30, and 35. Over the course of the trial, the court heard testimony revealing that exposure to Freeze +P was not the only potentially traumatic event experienced by the plaintiffs. For example, T.A.P. had a history of sexual abuse and mental illness predating her exposure to Freeze +P. 2/22/15 at 164. T.L.P.'s boyfriend died after being tazed by police officers. 2/26/15 at 58. K.B. became pregnant at fifteen. *Id*. at 44. B.D. had a history of mental illness, 1/21/15 at 21, and was subsequently arrested on charges of grand theft auto, robbery, and assault,[33] *id*. at 32. B.J. is currently incarcerated. 1/23/15 at 2. In sum, because, as Dr. Glindmeyer testified, trauma is "additive,"[34] and because it is impossible to say how much of any "peritraumatic symptomatology" exhibited by the plaintiffs was due to exposure to Freeze +P as opposed to other painful experiences, the court cannot reach any conclusions regarding the effect of exposure to Freeze +P on the plaintiffs' psychological state.

G. Decontamination Procedures

22. The parties are at odds regarding effective decontamination procedures. Because the constitutional adequacy of such procedures is a legal, rather than factual,

---

[33] B.D. pleaded guilty and received youthful offender status and probation.

[34] The court did not hear testimony about any additional troubling events befalling G.S. But, at any rate, she did not testify that she experienced long-term psychological damage, and, ultimately, her individual claim fails on the merits.

determination, the court will outline the parties' respective positions on the matter

here, and address the constitutional question in its Conclusions of Law.

23. The parties are in agreement that the Material Safety Data Sheet for Freeze

+P describes Emergency and First Aid procedures for exposure to Freeze +P:

> EYES:  Flush eyes with large quantities of water to speed recovery. Face subject into wind or forced air source such as fans or air conditioning outlet. Wash face with mild soap

> SKIN CONTACT:  Remove contaminated clothing. Wash affected area with soap and water to avoid transfer to more sensitive areas. Burning sensation with skin contact in most areas. Use no creams or salves. Persons with preexisting skin disorders may be more susceptible to the effects of this agent.

> INHALATION:  Irritant, stimulation of facial nerves causes feeling of restricted airway. No danger exists for asphyxiation. Remove persons to fresh air.

> INGESTION:  Severe burning heartburn sensation may cause nausea. Seek medical attention if nausea persists.

Pl. Ex. 9. Additionally, the plaintiffs note that Aerko training materials describe the

following as proper treatment of persons who have been exposed to chemical spray:

> While there are no medical practitioners on the staff of Aerko International, the following regimen is suggested based on documents of the United States Chemical Warfare Service and our experience overseeing hundreds of exposures, both intentional during training or accidental as a result of production mishaps.

> A wash may be prepared utilizing approximately 100 to 120 grams of sodium bisulfate in four gallons of cool water. Subjects experience some relief when splashing this solution on [a]ffected areas.

When running water is available, a softly flowing stream from a hose should be applied to the face and eyes. Copious amount[s] of cool water will give some relief.

After initial treatment with water or wash, the subject should be moved to fresh air and faced into the wind. The time to recovery is directly proportionate to the speed of the air stream. Fans or air conditioning outlets provide an excellent source of relief. In the event running water or the [s]odium [b]isulfate solution is not available[,] excellent field treatment results may be obtained by placing the subject in the front section of a vehicle and directing the air conditioning vent into his face.

Pl. Ex. 10 at 64. Based on this material, the plaintiffs' position is that adequate decontamination involves removing contaminated clothes, washing with copious amounts of water, and exposure to moving air.

24. Turning to the defendants' position, the Chemical Policy notes that "[t]he effects of chemical spray will begin to lessen in 10–15 minutes, with no treatment being administered," but that "[f]ollowing the use of chemical spray the officer will ensure that the subject receives adequate decontamination as soon as practical." Pl. Ex. 3 at 3. At trial, Chief Roper explained that:

[t]he policy requires officers to take adequate decontamination efforts. And so under decontamination, that can be water. That can be time. That can be air. Our policies also requires the officers to notify the Birmingham Fire and Rescue[35] . . . . [I]f you're asking me does the policy specifically say large qualities of water, then the policy does not say that.

1/23/15 at 68.

---

[35] It was undisputed at trial that Birmingham Fire Rescue Services personnel did nothing to decontaminate the plaintiffs. Moreover, the defendant S.R.O.s conceded that this was generally the case. *See e.g.*, 2/3/15 at 97.

25. Interestingly, the defendants' expert, Dr. Tanen, who was exposed to chemical spray for training purposes on an annual basis during his twenty-year career in the Navy, had a different assessment of adequate decontamination. 1/28/15 at 14–15. He testified that if he were sprayed, his first choice method of decontamination would be to wash with copious amounts of water and soap, and if neither were available, he would want access to a fan. *Id.* at 98.

26. Dr. Tanen also testified that ideal decontamination after exposure to Freeze +P includes the passage of time, exposure to wind or a fan, and washing with copious amounts of water and soap. *Id*. at 34. He noted, though, that ideal decontamination is possible in a controlled environment, such as a police training scenario, where spraying is anticipated, the necessary materials are on hand, and decontamination can be accomplished without jeopardizing officer safety, and that such conditions are less likely in many situations when police deploy Freeze +P in the field. *Id*. Dr. Tanen acknowledged, however, that in terms of the practicality of ideal decontamination, a school environment where officers are permitted to deploy Freeze +P and consequently can anticipate its use has much in common with a police academy. *Id*. As a result, he believes that officers should provide students who are intentionally sprayed with chemical spray in schools with water to decontaminate as soon as the situation is safe. *Id*. at 122.

27. The court heard testimony that there are multiple facilities in each high school where students could wash after being sprayed with Freeze +P including gym showers and science lab wash stations. 2/2/15 at 79, 263, 264; 2/4/15 at 118.

28. Turning to a different topic involving decontamination, the plaintiffs elicited testimony from Chief Daniel Coulombe that seemed to be for the purpose of pointing to a failure on the part of the defendants to decontaminate school facilities. 1/27/15 at 37–39; 200–01. However, although Chief Coulombe testified that chemical spray can contaminate the space in which it is deployed, *id*. at 37–39, the only concrete example he provided involved the lingering effects of chemical spray in an apartment with thick carpet a month after officers used the spray to diffuse a hostage situation, *id*. at 200–01. Because of the anecdotal nature of Chief Coulombe's testimony, the dissimilarity of the situation he described to the facts in this case, and, most importantly, because not one witness at this trial contended that he or she suffered ill effects from residual Freeze +P in a school facility, the court declines to give this theory further attention.

**Conclusions of Law**

The plaintiffs raise individual claims pursuant to 42 U.S.C. § 1983 and Alabama tort law and a class claim for injunctive relief. *See* doc. 188. The court will address the plaintiffs' individual claims before turning to their class claim.

III. Conclusions of Law Related to the Plaintiffs' Individual Claims

     A. The Plaintiffs' Constitutional Claims

     The plaintiffs contend that the S.R.O.s violated their constitutional rights and that the S.R.O.s are consequently liable to them pursuant to 42 U.S.C. § 1983. Doc. 188 at 60–75. The court's analysis, therefore, begins with § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The plaintiffs' claim alleges violations of their rights under the Fourth Amendment, which guarantees an individual's "freedom from unreasonable searches and seizures." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). This guarantee "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 395–95 (1989)).

     The plaintiffs' constitutional claims raise two distinct questions. The first is whether the defendant S.R.O.s violated their Fourth Amendment rights by spraying them with Freeze +P. As to some of the plaintiffs, the answer to this question is yes, as to some, the answer is no. The second question is whether the defendant S.R.O.s

violated the plaintiffs' Fourth Amendment rights by failing to properly decontaminate them. The answer to that question is unequivocally yes.

### 1. The Initial Sprayings

The plaintiffs can only succeed in their claims against the defendant S.R.O.s if the officers are not entitled to qualified immunity.[36] "'Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005) (quoting *Ferraro*, 284 F.3d at 1193–94). "Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Id*. (quoting *Ferraro*, 284 F.3d at 1194).

---

[36] The parties submitted briefs to assist the court in resolving this matter. *See* docs. 274, 275, and 279. The defendant S.R.O.s contend that because the plaintiffs failed to address qualified immunity in their brief, they abandoned any argument that the defendant S.R.O.s are not entitled to qualified immunity. Doc. 279 at 5 (citing *Access Now, Inc. v. Sw. Airlines Co*., 385 F.3d 1324, 1330 (11th Cir. 2004)). While it is clearly established that "a party seeking to raise a claim on appeal must plainly and prominently so indicate," *Access Now*, 385 F.3d at 1330, and, similarly, that failing to raise an argument in response to a motion for summary judgment results in its abandonment, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n. 2 (11th Cir. 2009) (citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n. 1 (11th Cir. 2001)), the defendants have presented the court with no authority that dictates a similar result with regard to briefs filed in association with bench trials. Because the plaintiffs raised the issue in their pretrial submissions and because the court believes the correct question here is whether the evidence presented at trial establishes that the defendant S.R.O.s are entitled to qualified immunity, it rejects the defendant S.R.O.s argument that the plaintiffs abandoned the issue.

"'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

For the defendant S.R.O.s to invoke qualified immunity, they "must first establish that [they were] acting within the scope of [their] discretionary authority." *Id.* at 1325. This point is not in dispute. "The burden then shifts to the plaintiff[s] to overcome the defense of qualified immunity." *Id.* (citing *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)).  Once the burden shifts, a plaintiff must show that (1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. at 236.

As explained above, the Fourth Amendment guarantees that citizens be "secure in their persons . . . against unreasonable . . . seizures." *Graham*, 490 U.S. at 394. "At the core of the Fourth Amendment is the understanding that officers cannot unnecessarily harm suspects in the course of arresting or otherwise seizing them." *M.D. ex rel. Daniels v. Smith*, 504 F. Supp. 2d 1238, 1251 (M.D. Ala. 2007) (citing *Ferraro*, 284 F.3d at 1200; *Priester v. City of Riviera Beach, Fla*., 208 F.3d 919, 926–27 (11th Cir. 2000); *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Claims alleging that an officer used excessive force during the course of an arrest or other "seizure" are analyzed under an objective reasonableness standard. *Graham*, 490 U.S. at 388; *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). If "'the nature and quality of the intrusion on the [plaintiffs'] Fourth Amendment interests'" outweigh "the countervailing government interests at stake," the seizures violated the plaintiffs' constitutional rights. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

In the Eleventh Circuit, courts determine whether the "nature and quality of the intrusion" on Fourth Amendment interests surpasses the government interests at stake by considering "1) the need for the application of force, 2) the relationship between the need and the amount of force used, and 3) the extent of the injury inflicted." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)). To evaluate the need for the application of force, courts follow the factors laid out in *Graham*—"the severity of the crime, the danger to the officer, and the risk of flight." *Ferraro*, 284 F.3d at 1198. The guiding principle in excessive force cases is that "'gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.'" *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010) (quoting *Hadley*, 526 F.3d at 1330).

This circuit first considered whether an officer's use of chemical spray during the course of an arrest constituted excessive force in *Vinyard v. Wilson*, in which the court concluded that a deputy sheriff inflicted excessive force when he sprayed the plaintiff with pepper spray while the plaintiff was sitting, handcuffed, albeit screaming and cursing loudly, in the back seat of his patrol car. 311 F.3d at 1348. In evaluating the plaintiff's claim, the court noted that the charges against her, disorderly conduct and obstruction, "were of minor severity," *id.* at 1347, she "was a nuisance[,] but not a threat to [the deputy], herself or others," *id.* at 1347–48, she neither resisted the initial arrest nor attempted to flee, and "at the time of the force . . . [the plaintiff] was under arrest and secured with handcuffs and in the back seat of the patrol car," *id.* at 1348.

In addition to its analysis of the specific facts before it, the *Vinyard* court noted that in the context of an arrest,

> [c]ourts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else.[37] Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital.[38]

---

[37] Citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1129–30 (9th Cir. 2002); *Park v. Shiflett*, 250 F.3d 843, 852–53 (4th Cir. 2001); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

[38] Citing *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir. 2001); *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000); *Monday v. Oullette*, 118 F.3d 1099, 1104–05 (6th

*Id.* (footnotes omitted). These principles have guided this circuit's jurisprudence as it evaluates the constitutionality of officers' use of chemical spray and similar weapons during the course of an arrest. To be clear, "this [circuit] has noted that the use of pepper spray is not excessive force in situations where the arrestee poses a threat to law enforcement officers or others, uses force against officers, physically resists arrest, or attempts to flee, . . . ." *Brown*, 608 F.3d at 739.  However, in situations where the suspect faces only minor charges, does not pose a risk to anyone's safety, and is not resisting arrest or attempting to flee, an officer's use of chemical spray is generally excessive. *See Hawkins v. Carmean*, 562 F. App'x 740, 743 (11th Cir. 2014) (officer used excessive force when she sprayed motorist stopped on suspicion of a tag light violation who neither threatened anyone's safety nor attempted to flee); *Fils v. City of Aventura*, 647 F.3d 1272, 1288–89 (11th Cir. 2011) (officer used excessive force when he shot a bystander to an arrest with a taser[39] after the bystander remarked "'they're overreacting, these motherfuckers are overreacting'—'they' presumably meaning the police"; the charges the bystander

---

Cir. 1997); *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995); *Fernandez v. City of Cooper City*, 207 F. Supp. 2d 1371, 1380 (S.D. Fla. 2002); *Gainor v. Douglas Cnty.*, 59 F. Supp. 2d 1259, 1287–88 (N.D. Ga. 1998); *Griffin v. City of Clanton*, 932 F. Supp. 1359, 1369 (M.D. Ala. 1996).

[39] Although *Fils* involved a taser, not chemical spray, the court found "no meaningful distinction between the two under the [present] circumstances." 647 F.3d at 1289 (comparing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (stating that, while a taser shock is "unpleasant," it "did not inflict any serious injury" on the plaintiff) with *Vinyard*, 311 F.3d at 1348 (describing pepper spray as "generally of limited intrusiveness")).

ultimately faced, disorderly conduct and resisting arrest without force, were not serious,[40] the bystander did not pose a threat to anyone's safety, and he did not resist arrest[41] or attempt to escape); *Brown*, 608 F.3d at 739–40 (officer used excessive force when he pepper sprayed the plaintiff who was suspected of playing music too loudly and slammed her to the pavement when plaintiff posed no threat and was attempting to exit her vehicle so the officer could arrest her); *Howell v. Sheriff of Palm Beach Cnty.*, 349 F. App'x 399, 405 (11th Cir. 2009) (officer used excessive force when he pepper sprayed the plaintiff after approaching him about a violation of a noise ordinance, and although the plaintiff "responded to [the officer's] confrontational tone with an equally brash one, . . . he was not acting in a physically aggressive manner," and the evidence suggested the plaintiff was neither resisting arrest nor attempting to flee); *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008) ("In view of the fact that Reese was lying face down on the ground, was not suspected of having committed a serious crime,[42] did not pose an immediate threat of harm to anyone, and was not actively resisting or evading arrest, the defendants' use of

---

[40] More specifically, the court noted that "[d]isorderly conduct is not a serious offense," *Fils*, 647 F.3d at 1288 (citing *Vinyard*, 311 F.3d at 1347), and that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force," *id*.

[41] The court noted that the bystander faced charges of resisting arrest without force, he "did not ignore any verbal instructions, nor did he attempt to free himself" from the officer after the officer tazed him. *Fils*, 647 F.3d at 1289.

[42] Reese faced charges of "misdemeanor obstruction[, . . .] a crime of 'minor severity' for which less force is generally appropriate." *Reese*, 527 F.3d at 1274 (citing *Vinyard*, 311 F.3d at 1348–49).

[chemical spray] was a wholly disproportionate response to the situation.").

There is a final consideration in the present matter that potentially distinguishes it from the previous cases: the defendant S.R.O.s inflicted the alleged excessive force at issue here on students in schools. It is well-established that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340–42 (1985)). "[W]hile children assuredly do not 'shed their constitutional rights at the schoolhouse gate,' the nature of those rights is what is appropriate for children in school." *Vernonia Sch. Dist. 47J v. Action*, 515 U.S. 646, 655–56 (1995) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). In particular, courts have routinely determined that under certain circumstances, public school students enjoy reduced rights pursuant to the First and Fourth Amendments.[43] In the Fourth Amendment context, the Supreme Court has held that, in the public school setting, "a search will be permissible in its scope when the measures adopted are reasonably related to the

---

[43] *See e.g.*, *Morse v. Frederick*, 551 U.S. 393, 410 (2007) (holding that the First Amendment does not guarantee a student's right to display a message that could reasonably be interpreted as promoting drug use at a school event); *Vernonia Sch. Dist. 47J*, 515 U.S. at 655–56 (holding that random drug testing for student athletes did not violate their Fourth Amendment rights); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 276 (1988) (holding that a principal did not impinge students' First Amendment rights by censoring articles in a high school newspaper); *Fraser*, 478 U.S. at 686 (holding that the First Amendment did not guarantee a student's right to deliver a sexually explicit speech at an assembly); *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985) (holding that a search of a student's purse that was not based on probable cause did not violate the Fourth Amendment). The court notes that these cases involve alleged constitutional violations by school officials, not law enforcement officers.

objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). The Eleventh Circuit has extended this rule to seizures by school-based police officers. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305 (11th Cir. 2006).

The defendants argue that because the incidents giving rise to this lawsuit occurred in schools and involve students, "the [c]ourt should not analyze the force applied to [the p]laintiffs as it would were it applied to an average citizen stopped on the street as *Graham* envisions, but instead, the [c]ourt must balance the government's interest in 'maintaining order in the schools' and [the p]laintiffs' reduced Fourth Amendment expectations." Doc. 273 at 35–36. In other words, the defendants seem to take the eyebrow-raising position that school children are less deserving of protection from harm at the hands of overzealous law enforcement officers than adults when the harm occurs at school. In support of their stance, the defendants direct the court to a number of cases in which courts have recognized that the Fourth Amendment rights of children are reduced in the public school setting. *Id.* at 33–36.[44] The problem with these cases is that while they do examine the limitations

---

[44] Citing *Vernonia Sch. Dist.*, 515 U.S. at 655–56; *T.L.O.*, 469 U.S. at 342; *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 432 (5th Cir. 2008) (social workers permissibly seized a child from a public school to interview him in a safe place; seizing the child from his home would not have been); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 148 (3d Cir. 2005) (school officials permissibly "seized" a student by detaining him in a conference room for several hours while investigating allegations that he was involved in an incident of sexual misconduct); *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1015 (7th Cir. 1995) (a teacher who briefly held a student by the elbow while escorting her out of

of students' Fourth Amendment expectations regarding searches and seizures, none

of them involve allegations of excessive force pursuant to the Fourth Amendment.[45]

Absent a clear directive from binding authority,[46] the court declines to adopt the

position that children in public schools have a reduced expectation of being free from

_____

the classroom did not conduct an illegal seizure per the Fourth Amendment); *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (seizure of student for questioning about a bomb threat was reasonable).

[45] The only case that comes close, *Wallace by Wallace v. Batavia Sch. Dist. 101*, is distinguishable from the present matter both factually and legally. In *Wallace*, the defendant, a teacher, briefly grasped the plaintiff by the wrist and elbow and guided her toward the classroom exit. 68 F.3d at 1011. The plaintiff halted and told the defendant to let go. *Id*. The defendant complied. *Id*. The plaintiff subsequently brought a claim against the defendant for wrongful seizure, pursuant to the Fourth Amendment, and unlawful excessive corporal punishment, pursuant to the Fourteenth Amendment. Although the court applied *T.L.O.*'s reasonableness standard to the plaintiff's Fourth Amendment claim, its inquiry was limited to the reasonableness of the seizure itself, not of the degree of force. *Id*. at 1015. To the extent that Wallace raised a claim of excessive force, she did so in the context of excessive corporal punishment in violation of the Fourteenth Amendment, which is not a legal issue in this case. *Id*. at 1016.

The court also notes the following language in *Wallace*:

> Because a student is at least as much seized when a school official administers corporal punishment as Wallace was here, corporal punishment may be evaluated under the Fourth Amendment standard. Therefore, even assuming that Cliffe's actions constituted corporal punishment, we reject Wallace's theory of recovery under the Fourteenth Amendment as we have done under the Fourth Amendment.

*Wallace*, 68 F.3d at 1016. Lest this provoke confusion, the court provides the following clarification. The same behavior—the defendant's brief seizure of the plaintiff's elbow and wrist—gave rise to both the plaintiff's Fourth and her Fourteenth Amendment claims. The threshold for finding that a seizure is unreasonable (as the court will subsequently discuss at length) is much lower than for finding a violation of a plaintiff's substantive due process rights. Because Wallace failed to clear the comparatively low Fourth Amendment threshold, she certainly could not establish a substantive due process violation.

[46] Perhaps in recognition of its problematic implications, the Eleventh Circuit has sidestepped the issue. *See Gray*, 458 F.3d at 1304 ("Gray argues that Deputy Bostic used excessive force in detaining her because he lacked a right to detain her at all. Therefore, her excessive force claim is not an independent claim, but rather is subsumed in her illegal seizure claim.").

the infliction of excessive force by law enforcement officers. At any rate, the court's position is largely academic because the outcome of the plaintiffs' individual claims against the defendant S.R.O.s is the same whether the court applies *T.L.O.*'s reasonable-under-the-circumstances test or the factors described in *Graham*[47]—which, the court notes, are fairly similar analyses.

With this legal framework in mind, and based on the findings in this case, the court makes the following conclusions of law:

a. K.B.

1. Officer Smith inflicted excessive force on K.B. when he sprayed her with Freeze +P. The crime Officer Smith charged K.B. with, disorderly conduct, was minor. *See Fils*, 647 F.3d at 1288 ("Disorderly conduct is not a serious offense."). Although her sobs may have created a disturbance, K.B. was standing still and restrained with handcuffs when Officer Smith sprayed her, and posed no threat to Officer Smith or to L.M., who, more to the point, was no longer present at the scene. K.B. also made no attempt to flee the area.

2. Although Officer Smith may have, at one point, had a legitimate concern—albeit perhaps not one significant enough to outweigh all of the factors that counsel finding against him—about K.B.'s cries provoking other students to fight, he

---

[47] I.e. the severity of the crime, the danger to the officer, and the risk of a subject fleeing.

testified at his deposition that the crowd that concerned him had dispersed by the time he sprayed K.B.

3. For these reasons, the court concludes there was simply no reason for Officer Smith to spray K.B. with Freeze +P, and when he did so, he caused her to experience a great deal of physical pain. Consequently, the court concludes that when Officer Smith sprayed K.B. with Freeze +P, he violated her right to be free of excessive force, pursuant to the Fourth Amendment.

4. Finally, while all of the facts in this case are disturbing, the court is especially taken aback that a police officer charged with protecting the community's children considered it appropriate and necessary to spray a girl with Freeze +P simply because she was crying about her mistreatment at the hands of one of her male peers.

b. B.J.

1. No justifiable basis existed for Officer Benson to spray B.J. with Freeze +P.

2. Physical harassment, the crime with which Officer Benson charged B.J., is a minor offense.

3. B.J. did not pose a threat to Officer Benson. Officer Benson stood idly by while B.J. struggled with school officials Gadson and Gates, and by the time she sprayed B.J., he had stopped struggling. More to the point, B.J. was a 135-pound boy

who two adult men had pinned against a set of lockers, and he posed no risk to Gadson or Gates. In fact, Officer Benson never testified that Gadson and Gates asked for her assistance. Moreover, B.J. was not trying to flee.

4. To the extent B.J. struggled with Gadson and Gates, he did so to resist a search by school officials, not an arrest by a law enforcement officer. There were no non-school-specific concerns associated with this incident, and the incident, which took place in a hallway, away from other students, cannot be characterized as a disturbance to the school environment. By Officer Benson's own admission, her role as an S.R.O. did not involve enforcing school disciplinary policies. 2/3/15 at 142. In fact, Officer Benson also testified that it would be inappropriate for an S.R.O. to spray a student with Freeze +P for refusing to consent to a search by a school official, 2/3/15 at 181, although that is essentially what she did.

5. As with K.B., there was no reason for Officer Benson to spray B.J. with Freeze +P, much less throw him on the ground and kneel on his back, and when she did so, she caused B.J. to experience a great deal of physical pain. Consequently, the court concludes that when Officer Benson sprayed B.J. with Freeze +P, she violated his right to be free of excessive force, pursuant to the Fourth Amendment.

c. G.S.

1. As the court has previously stated, physical harassment, G.S.'s purported offense, is not a serious crime, and the court views G.S.'s resistance as de minimis. Nonetheless, although G.S. engaged in de minimis resistance, her claim fails because of the law of the case. In particular, this court's opinion regarding the defendants' motion for summary judgment, doc. 196, which, among other things, denied Officer Clark's claim that he was entitled to qualified immunity, contained the following description of G.S.'s encounter with Officer Clark:

> On December 8, 2009, as seventeen year old G.S. chased another student across the lawn at Huffman High School, an S.R.O. grabbed G.S. from behind. Before she recognized the individual as an S.R.O., G.S. tried to free herself. Allegedly, S.R.O. A. Clark immediately sprayed chemical spray directly in G.S.'s eyes and face. G.S. contends S.R.O. Clark sprayed her a second time even after she fell to the ground due to the pain caused by the first spray.

*Id*. at 7 (citations omitted). The defendants appealed the court's denial of qualified immunity to the Eleventh Circuit, doc. 197, which upheld the court's findings, doc. 212-1. As to G.S., however, the Eleventh Circuit made the following observation:

> With regard to Officer Clark, the denial of qualified immunity is based on the second macing of G.S. Viewing the facts in the light most favorable to G.S., Officer Clark maced G.S. a second time when she was incapacitated, non-resistant, and writhing in pain on the ground. *Although the first macing was reasonable due to G.S.'s initial resistance*, that resistance does not shield Officer Clark from liability when he used force after the resistance and risk of flight was over.

*Id*. at 11 (emphasis added).

2. At trial, G.S. did not testify that Officer Clark sprayed her a second time; she only testified that he sprayed her after she tried to pull away from him. 1/20/15 at 140–42. Because the Eleventh Circuit has explicitly ruled that Officer Clark's actions were reasonable, the court finds that Officer Clark did not inflict excessive force on G.S. when he sprayed her with Freeze +P.

### d. B.D.

1. Based on testimony at trial, it seems likely to the court that Officer Henderson, who was 6'1" and weighed 240 pounds at the time, had complete control over B.D., who was 5'4" and weighed only 110 pounds, and consequently that it was unlikely she actually posed a risk to Principal Burrell.

2. Nonetheless, B.D. resisted Officer Henderson by pulling away from him and actively attempted to charge at Principal Burrell who, albeit, was out of harm's way. However, B.D.'s conduct is an act that in this circuit justifies the use of chemical spray. *See Brown*, 608 F.3d at 739. Consequently, the court finds that Officer Henderson did not inflict excessive force on B.D. when he sprayed her with Freeze +P.

e. T.A.P.

1. Based on the trial testimony that T.A.P. swung her bookbag intentionally at Officer Tarrant and then fled, and in light of this circuit's general principal that fleeing from law enforcement justifies the use of chemical spray, *id.*, the court finds that Officer Tarrant did not inflict excessive force on T.A.P. when he sprayed her with Freeze +P.

f. T.L.P.

1. Officer Nevitt acted justifiably in spraying T.L.P. The incident occurred in a charged setting, and after T.L.P. had beaten E.H. to the ground and was still holding on to E.H.'s hair. Moreover, two, large, adult men were unable to separate T.L.P. and E.H., and T.L.P. ignored Officer Nevitt's repeated instructions to let go of E.H. The volatility of the situation was highlighted by the fact that although Officer Nevitt tried to spray T.L.P., he mainly sprayed Coach Johnson. In short, T.L.P. was actively harming another person and had ignored officer instructions.

2. Additionally, the court notes that the fight took place in a crowded cafeteria, and by the time Officer Nevitt sprayed T.L.P., other students were growing rowdy and throwing things.

3. In this circuit, T.L.P.'s actions were sufficient to justify the use of chemical spray. *See id*; *Vinyard*, 311 F.3d at 1348. Consequently, the court concludes that Officer Nevitt did not inflict excessive force on T.L.P. when he sprayed her with Freeze +P.

### g. J.W.

1. As the court previously explained, an S.R.O. sprayed J.W. and other members of a crowd who were gathered around a pair of fighting students with Freeze +P. If there was ever a dispute regarding whether Birmingham's S.R.O.s need better training, this incident is the perfect response. Aerko International, Freeze +P's manufacturer, does not recommend its use for crowd control, 1/26/15 at 134–35, and "'mere obstinance by a crowd, without any evidence of a potential public safety threat or other law enforcement consideration' d[oes] not justify [the] use of batons and pepper spray," *Buckley v. Haddock*, 292 F. App'x 791, 803 (11th Cir. 2008) (quoting *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60 (1st Cir. 2008)).

2. Here, however, although he sought damages in the plaintiffs' most recent pleading, *see* doc. 188 at 4, 60–61, at trial, J.W. conceded that he no longer seeks money damages, 1/21/15 at 100 ("Q. You're not seeking any money damages today, correct? A. No, sir."). Additionally, the court notes that J.W.'s individual claim fails

because although he identified the S.R.O. who sprayed the crowd as Officer Nevitt in the plaintiffs' most recent pleadings, *see* doc. 188 at 60, at trial, J.W. was unable to identify the officer who sprayed him, *see* 1/21/15 at 88–91. Therefore, the court finds that J.W. failed to prove his claims.

To summarize, as to the plaintiffs' individual excessive force claims stemming from being sprayed with Freeze +P, the court finds only in favor of K.B. and B.J. Therefore, because the court concludes that Officers Smith and Benson violated K.B. and B.J.'s Fourth Amendment rights by spraying them with Freeze + P, the court turns next to the second prong of its qualified immunity inquiry: were those rights clearly established at the time the violation occurred. In this circuit, courts use "two methods to determine whether a reasonable officer would know that his conduct is unconstitutional." *Fils*, 647 F.3d at 1291. "The first method looks at the relevant case law at the time of the violation; the right is clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" *Id*. (quoting *Hadley*, 526 F.3d at 1333. "This method does not require that the case law be 'materially similar' to the officer's conduct; 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "But, where the law is stated in broad propositions, 'a very high degree of

prior factual particularity may be necessary.'" *Id*. (quoting *Hope*, 536 U.S. at 740–41).

"The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" *Id*. (quoting *Vinyard*, 311 F.3d at 1355) (alteration in the original). "This method—termed 'obvious clarity,'—is a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Id.* (citations omitted) (citing *Lee*, 284 F.3d at 1198–99). "Concrete facts are generally necessary to provide an officer with notice of the 'hazy border between excessive and acceptable force.'" *Id*. at 1291 (citing *Lee*, 284 F.3d at 1198–99). "But, where the officer's conduct is so outrageous that it clearly goes 'so far beyond' these borders, qualified immunity will not protect him even in the absence of case law." *Id*. at 1291–92 (quoting *Reese*, 527 F.3d at 1274.

Therefore, as to the clearly established rights inquiry of the qualified immunity analysis, the court makes the following conclusions of law:

1. Officers Smith and Benson were on notice under either test. Similar to *Vinyard*, where the Eleventh Circuit concluded that the officer inflicted excessive

force on the plaintiff when he sprayed her with pepper spray, even though she was screaming and cursing at him, because the plaintiff was under arrest for a crime of minor severity, was restrained, and posed no danger to the officer, herself, or anyone else, 311 F.3d at 1349, K.B. and B.J. were arrested for minor offenses (disorderly conduct and physical harassment), restrained (K.B. was handcuffed and B.J. was held against a row of lockers by two adult men), and neither posed a danger to the officer, themself, or anyone else.[48] By Officers Smith and Benson's own accounts, both children were making a scene—K.B. was crying hysterically and B.J. was cursing at Gadson and Gates. However, as the Eleventh Circuit noted  in *Vinyard*, being a nuisance is not synonymous with being a threat. *Id*. at 1347–48.

2. Because the facts here are almost identical to those in *Vinyard*, it should have been obvious to Officers Smith and Benson that their actions constituted excessive force. Consequently, they are not entitled to qualified immunity.[49]

---

[48] K.B. never posed a threat to anyone, and, to the extent that B.J. posed a threat to Gadson and Gates by struggling with them when they attempted to search him, by the time Officer Benson sprayed him with Freeze +P, B.J. had ceased struggling.

[49] *Fils* also counsels in favor of a finding that clearly established law proscribed Officers Smith and Benson's actions. Although *Fils* postdates the incidents giving rise to K.B. and B.J.'s individual claims against Officers Smith and Benson and cannot serve as clearly established law in and of itself, the *Fils* court found that *Vinyard*, along with *Priester*, a case in which a police officer set his attack dog on the plaintiff, who had obeyed the officer's commands and was lying prone on the ground, "establish that such force is excessive when the suspect is non-violent and has not resisted arrest," and that consequently the *Fils* defendant was on notice that tazing an unrestrained crowdmember who had criticized police was excessive. *Fils*, 647 F.3d at 1292 (citing *Vinyard*, 311 F.3d at 1347–48; *Priester*, 208 F.3d at 927). If those cases were sufficient to place the *Fils* defendant on notice, they were sufficient to place Officers Smith and Benson on notice as well.

3. Additionally, in both *Vinyard* and *Fils*, the Eleventh Circuit noted that the behavior of the defendant officers "clearly [went] so far beyond" the "hazy border between excessive and acceptable force" that it met the "obvious clarity" standard described above. *Fils*, 647 F.3d at 1291, 1292 (internal quotation marks omitted); *Vinyard*, 311 F.3d at 1355. Because Officers Smith and Benson violated clearly established law, the court need not rely on this standard, but it notes that their actions were so factually similar to those at issue in *Vinyard* and *Fils* that they meet the obvious clarity standard as well. In other words, their behavior was "so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer had to know he was violating the Constitution even without caselaw on point." *Id*. (citing *Priester*, 208 F.3d at 926; *Smith*, 127 F.3d at 1419).

## 2. Adequate Decontamination

The plaintiffs contend that by failing to adequately decontaminate them, the defendant S.R.O.s violated their Fourth Amendment rights. As a preliminary matter, the defendants contend that because the plaintiffs were in custody at the time the purportedly inadequate decontamination occurred, these claims allege violations of the Fourteenth Amendment, not the Fourth Amendment. Doc. 273 at 40–42 (citing *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996), which the defendants contend "analyz[ed] the conduct of officers during [an] arrest under [the Fourth

Amendment] and, after placing the suspect in the vehicle, under Fourteenth Amendment substantive due process").[50] Consequently, the defendants contend the court should not consider the plaintiffs' decontamination claims because they were improperly pleaded,[51] *id.* at 41, or, in the alternative, that the court should analyze whether the decontamination measures taken by the defendant S.R.O.s "shock the conscience" under the Fourteenth Amendment rather than whether they run afoul of

---

[50] The court's reading of *Cottrell* is not so clear-cut. *Cottrell* involved an arrestee who died from positional asphyxia while officers transported him in the back of a police car following his arrest. 85 F.3d at 1488. The administrator of the arrestee's estate filed a mistreatment in custody claim and an excessive force claim. *Id.* at 1489, 1492. As to the mistreatment in custody claim, the court noted that "[c]laims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." *Id.* at 1490. However, as to the excessive force claim, the court noted that, unlike the mistreatment in custody claim, "the proper standard for judging Fourth Amendment excessive force claims . . . is one of objective reasonableness." *Id.* at 1492. The court did not, however, indicate that the mistreatment in custody claim was the plaintiff's sole claim regarding his post-arrest treatment; put differently, the court did not limit the plaintiff's excessive force claim to his pre-arrest treatment, and applied the Fourth Amendment reasonableness standard to the entire claim. Discussing *Cottrell*, Judge Myron Thompson noted that:

[i]n reversing the district court's denial of summary judgment on both claims, the appellate court did not specifically address whether the Fourth Amendment 'reasonableness' test was the appropriate standard for all post-arrest, pre-detention excessive-force claims. However, by analyzing and rejecting the plaintif's excessive-force claim without further commenting on the relevant standard, it at least implicitly acknowledged that the Fourth Amendment provided the appropriate constitutional framework in that particular post-arrest case.

*Calhoun v. Thomas*, 360 F. Supp. 2d 1264, 1273 (M.D. Ala. 2005).

[51] The court notes that while the plaintiffs pleaded their individual claims against the defendant S.R.O.s under the Fourth *and* Fourteenth Amendment, *see, e.g.*, doc. 188 at 62–63, the pretrial order clearly indicates that the plaintiffs' decontamination claims are pursuant to the Fourth Amendment. *See e.g.*, Doc. 270-1 at 12 ("Defendant Clark further subjected Plaintiff G.S. to an illegal seizure in violation of the Fourth Amendment when he failed to commence adequate decontamination procedures after he sprayed her.").

the Fourth Amendment's prohibition on unreasonable seizures, *id.* at 41–42; *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)) ("[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking . . . .'").

Based on the evidence and the case law, the court makes the following conclusions of law with respect to the decontamination claim:

1. "'[T]he precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit.'" *Nasseri v. City of Athens*, 373 F. App'x 15, 17 n. 2 (11th Cir. 2010) (quoting *Hicks v. Moore*, 422 F.3d 1246, 1253 n. 7 (11th Cir. 2005)).

2. In *Hicks*, the Eleventh Circuit faced facts regarding timing similar to those currently before the court. The *Hicks* plaintiff alleged that, following her arrest, a police officer touched her in a sexual manner while fingerprinting her at the jail during the booking process. *Hicks*, 422 F.3d at 1253 n. 7. Noting that the plaintiff contended this behavior violated the Fourth, not the Fourteenth Amendment, the Eleventh Circuit assumed for the purpose of deciding *Hicks* that at the time of the

fingerprinting, the plaintiff was still being seized,[52] and analyzed the claim under the Fourth Amendment.[53] *Id.*

    3. Turning to the present matter, the purported excessive force at issue—the defendants' alleged failure to decontaminate the plaintiffs—is substantively, temporally, and logistically less removed from the initial seizure, i.e. the exposure to Freeze +P, than was the case in *Hicks*. The defendants' failure to decontaminate the

---

    [52]    "[A] number of appellate courts have applied the Fourth Amendment to incidents of excessive force occurring after the moment of arrest by adopting the 'continuing seizure' approach to defining when seizure ends and pretrial detention begins. Under this analysis, a Fourth Amendment seizure is treated as extending beyond the actual moment of arrest to the ensuing period of intermittent custody in the hands of the arresting officers."

*Calhoun*, 360 F. Supp. 2d at 1272 (citing *Fontana v. Haskin*, 262 F.3d 871, 879–80 n. 5 (9th Cir. 2001); *Torres v. McLaughlin*, 163 F.3d 169, 174 (3d Cir. 1998); *Cox v. Treadway*, 75 F.3d 230, 235 (6th Cir. 1996); *Austin v. Hamilton*, 945 F.2d 1155 (10th Cir. 1991) (overruled on other grounds); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)). See Judge Thompson's *Calhoun* opinion for a thorough survey of 'continuing seizure' jurisprudence, along with a convincing explanation as to why "the Eleventh Circuit's own case law, in addition to the case law of a number of other circuits and the Supreme Court, suggests that an analysis under the Fourth Amendment is appropriate, if not required, in post-seizure, pre-detention allegations of excessive force." *Id.* at 1274.

    [53] *But see Nasseri*, 373 F. App'x at 17 n. 2 (analyzing arrestee's excessive force claim as an alleged Fourteenth Amendment violation). A police officer exposed the *Nasseri* plaintiff to chemical spray during the booking process, and the plaintiff subsequently brought a claim for both the initial spraying and the officer's failure to properly decontaminate him. *Id.* at 18. In analyzing the plaintiff's claim pursuant to the Fourteenth Amendment's shocks-the-conscience standard, the court noted that:

    Nasseri filed his claim solely under the Fourteenth Amendment, specifically identified himself as a pre-trial detainee, and indicated that the constitutional violation was for cruel and unusual punishment. Nasseri first attempted to assert a Fourth Amendment excessive force claim in his opposition to summary judgment. However, this assertion was too late, and we consider the claim only under the Fourteenth Amendment.

*Id.* at 17 n. 2.

plaintiffs commenced immediately after they subdued the plaintiffs with Freeze +P, at the schools where the defendants sprayed the plaintiffs, and was directly related to the plaintiffs' exposure to Freeze +P. In contrast, the *Hicks* plaintiff objected to alleged behavior that took place hours after her initial seizure, at a different location than her initial seizure, and was wholly unrelated to her initial seizure.

4. Consequently, the court concludes that there is no impropriety in considering the defendants' failure to decontaminate the plaintiffs as part of an ongoing seizure that it should evaluate pursuant to the Fourth, rather than the Fourteenth Amendment.[54]

5. The Fourteenth Amendment is relevant to the court's inquiry, however, because the Eleventh Circuit has addressed the specific behavior currently before the

---

[54] Because the court concludes that the plaintiffs' decontamination claims properly allege Fourth Amendment violations, the defendants' argument that the claims should have been pleaded as Fourteenth Amendment violations fails. However, the court notes that, in the alternative, were it to adopt the defendant's position that the claims allege Fourteenth Amendment violations, the plaintiffs would still prevail. First, the defendant's claim that they lacked notice of the plaintiffs' decontamination claim is remarkable in light of the thorough and impassioned defense of their decontamination policy they presented at trial. "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2). Second, the defendants could hardly argue that they would be prejudiced were the court to apply the Fourteenth Amendment's more stringent shocks-the-conscience standard rather than the Fourth Amendment's reasonableness standard. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) ("The standard for showing excessive force in violation of the Fourteenth Amendment . . . is higher than that required to show excessive force in violation of the Fourth Amendment."). Third, as the court will subsequently explain, the defendants' failure to adequately decontaminate the plaintiffs violated the plaintiffs' Fourteenth Amendment right as established by binding Eleventh Circuit precedent.

court, i.e. failing to decontaminate a subject whom law enforcement has exposed to chemical spray, in the Fourteenth Amendment context. In *Danley v. Allen*, the plaintiff alleged that after spraying him with chemical spray, jail guards confined him in a small, poorly ventilated cell for twenty minutes, then allowed him to take a two-minute shower, which was not long enough for him to effectively decontaminate himself, before confining him with a group of inmates in another poorly ventilated cell. 540 F.3d 1298, 1304 (11th Cir. 2008), *overruled on other grounds as recognized by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). "Because he had not been permitted to adequately decontaminate himself, pepper spray still clung to Danley and his clothes. Within thirty minutes of being placed in the group cell, Danley's cellmates began complaining that their eyes were burning because of the residue left on him." *Id*. Both before and after the guards permitted him to shower, Danley repeatedly complained that he was having trouble breathing and that his skin was burning, and asked for medical attention. *Id*. at 1304–05. The guards ignored his requests and made fun of his distress by, among other things, laughing at him and holding their hands to their necks in a mock-choking gesture. *Id*. at 1304. Danley finally obtained treatment from his doctor when the jail released him after twelve or thirteen hours of confinement. *Id*. at 1305.

6. As explained above, "[w]hether a jailer's use of force is excessive, and thus violates [an] inmate's Fourteenth Amendment right to be free from cruel and unusual

punishment, depends on whether the jailer's act 'shocks the conscience,'" *id.* at 1307, rather than the reasonableness standard the court will apply in this case.

7. Evaluating the merits of Danley's claim, the Eleventh Circuit noted that "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Id.* at 1309 (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). In Danley's case, the court determined that the guards' initial use of chemical spray was permissible because Danley failed to follow instructions and was creating a disturbance. *Id.* at 1308. The court went on, however, to find that the guards' failure to decontaminate Danley violated his right to be free from excessive force. *Id.* at 1309. More specifically, the court noted that "[t]he use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive." *Id.* The court also noted that by mocking Danley's distress, the guards exhibited malicious intent, and that while they "eventually did permit Danley to shower, they did not allow him the amount of time required by jail policy." *Id.* at 1309–10, 1310.

8. The Eleventh Circuit returned to the decontamination issue in *Nasseri v. City of Athens*. In that case, a guard who was responding to a jailhouse fight sprayed

Nasseri with pepper spray after Nasseri, a bystander, told the guard to "stop that mess." 373 F. App'x at 18. The circuit held that, while eyebrow-raising, this initial "use of pepper spray . . . does not shock the conscience." *Id.* What happened next did. Because ambient pepper spray had contaminated the entire jail facility, guards were forced to move detainees and inmates who also were exposed to the spray into the jail yard and allowed them access to fresh air and water from a hose. *Id*. However, the defendant placed Nasseri in the back of a police car, where he remained for an hour. *Id.* Nasseri repeatedly tried to place his head through an eight to ten inch opening in a rear window, and yelled for help, claiming he could not breathe. *Id*. Evaluating these facts, the court found that the

> confinement of [Nasseri] in an unventilated patrol car without decontamination constituted excessive force. Under this version, after being sprayed, Nasseri was cooperating, was not posing a threat to himself, the officers, or other detainees, and repeatedly cried out for medical help. . . . It is excessive force for a jailer to continue using force against a prisoner who already has been subdued.

*Id*. at 19. Critical to the present analysis, unlike the defendants in *Danley*, who maliciously took pleasure in Danley's distress by laughing at him, the court did not point to similar behavior on the part of the Nasseri defendant.

9. In contrast to *Danley* and *Nasseri*, in *Scroggins v. Davis*, the Eleventh Circuit found that corrections officers' failure to decontaminate Scroggins did not rise to the level of a Fourteenth Amendment violation. The corrections officers sprayed

Scroggins with chemical spray after he "disobeyed a direct order[,] . . . got involved in a scuffle with the guards, [and] made an aggressive move toward one of them." 236 F. App'x 504, 505 (11th Cir. 2009). Scroggins attempted to base an excessive force claim on *Danley*, noting that corrections officers placed him in restraints for three hours and fifteen minutes after they sprayed him and that none of them washed the spray off of him. *Id*. at 505–06. The court distinguished *Danley* for a number of reasons. Unlike in *Nasseri*, the court noted that in *Danley*, the guards made fun of the Danley's distress, and Scroggins did not make similar allegation. *Id*. at 506.This was not, however, the primary reason the court found *Danley* did not apply. *Danley*, it noted "was not a restraint case and it did not involve a dangerous, high risk inmate." *Id*. at 505–06. Most importantly, although Scroggins based his excessive force claim in part on the defendants' failure to decontaminate him,

> [t]he only time Scroggins mentioned to anyone feeling any discomfort from the O.C. spray was when he told the nurse who checked him immediately after he was put in four-point restraints, which was soon after he had been sprayed. One would expect some discomfort from the spray soon after it had been administered. Scroggins was checked every fifteen minutes thereafter during the time he was restrained but never again did he mention the slightest discomfort from the O.C. spray. . . . An inmate cannot keep his suffering to himself and then complain about jailers not doing anything to alleviate it.

*Id.* at 506.

10. Although it is not on point with the present facts, *Scroggins* is relevant to the court's present analysis because it illustrates that failure to decontaminate is not

a per se constitutional violation; there are circumstances, such as the risk posed by a dangerous adult inmate that may outweigh the harm caused by failing to decontaminate an individual who law enforcement have exposed to chemical spray.

11. Taken together, *Danley*, *Nasseri*, and *Scroggins* stand for the premise that, absent exigent circumstances, failing to decontaminate an individual after exposing him to chemical spray shocks the conscience and is a violation of the Fourteenth Amendment. Logically, it follows that the cases also stand for the premise that the same conduct is an unreasonable seizure and is a violation of the Fourth Amendment as well. This is because the courts in *Danley*, *Nasseri*, and *Scroggins* subjected the prison guards' behavior in those cases to a higher degree of scrutiny than the degree of scrutiny to which the defendants in this case are entitled, both because they analyzed the plaintiffs' claims under the Fourteenth Amendment and because the claims arose in the penal context. After all, "[t]he standard for showing excessive force in violation of the Fourteenth Amendment . . . is higher than that required to show excessive force in violation of the Fourth Amendment." *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009); *see also Hicks*, 422 F.3d at 1253 n. 7 (noting that as opposed to the Fourteenth Amendment's standard, "the Fourth Amendment standard . . . is commonly an easier standard for a plaintiff to meet"). Put differently, if behavior shocks the conscience, it certainly also exceeds the lower threshold of unreasonable.

12. Ultimately, the crux of the matter is this: in light of *Danley* and its progeny, finding that a failure to decontaminate, under the circumstances of this case, does not violate the Fourth Amendment would require the court to conclude that school children are less deserving of protection against excessive force than adult pretrial arrestees or criminals. The court will not take such an untenable position.

13. Having concluded that, absent extenuating circumstances, failing to adequately decontaminate an individual who officers have exposed to chemical spray is excessive force and violates the Fourth Amendment, the court now turns to the question of whether the defendants adequately decontaminated the plaintiffs. The court's task here is eased, somewhat, by the fact that, with regard to most of the plaintiffs, the defendants did absolutely nothing other than call Birmingham Fire Rescue, whose paramedics, in turn, did nothing to ease the plaintiffs' pain. The plaintiffs' descriptions of being forced to sit in interior offices without airflow or in police cars with the windows rolled up or access to water is roughly analogous to the situations endured by Danley and Nasseri, who, similarly, were confined in enclosed spaces with no airflow and no access to water. While the defendant S.R.O.s testified that the B.P.D. trained them to believe that time and air are the best decontamination techniques, their actions fall short even of that. They clearly did not adequately decontaminate the plaintiffs. Moreover, while the court fully acknowledges that situations may exist in which decontamination is not feasible, such as when an officer

does not have access to blowing air or copious amounts of water, that was not the case here. The court heard testimony that the schools where these incidents occurred were equipped with showers in the locker rooms and eye wash stations in the chemistry labs. They also had bathrooms with sinks, and, presumably, soap. At a minimum, the officers could have taken the plaintiffs outside and exposed them to fresh air, as Officer Henderson did with B.D. There was simply no good reason for the defendant officers not to attempt to alleviate the plaintiffs' discomfort.

14. There were two exceptions[55] to this complete lack of effort to help the plaintiffs. T.A.P and Officer Tarrant testified that Officer Tarrant rolled down the windows of her patrol car while transporting T.A.P. to Cooper Green and Family Court so that the moving air would afford T.A.P. some relief. 1/22/15 at 174. Like the two-minute shower in *Danley*, however, this measure was too little, and, additionally here, too late. By the time Officer Tarrant transported T.A.P. to Cooper Green, ninety minutes had elapsed since Officer Tarrant sprayed T.A.P. *Id*. More to the point, by T.A.P.'s own account, the moving air did not alleviate her pain. *Id*. at 190.

---

[55] The court acknowledges that two of the defendant S.R.O.s, Officers Nevitt and Benson, testified that the offices where they took T.L.P. and B.J. after spraying them with Freeze +P were air conditioned, and seemed to take the position that this was adequate exposure to air. 2/2/15 at 234; 2/3/15 at 162. In light of the defendants' own expert's testimony that wind or a fan are proper sources of air for decontamination purposes, and in the absence of any testimony that Officers Nevitt and Benson sat T.L.P. and B.J. directly in front of an open air conditioning vent or testimony from T.L.P. and B.J. that the air conditioning alleviated their discomfort, the fact that the offices were air conditioned has no bearing on the court's decontamination analysis.

15. The second exception deserves more attention. Both B.D. and Officer Henderson testified that immediately after Officer Henderson sprayed B.D. with Freeze + P, he took her outside so that she could sit in fresh air while waiting for paramedics to arrive. Determining whether Officer Henderson's measures were sufficient to rise to the level of adequate decontamination turns the court's attention to what, somewhat puzzlingly, has emerged as a key point of contention between the parties, namely, whether, as the defendants contend, time and/or air are adequate measures, or, as the plaintiffs contend, whether water is necessary as well. Based on several factors, the court believes that the plaintiffs are correct and that, if practicable, access to copious amounts of flowing water is necessary for adequate decontamination after exposure to chemical spray.

16. First, Freeze +P's manufacturer, Aerko International, advocates using water for decontamination. Freeze +P's Material Safety Data Sheet states that the effects of Freeze +P "can be relieved with running water and soap for cleanup." Pl. Ex. 9 at 2. The Material Safety Data Sheet further states that Freeze +P's effect on eyes can be relieved by "[f]lushing eyes with large quantities of water to speed recovery[, f]acing [a] subject into wind or forced air source such as fans or air conditioning outlet[, and w]ashing face with mild soap," and that its effect on skin can be relieved by "[r]emov[ing] contaminated clothing[, and w]ash[ing] affected area with soap and water to transfer to more sensitive areas." *Id*.

17. Second, Dr. Tanen's testimony is very convincing. Based on annual personal exposure for training purposes during his twenty-year career in the Navy, 1/28/15 at 14–15, he testified his first choice method for his personal decontamination would be to wash with copious amounts of water and soap, followed by access to a fan. *Id.*

18. Dr. Tanen also testified that ideal decontamination after exposure to Freeze +P includes the passage of time, exposure to wind or a fan, and washing with copious amounts of water and soap. *Id*. at 34. He noted, though, that ideal decontamination is possible only in a controlled environment, such as a police training scenario, where spraying is anticipated, or a school environment where officers are permitted to deploy Freeze +P and consequently its use can be anticipated much like at a police academy. *Id*. He further testified that S.R.O.s should provide students who are intentionally sprayed with water to decontaminate as soon as the situation is safe. *Id*. at 122.

19. Principal Lyons echoed Dr. Tanen's assessment of the practicality of decontamination in the school setting by testifying that it would not be difficult for an S.R.O to take a student to a location like a chemistry lab where the student could flush her face. 2/4/15 at 118.

20. Aerko International's instructions regarding decontamination and Dr. Tanen's testimony about his personal experience convince the court that, absent exigent circumstances, students who S.R.O.s spray with Freeze +P should receive access to copious amounts of water and soap. The court also notes two additional facts that, while not weighing strongly on the court's decision, support it nonetheless. First, based on the S.R.O.s' testimony, it appears that Birmingham police trainees receive an opportunity to wash their faces after they are exposed to Freeze +P during training.[56] 2/2/15 at 143; 2/3/15 at 94. Second, based on the court's review of cases involving law enforcement spraying arrestees and inmates with chemical spray, it appears that showers are a fairly common, if not standard, decontamination technique. *See Danley*, 540 F.3d at 1304; *Vinyard*, 311 F.3d at 1344. As the court has previously indicated, it is inconceivable that accommodation afforded to police trainees, arrestees, and inmates are denied to school children.

21. While the court acknowledges that Officer Henderson made more of an effort to alleviate B.D.'s pain than his fellow S.R.O.s did toward the other plaintiffs, there was simply no reason under the circumstances for him not to provide B.D. access to copious amounts of water and soap. Consequently, he, like the other

---

[56] Officers Nevitt and Smith both testified that applying water to their faces after being exposed to Freeze +P during training made the burning sensation worse. 2/2/15 at 143; 2/3/15 at 94. However, Officer Nevitt admitted that he only splashed his face with water for ten or fifteen seconds, 2/2/15 at 191, and the court repeatedly heard testimony indicating that a small amount of water exacerbates the burning sensation caused by Freeze +P, *see e.g.*, 1/28/15 at 32. Officer Smith did not testify regarding how much water he applied to his face.

S.R.O.s, inflicted excessive force on B.D. when he failed to adequately decontaminate her after spraying her with Freeze +P.

22. In sum, except as to J.W. and P.S., the court finds that the defendant S.R.O.s inflicted excessive force on the plaintiffs when they failed to adequately decontaminate them after spraying them with Freeze +P.

B. The Plaintiffs' State Law Claims

Plaintiffs G.S., T.L.P., B.D., K.B., B.J., and T.A.P. contend that by spraying them with Freeze +P the defendant S.R.O.s committed the Alabama torts of assault and battery and outrage. Doc. 188 at 85–102. The defendant S.R.O.s contend that they are entitled to state-agent immunity. Under Alabama law,

> "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975."[57]

*Ex Parte City of Midfield*, 161 So. 3d 1158, 1163 (Ala. 2014) (quoting *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006)).

---

[57] Section 6-5-338(a) provides peace officers with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

The plaintiffs do not appear to dispute that the defendant S.R.O.s were acting within the scope of their law enforcement duties. Therefore, to prevail, the plaintiffs must present evidence that the defendant S.R.O.s fall into one of the exceptions to state-agent immunity. *See Midfield*, 2014 WL 2619862 at *4 (citing *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)). The only potential exception in this case provides that "'a State agent shall not be immune from civil liability in his or her personal capacity . . . when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'" *Id*. at *4–*5 (quoting *Cranman*, 792 So. 2d at 405). Based on the evidence at trial, the plaintiffs failed to meet this burden. The court emphasizes that it does not condone the defendant S.R.O.s' behavior. Trial testimony revealed a culture of cavalier Freeze +P use by S.R.O.s and indifference to the pain the product caused Birmingham school students. However, the evidence did not show that the defendant S.R.O.s acted maliciously. Put differently, the court heard no convincing evidence[58] that persuaded it to conclude that the defendant S.R.O.s exposed the plaintiffs to Freeze +P solely for the purpose of inflicting pain upon the plaintiffs. Consequently,

---

[58] If the court were to credit T.A.P.'s account of her encounter with Officer Tarrant, specifically that Officer Tarrant taunted her before spraying her with Freeze +P, 1/22/15 at 172, the court would reach a different conclusion regarding T.A.P.'s claim. However, as the court previously explained, it is basing its finding on Officer Tarrant's account of events, to the extent they differ from that of T.A.P.

the court finds that the defendant S.R.O.s are entitled to state-agent immunity regarding the plaintiffs' individual assault and battery claims.[59]

IV. Conclusions of Law Regarding the Plaintiffs' Class Claim

Two plaintiffs, K.B. and P.S., bring a claim against Chief Roper in his official capacity as named plaintiffs representing a class of "all current future high school students of Birmingham City Schools." Doc. 187 at 1. They allege violations of their Fourth Amendment rights and seek declaratory and injunctive relief. Doc. 188 at 56–57. The class representatives fall into two distinct categories: (1) intentionally

---

[59] Because the court concludes that the defendant S.R.O.s are entitled to state-agent immunity with regard to the plaintiffs' state law tort claims, it need not examine the merits of those claims. The court notes, however, that, with regard to the plaintiffs' outrage claim, that Alabama courts have recognized the tort only in regard to three, arguably four, kinds of conduct: "wrongful conduct in the family-burial context," *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (citing *Whit v. Hulsey*, 519 So. 2d 901) (Ala. 1987)), "barbaric methods employed to coerce an insurance settlement," *id.* (citing *Nat'l Sec. Fire & Cas Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983), and "egregious sexual harassment," *id.* (citing *Busby v. Tuswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989)); *see also O'Rear v. B.H.*, 69 So. 3d 106, 118–19 (Ala. 2011) (affirming an outrage judgment against a physician who, when asked by a teenage boy's mother to counsel the boy about the unhappiness he experienced as a result of his parents' divorce, instead began exchanging addictive prescription drugs for sex for a number of years, resulting in the boy's drug addiction). While the court has indicated that the tort of outrage is not limited to these circumstances, *Little*, 72 So. 3d at 1172–73, they are markedly different from in kind and degree from the incidents giving rise to this case, and the plaintiffs have not presented evidence to the court to make such a broad deviation from Alabama case law as would be the case were it to conclude the plaintiffs' exposure to Freeze +P constituted the tort of outrage. Additionally, the court believes that the same lack of evidence that the defendant S.R.O.s' actions were motivated by ill will toward the plaintiffs that supported the court's conclusion that the defendant S.R.O.s are entitled to state agent immunity also counsels against finding the defendants' behavior amounted to conduct "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized world.'" *Id.* at 1173 (quoting *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010) (defining the tort of outrage).

sprayed (K.B.)[60] and (2) innocent bystanders (P.S.)[61] accidentally exposed to the effects of chemical spray. *Id.* at 6. As a preliminary matter, the court will first address Chief Roper's contention that the plaintiffs' claim lacks justiciability. The court will then address the merit of the plaintiffs' claim before finally turning to the plaintiffs' contention that they are entitled to injunctive relief.

A. Justiciability

Chief Roper contends that the court lacks subject matter jurisdiction over the plaintiffs' class claim because it fails to present a justiciable case or controversy. Doc. 273 at 4–10.        "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party . . . at any stage in the litigation, even after trial and the entry of judgment." *Arbeaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)). Consequently, the court is obligated to examine Chief Roper's contention that the plaintiffs lack standing and that their claim is moot even though

---

[60] B.D. and T.A.P. assert only individual claims against the defendant S.R.O.s. *See* doc. 188 at 6–7. T.L.P., B.D., and G.S. were named class representatives, but can no longer be since the court determined they did not suffer a constitutional injury when it concluded their claim failed on the merits. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *E. Tex. Motor Freight Sys., Inc.*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'"). Moreover, it does not appear that T.L.P., B.D., and G.S. were Birmingham City School students at the time of class certification. *See* doc. 274 at 3.

[61] J.W. also asserted a class claim on behalf of bystanders. However, in light of the court's finding that J.W.'s individual claim fails and because it does not appear he was a student at the time the court certified the class, *see* doc. 274 at 3, he has no standing to act as a class representative.

the facts supporting the contentions were established and obvious by, at the absolute latest, August 31, 2012, when the court certified the plaintiffs' class.[62] *See* doc. 187.

Standing is "perhaps the most important of [the jurisdictional] doctrines." *Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty.*, 690 F.3d 1244, 1249 (11th Cir. 2012) (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750).

> The three prerequisites for standing are that: (1) the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there be a causal connection between that injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision.

*31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). "These three elements 'constitute[ ] the core of Article III's case-or-controversy requirement.'" *Id*. (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998)). This is critical because "[t]he exercise of jurisdiction by the federal courts 'depends upon the existence of a case or controversy.'" *Id.* (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). Additionally, and relevant here, "'a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Id*. (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "'Put another way, [a]

---

[62] As to the bystander plaintiffs, the basis for arguing that they lack standing has existed since the inception of this lawsuit in 2010.

case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehabilitative Servs.*, 225 F.3d 1208, 1217 (11th Cir. 2000).

With these general principles in mind, the court makes the following conclusions of law:

1. The plaintiffs' class claim is not moot. Chief Roper's position to the contrary is premised on the fact that "none of the named plaintiffs were currently enrolled as students in Birmingham City Schools at the time this litigation proceeded to trial." Doc. 273 at 5. As a result, Chief Roper contends that "all of their claims were, at a minimum, moot." *Id*. The implication—a logical one—is that because all of the named plaintiffs are no longer enrolled in Birmingham City schools, none of them will benefit from the injunction they seek. In spite of the argument's logic, however, Chief Roper's position is baffling because in the preceding paragraph, he recites, verbatim, the proper rule governing mootness in a class action: "'In a class action, the claim of the named plaintiff, who seeks to represent the class, must . . . be live both *at the time he brings suit and when the district court determines whether to certify the putative class.*'"[63] *Id*. (emphasis added) (quoting *Tucker v. Phyfer*, 819 F.2d 1030,

---

[63] In the briefing on the defendants' Rule 52(c) motion, Chief Roper "do[es] not concede" that this rule applies to him, but offers no reason for this stance, other than that the plaintiffs have not argued the rule applies. Doc. 273 at 5. This position carries no weight because courts are "obliged to consider standing sua sponte even if the parties have not raised the issue." *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir.

1033 (11th Cir. 1987)); *see also Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001); *McKinley v. Kaplan*, 177 F.3d 1253, 1256 (11th Cir. 1999).

2. By Chief Roper's own admission, K.B. and P.S. "were Birmingham City Schools students at the time the complaint was filed and at the time of certification." Doc. 273 at 6. Consequently, because one member of each subset of named plaintiffs would have benefitted from the relief they seek at the time they filed the complaint and at the time this court certified their class, the plaintiffs' class claim is not moot.

3. Alternatively, Chief Roper contends that the plaintiffs lack standing to represent a class. Chief Roper is partially correct. P.S. cannot serve as a named plaintiff because Officer Clark did not violate her Fourth Amendment rights. P.S.

---

2007) (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005)). Then, after the close of trial, Chief Roper filed a motion to decertify the class and dismiss all claims against him in his official capacity. Doc. 276. In it, he again notes the rule regarding class action mootness should not apply to this case because the plaintiffs have failed to invoke it. *Id.* at 4. He also argues that the rule should not apply to this action because it is brought pursuant to 42 U.S.C. § 1983 and that the Supreme Court implicitly overruled the rule in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). *Id.* at 4 n. 1. The court agrees with the plaintiffs that the motion is repetitive of Chief Roper's earlier filings, but because it raises jurisdictional questions, the court must address it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). The court cannot make heads or tails of Chief Roper's § 1983 argument; it is clear that he believes the class action mootness rule should not apply to the case because it is brought pursuant to § 1983, but not why that is the case. His argument that the *Wal-Mart Stores* implicitly overruled the rule is undermined by the fact that the Court cited the rule as good law in a case published two years after *Wal-Mart Stores*. *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1530 (2013) ("In *Sosna*, the Court held that a class action is not rendered moot when the named plaintiff's individual claim becomes moot *after* the class has been certified."). As to the rest of Chief Roper's motion, because the court agrees with the plaintiffs that Chief Roper is essentially rehashing arguments he raised in opposition to class certification in 2012, the motion is denied.

testified at trial that she was standing nearby when Officer Clark sprayed her sister, G.S., with Freeze +P, and that he inadvertently exposed her to the spray.

    4. In *Brower v. County of Inyo*, the Court stated that:

> a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied.

489 U.S. 593, 596–97. As Judge Thompson of the Middle District of Alabama has explained, "[s]ince *Brower*, lower courts addressing the issue of when a 'seizure' has occurred have distinguished between situations where officers' actions are directed toward the particular individual alleging the Fourth Amendment violation, and those in which an injury is instead the 'unintended consequence of government action.'" *Green v. Freeman*, 434 F. Supp. 2d 1172, 1175 (M.D. Ala. 2005) (quoting *Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir.1991)). "These courts have consistently held that an injury sustained under the former circumstances constitutes a Fourth Amendment seizure, but that one suffered under the latter does not." *Id*. Relevant to the facts before the court in *Green*, Judge Thompson noted that several circuit courts have concluded that, pursuant to *Brower*, "no Fourth Amendment 'seizure' occurs where a hostage is wounded by bullets intended for his or her captor." *Id*. (citing *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000); *Medeiros v. O'Connell*,

150 F.3d 164 (2d Cir. 1998); *Rucker v. Harford Cnty.*, 946 F.2d 278 (4th Cir. 1991);

*Landol-Rivera v. Cosme*, 906 F.2d 791 (1st Cir. 1990)).

5. While the Eleventh Circuit has never considered a set of facts as cut-and-dry as those described in these hostage scenarios, its cases too require directed, intentional government action to support a finding of a Fourth Amendment seizure. *See Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991) ("unintended consequences of government action [cannot] form the basis for a [F]ourth [A]mendment violation . . . [c]onsequently, . . . negligent conduct alone absent any intentional government conduct [cannot] form the basis of a section 1983 claim premised on the [F]ourth [A]mendment").

6. Returning to the facts of this case, while unfortunate, the incident involving P.S. and Officer Clark is roughly analogous to those involving the plaintiffs in *Green* and the other hostage cases. Like the hostage plaintiffs, P.S. had the misfortune to be in the vicinity of the intended target of a display of force by law enforcement and felt its effects. But, because the law is clearly established that "unintended consequence of government  [cannot] form the basis for a [F]ourth [A]mendment violation," *Ansley*, 925 F.2d at 1334, any injuries P.S. suffered because Officer Clark accidentally exposed her to Freeze +P do not amount to a Fourth Amendment violation.

7. Because "'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members,'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)), P.S. cannot serve as a named plaintiff for the purpose of representing a class of Birmingham City School students.

8. On the other hand, K.B. has standing to pursue injunctive relief because, as of the time of class certification, she had established a real and immediate threat of future injury as defined by Eleventh Circuit case law.

9. "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (emphasis in original) (citing *City of Los Angeles v . Lyons*, 461 U.S. 95, 102 (1983)).

10. Chief Roper argues that, pursuant to *City of Los Angeles v. Lyons*, K.B. has failed to show that, as of the time of class certification, a sufficient risk existed that an S.R.O. would, again, spray K.B. with Freeze +P for a court to confer standing on K.B., and that, consequently, K.B. cannot represent similarly situated plaintiffs. Doc. 273 at 7–9. In *Lyons*, police officers stopped Lyons for committing a traffic violation. *Lyons*, 461 U.S. at 97. Although Lyons did not resist or provoke the officers, they

subjected him to a chokehold that rendered him unconscious and damaged his larynx. *Id*. at 97–98. Lyons sued for damages and an injunction to bar future police use of chokeholds absent an immediate threat of deadly force. *Id*. at 98. The district court granted the preliminary injunction, which the Ninth Circuit affirmed, but the Supreme Court reversed. A sharply divided Court reasoned that Lyons' assertion of standing rested on mere speculation that police might stop him in the future, and if they did, they might subject him to the challenged chokehold. *Id.* at 108. The Court concluded that:

> [i]n order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner.

*Id.* at 105–06.

11. The court agrees with Chief Roper that, superficially, *Lyons* has much in common with the present matter. Both cases involve a plaintiff seeking to enjoin a certain kind of use of force by law enforcement. But, after a close review of *Lyons* and its treatment in this circuit, the court believes *Lyons* is distinguishable. In reaching this conclusion, the court is guided by two of this circuit's cases, *Church v. City of Huntsville* and *31 Foster Children v. Bush*, which distinguished *Lyons* based on factors that are present in this case. First, in *Church*, the plaintiffs brought a "[§]

1983 class action lawsuit . . . on behalf of the homeless residents of Huntsville, Alabama." 30 F.3d at 1335. The plaintiffs alleged that Huntsville had "deprived them of various constitutional rights as part of a concerted effort to drive them out of the City." *Id.* They sought, among other relief, injunctive relief prohibiting Huntsville from "implementing a policy of isolating and/or removing members of the defined class from the City of Huntsville simply because of their status as homeless persons" and "harassing, intimidating, detaining or arresting members of the defined class, solely because of their status as homeless persons, for walking, talking, sleeping, or gathering in parks or other public places in the City of Huntsville." *Id*. Over Huntsville's objections that *Lyons* controlled the case, the court found the plaintiffs had standing to pursue the injunctive relief they sought. *Id*. at 1339.

In the second case, *31 Foster Children v. Bush*, the plaintiffs filed a suit on behalf of themselves and a state-wide class of foster children contending that various aspects[64] of Florida's foster care system violated their constitutional rights and other federal laws. 329 F.3d 1255, 1261 (11th Cir. 2003). The plaintiffs sought extensive injunctive relief. *Id*. at 1262. The court considered whether *Lyons* forestalled the

---

[64] The plaintiffs alleged the defendants' practices denied and threatened the plaintiffs' rights to "safe care that meets their basic needs, prompt placements with permanent families, and services extended after their eighteenth birthdays, as guaranteed by substantive due process," "procedural due process in determining the services they will receive," "family association with siblings," "prompt placement with permanent families and to have their medical and educational backgrounds provided to their care givers," "health screening and followup," and, "in the case of the black plaintiff foster children, freedom from racial discrimination in the provision of care and services." *31 Foster Children v. Bush*, 329 F.3d 1255, 1261 (11th Cir. 2003).

plaintiffs' claims, *id*. at 1266, before determining that the case was "more like *Church v. City of Huntsville* than *Lyons*," and, relying heavily on *Church*, determined that the plaintiffs largely[65] had standing to pursue the injunctive relief they sought, *id*.

The *Church* and *31 Foster Children* courts pointed to two factors that they found distinguished those cases from *Lyons*. The first is that while *Lyons* involved a member of the general public who had an unfortunate encounter with a police officer, the plaintiffs in *Church* and *31 Foster Children* were *involuntary* members of a specific group of people who, by definition, had an increased risk of exposure to the challenged behavior. As the *Church* court explained, "[t]he tenor of the plaintiffs' complaint . . . is that they are homeless involuntarily. Because of the allegedly involuntary nature of their condition, the plaintiffs cannot avoid future 'exposure to the challenged course of conduct' in which the City allegedly engages." 30 F.3d at 1338. Similarly, the *31 Foster Children* court noted that the plaintiffs in that case were "in the custody of the defendants involuntarily and will be until they are returned to their parents, are adopted, or reach the age of majority. They cannot avoid exposure to the defendants' challenged conduct." 329 F.3d at 1266.

---

[65] The outcome of *31 Foster Children* is not as cut-and-dry as *Church* because of the number of plaintiffs, the differences in the facts of their circumstances, and the variety of different legal avenues via which they sought relief. The court found that some of the plaintiffs lacked standing because they were no longer in the custody of the state, because they did not adequately plead the elements of a procedural due process claim, and because they failed to satisfy timing requirements necessary to pursue a claim under the Adoption Assistance and Child Welfare Act. *31 Foster Children*, 329 F.3d at 1267.

The second factor that swayed the *Church* and *31 Foster Children* courts is that, unlike *Lyons*, the challenged actions in *Church* and *31 Foster Children* were allegedly the results of official policy. *Church*, 30 F.3d at 1339; *31 Foster Children*, 329 F.3d at 1266 ("The alleged systemic deficiencies in the Florida foster care system are similar to an injurious policy, and different from the random act at issue in *Lyons*. The alleged pattern and practice in this case presents a substantial likelihood that the alleged injury will occur."). "When the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again." *31 Foster Children*, 329 F.3d at 1266. As the *Church* court explained, that was not the case in *Lyons*:

> Lyons alleged that municipal policy authorized the use of chokeholds in situations where the officers are threatened by far less than deadly force. However, that allegation was insufficient to confer standing on Lyons, because it did not necessarily follow that the City either orders or authorizes application of the chokeholds when there is no resistance or other provocation—which is what had happened to Lyons. Instead, the evidence showed that police officers were instructed to use chokeholds only when lesser degrees of force do not suffice and then only to gain control of a suspect who is violently resisting the officer or trying to escape. Because Lyons had not resisted police—and there was no indication he would do so if stopped again in the future—he had no basis to challenge a policy that only authorized use of chokeholds against suspects who resist arrest.

*Church*, 30 F.3d at 1339.

12. *Church* and *31 Foster Children* counsel in favor of finding that K.B. has presented evidence that, at the time the class was certified, she was at sufficiently

imminent risk of being exposed to Freeze +P again to have standing to pursue injunctive relief. Like the homeless in *Church* and the foster children in *31 Foster Children*, she is an involuntary member of a specific group that is at an increased risk of exposure to the challenged behavior. School attendance is compulsory.[66] S.R.O.s are stationed in all Birmingham public high schools. They carry Freeze +P and have no qualms about using it, even against a group of students who engage in the basic teenage act of gathering around to watch other students fight. These facts align K.B. more closely with the plaintiffs in *Church* and *31 Foster Children* than with Lyons. Moreover, the court heard Chief Roper testify repeatedly that the S.R.O.s acted pursuant to B.P.D. policy when they exposed the plaintiffs, including K.B., to Freeze +P.  Consequently, the challenged behavior here, in the words of the *31 Foster Children* court, is the product of "injurious policy, and different from the random act at issue in *Lyons*." 329 F.3d at 1266.

13. The court turns next to Chief Roper's contention that it should find that K.B. lacks standing because "[c]ourts must generally be 'unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place

---

[66] *See* Ala. Code § 16-28-3 ("[E]very child between the ages of six and 17 years shall be required to attend a public school, private school, church school, or be instructed by a competent private tutor for the entire length of the school term in every scholastic year . . . ."). While the court acknowledges that students can and do drop out of school, the obvious public policy grounds for encouraging teenagers to complete their high-school education counsels against finding that K.B. lacks standing to represent a class because she could have dropped out of high school, and thus eliminated the possibility of being sprayed with Freeze +P by an S.R.O.

him or her at risk of that injury.'" Doc. 273 at 8 (citing *Honig v. Doe*, 484 U.S. 305,

320 (1988)). Chief Roper's argument traces its origin to *O'Shea v. Littleton*, in which

the Supreme Court first indicated that it "assume[s] that [individuals] will conduct

their activities within the law and so avoid prosecution and conviction." 414 U.S.

488, 497 (1974). The Court in *Littleton* largely based its decision that the plaintiffs,

who sought to enjoin a county magistrate and judge from engaging in illegal bond

setting, sentencing, and jury fee practices, failed to make an adequate showing that

they were at risk of imminent injury on this assumption. *Id*. However, this circuit

indicated that there are limits to *Littleton*'s assumption in *Georgia Latino Alliance for*

*Human Rights v. Governor of Georgia.*, a case that involved a challenge to a Georgia

law targeting illegal immigration. Among other things, the law

> authorize[d] Georgia law enforcement officers to investigate the immigration
> status of an individual if the officer has probable cause to believe the
> individual has committed another crime and the individual cannot provide one
> of the pieces of identification listed in the statute. If the officer verifies that the
> individual is not lawfully present in the United States, the officer "may take
> any action authorized by state and federal law," including detaining the person,
> transporting the person to a detention facility, or notifying the Department of
> Homeland Security.

691 F.3d 1250, 1256 (11th Cir. 2012). One of the *Georgia Latino Alliance* plaintiffs

was an undocumented immigrant who resided "permissibly in the United States but

ha[d] not acquired the requisite documentation to stave off the investigatory detention

permitted by" the challenged law. *Id.* at 1258. She contended that she "face[d] a

credible threat of detention . . . as she possesse[d] none of the listed documentation to prove that she ha[d] permission to remain temporarily in the United States." *Id.* at 1258–59. Because the challenged law empowered law enforcement to "investigate the immigration status of an individual [only] if the officer ha[d] probable cause to believe the individual has committed another crime," the defendants argued that the court should be unwilling to find the undocumented worker had standing to pursue injunctive relief because it "must assume that [the p]laintiff[] 'will conduct [her] activities within the law and so avoid prosecution and conviction.'" *Id*. at 1259 (quoting *Littleton*, 414 U.S. at 497). The court rejected this argument, noting that "[w]hereas in *Littleton* the alleged unconstitutional conduct could only result from an *actual* legal violation, prosecution, and conviction for that crime, here all that is necessary for application is an officer's finding of probable cause that a legal violation has occurred." *Id.* (emphasis in original). The court further noted that "uncontradicted declarations from three experienced law enforcement officers . . . confirm that any minor traffic violation such as failure to use a turn signal or failure to come to a complete stop can provide the requisite probable cause." *Id*.

14. K.B. is more like the *Georgia Latino Alliance* plaintiffs than the *Littleton* plaintiffs, in that K.B.'s encounter with Officer Smith demonstrates that a minor disturbance is the only thing necessary to trigger the injury K.B. fears. That is a far cry from the lengthy, specific chain of events that the *Lyons* and *Littleton* courts

rejected as too attenuated to confer standing. Indeed, the circumstances under which the S.R.O.s sprayed the plaintiffs in this case with Freeze + P demonstrate that a variety of normal adolescent behavior is sufficient to result in S.R.O.s spraying students with Freeze +P.

15. To the extent that Chief Roper raises concerns that by conferring standing on K.B., the court will be sanctioning behavior that falls outside the confines of the law, the court notes that while the question of whether K.B. committed a crime is not an issue in this case, the court doubts very much that by standing outside a school building and sobbing, K.B. behaved unlawfully. Moreover, as *Georgia Latino Alliance* illustrates, all that is necessary for K.B.'s feared injury to occur is for an S.R.O. to *believe* K.B. poses a sufficient threat to justify the use of Freeze +P, even though K.B.'s behavior may actually be perfectly innocuous. *See* 691 F.3d at 1259 ("[H]ere all that is necessary for application is an officer's finding of probable cause that a legal violation has occurred.").

16. The fact that although K.B. was arrested, she—nor indeed, any of the plaintiffs—did not face legal ramifications for the behavior that caused Officer Smith to spray her with Freeze +P is a further indication that her actions were within the confines of the law. Additionally, the court notes that at trial, it heard disturbing testimony from Officer Henderson and Nevitt that seemed to suggest that they always

arrest students they spray with Freeze +P as a post-hoc justification of their use of force. 2/3/15 at 5; 2/2/15 at 60.

17. In sum, because K.B. is an involuntary member of a group of people who have an increased risk of being exposed to Freeze +P compared to the population at large and because the S.R.O.s' use of Freeze +P is pursuant to B.P.D. policy, the court finds that, based on this circuit's precedent, she has standing to pursue injunctive relief against Chief Roper.

B. K.B.'s class claim against Chief Roper

K.B. pursues a claim against Chief Roper in his official capacity on behalf of herself and a certified class of Birmingham City Schools students for municipal liability under 42 U.S.C. § 1983. Doc. 188 at 57–58. "[A] suit against a governmental officer 'in his official capacity' is the same as a suit 'against [the] entity of which [the] officer is an agent,'" *McMillian v. Monroe Cnty.,* 520 U.S. 781, 785 n. 2 (1997) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Moreover, "municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). The parties do not dispute that Chief Roper is the final policymaker of the B.P.D. 2/3/15 at 19. Consequently, Chief Roper's official actions subject the B.P.D. to liability.

"A municipality may be liable under § 1983 for the actions of its police officers only if the municipality is 'found to have itself caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory.'"[67] *Ludaway v. City of Jacksonville, Fla.*, 245 F. App'x 949, 951 (11th Cir. 2007) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007)). "'It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983.'" *Id.* (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)). "Thus, to establish municipal liability under § 1983, [a] plaintiff must show that: (1) his constitutional rights were violated, (2) the municipality had a custom or policy that constituted deliberate indifference to his constitutional rights, and (3) the policy or custom caused the violation of his constitutional rights." *Id.* (citing *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

---

[67] K.B. seems to argue that her municipal liability claim should be evaluated with the far easier to satisfy standard than the court uses to evaluate § 1983 claims against individual defendants. Doc. 274 at 26 (quoting *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990)) ("To prevail on a § 1983 claim, Plaintiffs must show '(1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.'"). This position is disingenuous for two reasons. First, K.B. is well aware of the thirty-five years of jurisprudence beginning with *Monell v. Dep't of Soc. Servs. of City of N.Y.* in which the Supreme Court has developed and refined a heightened standard for municipal liability under § 1983. Second, the case K.B. cites in support of her erroneous position discusses that heightened standard. *See Bannum*, 901 F.2d at 997.

K.B. advances two theories of municipal liability against Chief Roper. The first is that Chief Roper violated her Fourth Amendment rights "[b]y promulgating an unconstitutional policy as applied in the Birmingham schools and by condoning unconstitutional customs and practices with respect to the use of chemical weapons in the Birmingham Schools." Doc. 188 at 57. The second is that Chief Roper violated her Fourth Amendment rights "[b]y failing to train, supervise, and monitor the use of Freeze +P by S.R.O.s in the Birmingham schools." *Id*. at 59. As will become apparent, there is a great deal of overlap between the two theories, but because they implicate slightly different facts, the court will address each in turn.

### 1. K.B.'s Policy and Custom Claim

K.B. first contends that Chief Roper rendered the city of Birmingham liable for violating her Fourth Amendment rights by promulgating an unconstitutional policy or custom. For the purposes of our analysis here, "'[a] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.'" *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). "'A custom is a practice that is so settled and permanent that it takes on the force of law.'" *Id*. (quoting *Sewell*, 117 F.3d at 489 (11th Cir. 1997)). If, as here, "a facially-lawful municipal action is alleged to

have caused a municipal employee to violate a plaintiff's constitutional rights, the plaintiff must establish 'that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.'" *Am. Fed'n of Labor and Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1187 (11th Cir. 2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. It may be shown through "'evidence of a history of widespread prior abuse,'" *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998) (quoting *Wright v. Shepherd*, 919 F.2d 665, 674 (11th Cir. 1990)), or "prior incident[s] in which constitutional rights were similarly violated." *Id.* (citing *Church*, 30 F.3d at 1332)). Similarly,

> To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."

*Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Finally, "'it is not sufficient for a government body's policy to be tangentially related to a constitutional deprivation.' The policy must be the 'moving force' behind the constitutional injury."*Am. Fed'n of Labor*, 637

F.3d at 1187 (quoting *Cuesta v. Sch. Bd. of Miami–Dade Co.*, 285 F.3d 962, 967 (11th Cir. 2002)).

The court makes the following conclusions of law:

1. The defendant S.R.O.s made a number of remarkable comments at trial. On cross-examination, it came to light that Officer Smith made an off-color joke during his deposition that chemical spray benefits the victim because it is an effective nasal decongestant. 2/3/15 at 233–34. Officer Benson testified that she never tried to separate students who were fighting because she feared that she would hurt herself. 2/3/15 at 183–84. On cross-examination, Officer Benson also confirmed that she testified in a deposition that she arrested students for cursing. *Id.* at 178. Officer Nevitt testified that he considers mace safer than hands-on techniques when small, female students are involved because of the size differential. 2/2/15 at 125–26; *c.f.* Pl. Ex. 1 at 7 (Revision 9, which states that "[w]hile soft empty hand techniques may inflict pain to gain control, they generally will not cause any form of bruising or injury to the subject"); 1/26/15 at 141 (Chief Coulombe's testimony that he used similar controls hundreds if not thousands of times during his thirty-year career, and he never injured anyone).

2. These remarks are worth mentioning, but ultimately they bear little on the court's analysis, which is simple. At trial, the court heard testimony from multiple

defendant S.R.O.s and, most importantly, Chief Roper, that Birmingham police officers are allowed to respond to a given level of resistence with a degree of force up to two levels higher than the resistance at issue. 1/23/15 at 150; 2/2/15 at 166; 2/3/15 at 54. Chief Roper explicitly testified that this practice meant that chemical spray, a Level 4 use of force, is a permissible response to verbal noncompliance, which is Level 2 resistance. 1/23/15 at 128. In short, the interplay between B.P.D. policy and custom explicitly permitted Officer Smith to spray K.B. with Freeze +P, which the court previously determined was excessive force.

3. As disturbing as all of this is, as explained above, Chief Roper is not liable for maintaining this state of affairs unless K.B. can point to evidence of a history of widespread prior abuse or similar prior incidents in which S.R.O.s violated constitutional rights. At trial, the plaintiffs submitted into evidence 110 use-of-force reports describing incidents in which S.R.O.s sprayed Birmingham City Schools students with Freeze +P between 2006 and March 2014. The incidents, which involve some in which the students made verbal threats, include:

- Officer Joel Davis, who is not a defendants in this case, spraying a student because he "was very loud and boisterous and created a big commotion." Pl. Ex. 15 at 0052. In the arrest narrative, Officer Davis noted that the student "had to be maced because he was completely out of control." *Id*. But, it appears from the report that the student was merely, albeit loudly and profanely, arguing with an assistant principal and that Officer Davis was physically restraining the student when he sprayed him. *Id*.

- Officer Tarrant spraying a student for cursing and refusing to leave a classroom. *Id*. at 0082.

- Officer Tarrant spraying a student who said "Fuck you motherfucker mace me" and was "using abusive and obscene language . . . in a loud and boisterous manner." *Id*. at 0116.

- Officer Eric Poole, who is not a defendant in this case, spraying a student for refusing to leave an area. *Id*. at 0137.

- Officer Victor Langford, who is not a defendant in this case, spraying a student for refusing to stop cursing at an assistant principal. *Id*. at 0158.

- Officer C. Thomas, who is not a defendant in this case, spraying a student for being "unusually loud and boisterous [and] disrupting the educational environment." *Id*. at 0210.

- Officer Tarrant spraying a student for cursing loudly about police. *Id*. at 0229.

- Officer Venus Feagins, who is not a defendant in this case, spraying a student for "being irate and disorderly in the classroom." *Id*. at 0298.

- Officer Feagins spraying a student for refusing to stop cursing at another student. *Id*. at 0332.

4. The recurring theme here is S.R.O.s using Freeze +P to subdue students who, to be sure, are loudly misbehaving, but who do not pose an immediate threat of physical harm to other students and school staff, the officers, or themselves. In fact, except for one student, none of the other students in the 110 incidents had any weapons.[68] While using Freeze +P may be a faster and easier way to subdue a "loud and boisterous" teenager than other techniques, speed and convenience to the officer are not factors that influence whether an officer's use of force is excessive. Rather,

---

[68] In one incident, an S.R.O. confiscated a box cutter from a student, then subsequently sprayed her with Freeze +P when she attempted to attack another student. Pl. Ex. 15 at 0159.

as the court has previously explained, the inquiry is whether the force was reasonable. Here, the reports describe a pattern of incidents in which S.R.O.s used force in a manner that was disproportionate to the threat posed by the student at issue.[69] In short, they describe S.R.O.s using excessive force in violation of the Fourth Amendment.

5. At trial, Chief Roper testified that he reviews all use-of-force reports.[70] 1/23/15 at 86. Consequently, the court finds that he was aware of a pattern of ongoing constitutional violations that resulted from B.P.D. policy or custom and nonetheless continued to maintain the policy or custom. To the extent that the significant shortcomings described above are more aptly characterized as the later, the court finds that the use-of-force reports establish "a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d at 1481 (quoting *Praprotnik*, 485 U.S. at 127).

---

[69] In this circuit, courts evaluate Fourth Amendment excessive force claims by considering "1) the need for the application of force, 2) the relationship between the need and the amount of force used, and 3) the extent of the injury inflicted." *Vinyard*, 311 F.3d at 1347 (citing *Leslie*, 786 F.2d at 1536). While the reports, not surprisingly, are silent as to the pain experienced by the students the S.R.O.s sprayed, the court finds, based on the testimony by the plaintiffs in this case about the pain they experienced after S.R.O.s sprayed them with Freeze +P, that it was not so de minimus as to counsel tipping the balancing test in Chief Roper's favor, especially given the court's conclusion that the amount of force used here significantly exceeded the amount needed.

[70] "[M]unicipal policymakers cannot evade liability for unconstitutional acts by delegation." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 (11th Cir. 1990) (citing *Praprotnik*, 485 U.S. at 127).

6. Since the use-of-force reports more or less make or break K.B.'s claim against Chief Roper, he unsurprisingly raises several objections to them.[71] First, Chief Roper contends that the incidents described in the use of force reports are insufficiently similar to establish deliberate indifference.[72] *See* doc. 273 at 19 (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005)) ("[P]rior incidents demonstrating notice must have 'involved factual situations that are substantially similar to the case at hand.'"). Here, K.B. alleges that Officer Smith inflicted excessive force on her by spraying her with Freeze +P because she was verbally non-compliant. The use-of-force reports describe incidents in which, based on the content of the reports, S.R.O.s inflicted excessive force on students by spraying them with Freeze +P because they were verbally noncompliant. They are sufficiently similar to establish deliberate indifference.

---

[71] In addition to the cases discussed *supra*, perhaps in an attempt to highlight a circumstance where a report generated by a municipality was nonetheless insufficient to put the municipality on notice of unconstitutional behavior, Chief Roper also points to *Church v. City of Huntsville.* In *Church*, the Eleventh Circuit found a demographic study commissioned by the city noting that "street people in Huntsville had been 'rousted' with some regularity by police and other city officials," insufficient to put final policymakers on notice of allegedly unconstitutional use of force against the homeless. 30 F.3d at 1347. However, *Church* is not particularly relevant to the present matter. The *Church* court found the report failed to establish deliberate indifference because "there is no evidence from which a trier of fact could conclude that 'roust[ing]' involved a violation of the plaintiffs' constitutional rights," "[t]he study's use of the single word 'rousted' provides no information on the circumstances in which force was used, nor the amount of force applied," and, most importantly, "the fact that the study was commissioned by an unidentified City department does not demonstrate that the final policymakers, here the City Council and the Mayor, were aware of its content." *Id*. In contrast, the use-of-force reports here are not vague (nor does Chief Roper raise that contention) and Chief Roper was indisputably aware of them.

[72] Chief Roper fails to explain *how* the incidents are insufficiently similar.

7. Next, Chief Roper directs the court to *Brooks v. Scheib*, in which the court found ten citizen complaints about an officer's propensity to use excessive force were insufficient to put municipal officers on notice of past police misconduct. 813 F.2d 1191, 1193 (11th Cir. 1987). The problem with applying *Brooks* to the present matter is that the *Brooks* court found the complaints insufficient notice of problematic behavior not because of their number, but because they were citizen complaints. *See id.* ("Indeed, the number of complaints bears no relation to their validity."). As the *Brooks* court noted,

> [i]n Scheib's case, for example, there is a logical explanation as to why a large number of complaints have been lodged against him: Officer Scheib patrolled a high crime area. A significant percentage of those Scheib arrested were continually in trouble with the law. These experienced "customers" frequently use citizens' complaints as a means of harassing officers who arrest them.

*Id.* Speaking more generally, the court notes that people who believe they have suffered a wrong at the hands of law enforcement are more likely to complain and they have an incentive to exaggerate or lie outright. Perhaps seeking to leverage his position, Chief Roper notes that "B.P.D.'s internal report of the use of force are not sustained findings of the unconstitutional use of excessive force. Thus they are insufficient to show notice as a matter of law." Doc. 279 at 5 (citing *Brooks*, 813 F.2d at 1193). While Chief Roper is technically correct that the use-of-force reports are unsubstantiated, he glosses over the fundamental difference between the reports and the complaints deemed insufficient evidence of notice in *Brooks*: the use-of-force

reports were prepared by the S.R.O.s who sprayed students with Freeze +P. They had no incentive to exaggerate the details of the circumstances under which they used Freeze +P so as to make it appear that they had inflicted excessive force when in fact they had not; to the contrary, just as the citizens in *Brooks* had a motive for exaggerating about the officer's alleged misconduct, the S.R.O.s had a motive for minimizing the amount of force they reported using and exaggerating the student behavior that warranted its use. In other words, to the extent that the use-of-force reports are inaccurate, because they were self-prepared by the S.R.O.s who sprayed students with Freeze +P, they are more likely to describe the S.R.O.s as less culpable rather than more culpable than they actually were. Consequently, neither *Brooks* nor the unsubstantiated nature of the use-of-force reports counsels against finding that the reports put Chief Roper on notice of S.R.O.s' unconstitutional use of Freeze +P.

8. To the extent that Chief Roper seeks to establish that K.B. must overcome a certain numerical threshold, the court notes that in *Depew v. City of St. Marys, Ga.*, the Eleventh Circuit upheld a jury verdict for municipal liability against the defendant based on four or five incidents of police brutality, finding that

> [t]he evidence revealed several incidents involving the use of unreasonable and excessive force by police officers. Therefore, the city had knowledge of improper police conduct, but failed to take proper remedial action. The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983.

787 F.2d 1496, 1499 (11th Cir. 1986); *see also Church*, 30 F.3d at 1345 (citing *Depew* approvingly). Three of the alleged victims testified, and testimony was elicited from city council members regarding the other two. *Id.* at 1497–98. In light of *Depew*, the court finds that eleven incidents—those involving K.B. and B.D., in addition to the nine described above—are sufficient to establish that S.R.O.s' use of excessive force when spraying students with Freeze +P was sufficiently widespread to trigger municipal liability under § 1983.

9. Moving away from the use-of-force reports, Chief Roper contends that K.B.'s policy or custom claim fails because K.B. has failed to establish a direct causal link between the challenged policy or custom and the deprivation of her rights. Doc. 273 at 21–23. Although Chief Roper is correct that "[a] municipality cannot be liable unless its 'policy or allegedly inadequate training was the "moving force" behind the plaintiffs' injuries,'" *id.* at 21 (citing *Best v. Cobb Cnty., Ga.*, 239 F. App'x 501, 504 (11th Cir. 2007), Chief Roper fails to explain *how* the policy or custom failed to cause K.B.'s injuries or point to an alternative cause. "Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived." *Cont'l Tech Serv., Inc. v. Rockwell Int'l Corp*, 927 F.2d 1198, 1199 (11th Cir. 1991).

10. More to the point, the court cannot conceive how Officer Smith's decision to spray K.B. with Freeze +P can be anything other than inextricably intertwined with a policy or custom that explicitly permitted him to spray her under the circumstances. It logically follows that the custom caused Officer Smith to consider spraying K.B. with Freeze +P to be an appropriate use of force.

11. In sum, the interplay between the B.P.D.'s use of force classifications and its custom of permitting officers to respond to resistance with a use of force two steps higher than that resistance caused K.B.'s injury. Moreover, the court finds that the use-of-force reports generated in connection with each use of Freeze +P put Chief Roper on notice of ongoing excessive use of force by S.R.O.s, and by maintaining the status quo, he expressed deliberate indifference to the constitutional rights of Birmingham City Schools students. Consequently, the court concludes that Chief Roper rendered the city of Birmingham liable to K.B. and the class she represents.

12. The court now turns it attention to the decontamination portion of K.B.'s claim against Chief Roper. As the court explained above, by failing to promptly decontaminate K.B., Officer Smith subjected her to excessive force.

13. At the outset, the court notes that it agrees with K.B. that the policy is vague and somewhat contradictory. On one hand, the policy states the "[t]he effects of chemical spray will begin to lessen in 10–15 minutes, with no treatment being

administered," Pl. Ex. 3 at 3, which could reasonably signal to an officer that no decontamination efforts are necessary. On the other hand, on the same page, the policy states that "[f]ollowing the use of chemical spray the officer will ensure that the subject receives adequate decontamination as soon as practical." *Id*. Problematically, the policy provides officers with no guidance on what constitutes "adequate decontamination."

14. At trial, Chief Roper offered some clarification:

> The policy requires officers to take adequate decontamination efforts. And so under decontamination, that can be water. That can be time. That can be air. Our policies also requires [sic] the officers to notify the Birmingham Fire and Rescue[73]. . . . [I]f you're asking me does the policy specifically say large qualities of water, then the policy does not say that.

1/23/15 at 68. In other words, Chief Roper testified that officers have the opportunity to rely on "time" as an adequate decontamination effort. The problem with this is that the court heard no testimony at trial indicating that a meaningful distinction exists between "relying on time" and "doing nothing."

15. The court certainly acknowledges that there are many situations in which time may be the only decontamination effort available to an officer; the officer may not have access to copious amounts of water or briskly moving air, or a subject's

---

[73] It was undisputed at trial that Birmingham Fire Rescue Services personnel did nothing to decontaminate the plaintiffs. Moreover, the defendant S.R.O.s conceded that this was generally the case. *See e.g.*, 2/3/15 at 97.

continued resistance may pose such a danger to the officer, bystanders, or the subject himself that decontamination is not safe or practical.

16. Those concerns, however, were not at play with regard to the plaintiffs in this case, nor are they concerns in schools generally. After the defendant S.R.O.s sprayed the plaintiffs with Freeze +P, the plaintiffs became compliant, and the incidents occurred in school facilities where there was access to multiple sources of copious amounts of flowing water.

17. Because the court has determined that adequate decontamination after exposure to Freeze +P, absent the exigent circumstances described above, requires exposure to briskly moving air and an opportunity to wash with copious amounts of flowing water, whereas B.P.D. policy permits an officer to take no measures at all, the court concludes that B.P.D.'s policy regarding decontamination permits the unconstitutional infliction of excessive force.

18. Generally in the municipal liability context, courts must infer from the evidence whether the requisite municipal officials were on notice of an unconstitutional custom. In light of Chief Roper's testimony, however, the court faces no such challenge here.

19. Here, Officer Smith imposed excessive force on K.B. by failing to adequately decontaminate her after spraying her with Freeze +P. In fact, the court

heard no testimony indicating that Officer Smith did *anything* to decontaminate K.B. He did so in reliance on a subpar policy that permits S.R.O.s to spray students with Freeze +P and then do nothing to alleviate their pain. In other words, the policy caused K.B.'s injury. Chief Roper knew of the custom and condoned it. Taken together, these facts are sufficient for the court to hold the B.P.D. liable through Chief Roper for Officer Smith's failure to decontaminate K.B.

### 2. K.B.'s Failure-To-Train Claim

K.B. also contends that Birmingham is liable to her and the class she represents through Chief Roper for B.P.D.'s failure to adequately train its officers. Doc. 188 at 58. A failure-to-train claim is a kind of deficient policy or custom claim. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."). Consequently, as with traditional policy or custom claims,

> [i]f a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.

*Brown*, 520 U.S. at 407 (citing *Cannon*, 489 U.S. at 1209 (O'Connor, J. concurring and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations . . . ."))._[74]_

The court makes the following conclusions of law:

1. With regard to the defendant S.R.O.s' initial use of Freeze +P, the court heard testimony suggesting several potential shortcomings in B.P.D.'s training

---

[74] K.B. also seems to argue that Birmingham is liable under a failure-to-train theory because Chief Roper was "on notice of 'the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'" Doc. 274 at 50 (quoting *Brown*, 520 U.S. at 409). This language from *Brown* is an allusion to the Court's indication in *City of Canton* that, in combination with a failure to train, a single constitutional violation could potentially give rise to municipal liability if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. In other words, under those circumstances, a plaintiff would not need to show a pattern of unconstitutional behavior to meet the deliberate indifference requirement for municipal liability.

However, the Court has distanced itself from the position it took in *Canton*:

In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

*Brown*, 520 U.S. at 409. As the Eleventh Circuit has noted, "to date, the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Gold*, 151 F.3d at 1352. Although it seems "obvious" in the layman's sense of the word that the circumstances at issue in this case would lead to an unconstitutional use of force, in light of the Court's unwillingness to apply its aside in *Canton* in other cases and K.B.'s alternative avenues to relief, the court declines to base its conclusion on an obvious need for training.

regimen that have a connection to officers' use of force. In particular, half of the defendant S.R.O.s testified that they had not received training in soft empty hand and pressure point techniques since their initial training at the police academy. *See* 2/2/15 at 47; 2/3/15 at 166; *id*. at 236. This fact is relevant because the plaintiffs contend that these techniques are an appropriate alternative to chemical spray, and, as Chief Coulombe testified, they are a skill set that officers need to maintain over time. 1/27/15 at 63. The court also heard testimony that the B.P.D. either failed to educate its officers about the differences between Revision 9 and Revision 10, or waited for over a year after the implementation of Revision 10 to do so. 2/2/15 at 49, 54–55; *id*. at 162; 2/3/15 at 184. This is relevant here because Revision 10, unlike Revision 9, explicitly instructs officers to take into account, among other factors, an individual's age and size when determining whether a given degree of force is appropriate. Pl. Ex. 2 at 11. More generally, some of the defendant S.R.O.s' testimony called into question whether they had received adequate S.R.O.-specific training, 2/2/15 at 60, and, in particular, *id*. at 205, whether they had received adequate training regarding adolescent-specific deescalation techniques.

2. While the court agrees with the plaintiffs that these deficiencies, especially with regards to the lack of soft hands and pressure point techniques training, are problematic, it is not convinced that they are the "moving force" behind the plaintiffs' injuries. *See Best*, 239 F. App'x at 504. None of the defendant S.R.O.s testified that

they sprayed students because they felt they did not know how to employ lesser degrees of force. Rather, they testified that they sprayed students, even those engaging solely in verbal resistance, because B.P.D. policy allowed them to do so. As explained above, it seems clear to the court that, with regard to Officer Smith's initial use of Freeze +P, the "moving force" behind K.B.'s injuries was that, per B.P.D. policy or custom, officers are allowed to respond to verbal noncompliance with Freeze +P. In sum, K.B.'s failure-to-train argument is really just another way of getting at her policy-or-custom claim, and because this approach lacks sufficient causation, the court rejects it.

3. With regard to the decontamination component of K.B.'s claim, five of the six[75] defendant S.R.O.s testified that, based on their training, they believed that the appropriate methods for decontamination were time, air, and calling Birmingham Fire Rescue Services. 2/2/15 at 12; *id*. at 262; 2/3/15 at 30; *id*. at 225; 2/4/15 at 70.  As the court previously explained, however, absent circumstances that make its use impractical, providing affected students with copious amounts of water and soap is a necessary component of decontamination. Consequently, the S.R.O.s' training was

---

[75] At trial, rather than ask Officer Benson what decontamination measures an S.R.O. was supposed to undertake after spraying a student with Freeze +P, counsel for the plaintiffs referenced Officer Benson's deposition testimony that she "did not have any understanding of the appropriate procedures for decontamination of someone who has been sprayed." 2/3/15 at 189.

constitutionally inadequate.[76] Nonetheless, this claim is fundamentally no different that K.B.'s policy or custom claim—in the policy or custom claim, the policy was unconstitutional, and here, the S.R.O.s were trained pursuant to the unconstitutional policy. Therefore, in light of the court's findings with respect to the policy or custom claim, the court finds that K.B.'s failure to train claim is subsumed by that claim.

### C. K.B.'s claim for injunctive relief

K.B. seeks an injunction requiring Chief Roper and his agents, employees, and all persons acting in concert with them to cease their unconstitutional use of Freeze +P. More specifically, K.B. seeks "a temporary injunction barring the use of chemical spray in Birmingham City high schools until and unless Chief Roper authorizes policies, training, and supervision that conform with constitutional norms, including the input from the [p]laintiffs and oversight by the [c]ourt." Doc. 274 at 53.

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[76] Moreover, the court notes that in spite of testifying that time and air were sufficient decontamination measures, of the six defendant S.R.O.s, only Officer Henderson took a student outside after spraying her with Freeze +P.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006) (citing *Weinberger v.*

*Romero—Barcelo*, 456 U.S. 305, 311–313 (1982); *Amoco Prod. Co. v. Gambell*, 480

U.S. 531, 542 (1987)).

Chief Roper contends that *Lyons*, which the court previously discussed in its

standing analysis, bars K.B. from seeking injunctive relief. Doc. 273 at 24. In *Lyons*,

after concluding Lyons lacked standing because his contention that the police were

likely to subject him to an allegedly unconstitutional chokehold in the future did not

allege a sufficiently imminent injury, the Court stated that:

> Lyons fares no better if it be assumed that his pending damages suit affords him Article III standing to seek an injunction as a remedy for the claim arising out of the October 1976 events. The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury. The speculative nature of Lyons' claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.

*Lyons*, 461 U.S. at 111. However, in this circuit, "[a]lthough the irreparable-injury

requirement cannot be met absent a real or immediate threat that the plaintiff will be

wronged again," *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (citing

*Lyons*, 461 U.S. at 111), "it is also well-established that injunctive relief is

appropriate 'to prevent a substantial risk of serious injury from ripening into actual

harm,'" *id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). "In such

circumstances, the irreparable-injury requirement may be satisfied by demonstrating

a history of past misconduct, which gives rise to an inference that future injury is imminent." *Id*. (citations omitted).

Consistent with these cases, the court makes the following conclusions of law.

1. At trial, the court heard testimony and the parties submitted evidence that between 2006 and 2014, at a bare minimum, S.R.O.s have sprayed eleven Birmingham City School students solely for verbal noncompliance. In fact, the defendant S.R.O.s readily admit that they consider the use of Freeze +P as an appropriate response to students who refuse their commands, for example, to stop crying, or who simply challenge them by backtalking or cursing at them. Moreover, based on the defendant S.R.O.s' testimony about their decontamination practices and Chief Roper's testimony about the B.P.D.'s decontamination policy, the court finds it reasonable to assume that during the same period, S.R.O.s failed to adequately decontaminate any of the 199 students they sprayed with Freeze +P. Critically, the defendant S.R.O.s uniformly testified that they believed their actions were permissible, both with regard to the initial spraying[77] and with regard to decontamination. Chief Roper concurred. In short, K.B. has submitted evidence establishing a history of misconduct, and based on the defendants' attitudes at trial,

---

[77] Policing is certainly a challenging profession that exposes officers to many dangers. Officers are repeatedly called upon to make split second decisions to protect citizens, their colleagues, and themselves. Still, one has to question whether a police department should have as standard practice a policy that permits officers in a school setting to use Freeze +P to respond to general verbal non-compliance by teenagers.

that misconduct is unlikely to cease without the court's intervention. Consequently, K.B. has satisfied the injury requirement for injunctive relief.

2. Chief Roper next contends that K.B. is not entitled to injunctive relief because damages afford her an adequate remedy at law. Doc. 273 at 25. This stance ignores both the pattern of misconduct at issue here and the class nature of this action. If the court adopts Chief Roper's position, S.R.O.s can continue to commit constitutional violations with impunity as long as they are willing to pay damages. Because the damages available with this kind of claim are relatively minor, the S.R.O.s will be further disincentivized from modifying their behavior. For this reason, the court does not believe that damages afford K.B. an adequate remedy at law.

In sum, K.B. has standing to pursue a municipal liability claim against the B.P.D. through Chief Roper. The remaining plaintiffs, including the bystander plaintiffs who either did not bring individual claims for damages or disclaimed damages, do not. K.B. is due to prevail on her municipal liability claim because Officer Smith sprayed her with Freeze +P and then failed to decontaminate her pursuant to B.P.D.'s unconstitutional policy or custom. Finally, K.B. has made a sufficient showing to render her entitled to injunctive relief.

III. Damages and Equitable Relief.

In light of the court's findings, the court turns finally to the relief portion of its ruling.

A. Damages

Six of the eight plaintiffs are entitled to monetary damages. First, G.S., B.D., T.L.P., and T.A.P. are each entitled to $5,000 in damages on their failure to decontaminate claims. While the S.R.O. who sprayed them with Freeze +P had legitimate reasons for doing so and have prevailed on that aspect of the plaintiffs' claims, the officers nonetheless had an obligation to adequately decontaminate these plaintiffs afterward and failed to do so.[78]

Second, K.B. and B.J. are entitled to $5,000 each from Officers Smith and Benson respectively because Officers Smith and Benson inflicted excessive force on K.B. and B.J. when they sprayed K.B. and B.J. with Freeze +P, and an additional $5,000 each for their failure to decontaminate claims.

---

[78] J.W. is not entitled to damages because he disavowed any claim to money damages, *see* 1/21/15 at 100, and, more importantly, was unable to identify the officer who sprayed him, *id*. at 88–91. P.S. is also not entitled to damages because, as the court previously explained, only deliberate conduct by a government actor can give rise to a Fourth Amendment violation, and Officer Clark did not intend to spray P.S. with Freeze +P. Moreover, there is no evidence before the court that P.S. conveyed her exposure or discomfort to Officer Clark.

B. Equitable Relief

As previously stated, the plaintiffs ask the court to temporarily enjoin the use of Freeze +P in Birmingham City high schools until Chief Roper, the plaintiffs, and the court can craft policy changes aimed at addressing the constitutional violations at the center of this case. Doc. 274 at 53. However, because the plaintiffs concede that there are scenarios when it is appropriate for S.R.O.s to use Freeze +P in the school setting, doc. 105 at 5, the court declines at this juncture to ban its use in schools for any duration because such a ban would create a safety risk for students, faculty and officers.[79]

Nonetheless, it is clear that the current system is flawed. At a minimum, better training reflecting the unique character and challenges of school-based policing is needed for S.R.O.s. As part of this training, Chief Roper needs to remind S.R.O.s that enforcement of school discipline is not part of their job description and that Freeze +P is not suited for general crowd control. Therefore, court **ORDERS** the parties to meet and confer, engage in fruitful discussions and compromise, and develop and jointly submit to the court on November 15, 2015 a training and procedures plan[80]

---

[79] This conclusion nullifies Chief Roper's argument that injunctive relief would create a public disservice because it "would remove an important intermediary weapon from [S.R.Os]." Doc. 273 at 28.

[80] So there is no misunderstanding, the court expects one (1) plan from the parties.

that will address the current deficiencies and form the template for S.R.O.s' use of Freeze +P going forward.[81]

In contrast, the relief regarding the decontamination portion of K.B.'s municipal liability claim is simple: S.R.O.s must decontaminate all students they spray with Freeze +P. As the parties craft an appropriate decontamination plan, here are some general practices to guide them: (1) unless doing so would endanger the student, officer, or bystanders, after an S.R.O. sprays a student with Freeze +P and has secured the student, the officer must provide the student with an opportunity to decontaminate with water, either in the form of a shower, washing at a sink, or using an eye wash station; (2) because of the lingering exposure from contaminated clothing, at all times, Chief Roper must maintain at each school where the B.P.D. allows S.R.O.s to spray students with Freeze +P a sufficient number (as agreed by the parties) of sweat suits in varying sizes, and must allow the student to change out of his or her contaminated clothes; (3) the S.R.O. must then place the student in front of a fan; (4) Chief Roper must ensure that S.R.O.s have available sealable plastic and/or garbage bags that an affected student can use to store her contaminated clothing; and (5) Chief Roper must replace each sweat suit a student uses so that the total number

---

[81] B.P.D.'s involvement in crafting this portion of K.B.'s equitable relief will address Chief Roper's concerns that in pursuing an injunction, K.B. "seeks to have the [c]ourt impermissibly interfere with the inner workings of the Birmingham Police Department." Doc. 273 at 27. The court, of course, has the right to act to enforce its orders, and in that respect, disagrees with Chief Roper that its involvement will amount to "impermissibl[e] interfere[nce]."

available at the start of each week is always the same as the initial number agreed on by the parties. Finally, because of Freeze +P's impact on nearby students and to generally educate students about its effects, the parties are also directed to jointly draft, by November 15, 2015, a one-page flyer that is to be posted prominently on each high school's central bulletin boards or to be disseminated electronically to each enrolled student that, among other things, outlines the effects of Freeze +P and the suggested methods to use to obtain relief in the event a student is exposed to Freeze +P.

The court will issue an order and judgment, including taxing costs, after November 15, 2015.

**DONE** this 30th day of September, 2015.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE